1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**

JOHN DOE 1, JOHN DOE 2, JOHN DOE 3,
JOHN DOE 4, JOHN DOE 5, JOHN DOE 6,
JOHN DOE 7, JOHN DOE 8, JOHN DOE 9,
JOHN DOE 10, JOHN DOE 11, JOHN DOE
12, JOHN DOE 13, and JOHN DOE 14,
individually and on behalf of all others
similarly situated,

        Plaintiffs,

v.

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION,

        Defendant.

CASE NO. 1:23-CV-00542-SEB-MJD

**FIRST AMENDED CLASS ACTION
COMPLAINT**

**JURY TRIAL DEMANDED**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................................. 1

II.    JURISDICTION AND VENUE ........................................................................... 4

III.    PARTIES ............................................................................................................. 5

     A.    Plaintiffs ................................................................................................... 5

     B.    Defendant ................................................................................................. 6

     C.    Unnamed Relevant Parties ....................................................................... 7

IV.    FACTS ................................................................................................................. 7

     A.    Student-Athletes Are at Heightened Risk for Sexual Harassment, Exploitation, and Mental Abuse by Coaches. .......................................... 7

     B.    By the 1990s, National Governing Bodies (NGBs) Prohibited Sexual Harassment by Coaches of Athletes, Recognizing the Power Disparities and Unequal Bargaining Positions. ...................................... 11

         1.    In 1992, the United States Olympics Committee established a code of ethics prohibiting sexual harassment. ................................... 11

         2.    In 1998, USA Swimming prohibited inappropriate sexual conduct. ........ 12

         3.    In 2007, the International Olympic Committee issued a consensus statement on sexual abuse in sport. .......................................... 13

         4.    In 2018, the Energy and Commerce Committee investigated and set out best practices for NGBs to prohibit coach misconduct and track wrongdoing. .......................................................... 14

     C.    Despite Widespread Recognition that Protection of Student-Athletes Is Paramount, the NCAA Knowingly Declined to Act, Placing Student-Athletes at a Substantial and Heightened Risk of Sexual, Physical, and/or Emotional Abuse and Misconduct. ........................................................ 16

         1.    The NCAA had and has a duty to protect the physical and educational well-being of student-athletes. ................................ 16

         2.    The NCAA regulates coaches in a myriad of ways—except when it comes to sexual harassment and sexual abuse of student-athletes. .......... 19

         3.    Student-athletes suffer in the vacuum created by the NCAA's failure to regulate abuse by coaches. ......................................... 20

         4.    Even when the NCAA addresses abuse, the NCAA's policies and pronouncements lack teeth. .................................................... 25

         5.    Because of its keen awareness of the problem it fostered and its desire to avoid liability, the NCAA continues to increase decentralization to the detriment of its student-athletes, placing student-athletes at a substantial and heightened risk of sexual, physical, and/or emotional abuse and misconduct. ................................... 29

     D.    With the NCAA's Blessing, the University of San Francisco Permitted Sexual Exploitation of Student-Athletes on and off the Field. ........................... 32

         1.    Coach Naks created an intolerable sexualized environment that Coach G not only tolerated, but participated in. ....................... 32

1

**TABLE OF CONTENTS**
(continued)

2

Page

3

2.  The NCAA knew or should have known of the abuse and retaliation
    of the baseball players at USF..................................................................... 38

4

E.  Plaintiffs are Current and Former NCAA Student-Athletes who were
    Damaged as a Result of the NCAA's Deliberate Choice To Do Nothing in

5

the Face of NCAA Coaches' Sexualized Misconduct. ........................................ 44

6

1.  2020-22: John Doe 1's experience was typical........................................ 44

7

2.  2020-22: John Doe 2's experience was typical........................................ 49

3.  2021-22: John Doe 3's experience was typical........................................ 52

8

4.  2017-18: John Doe 10's experience was typical...................................... 56

9

5.  2017-18: John Doe 4's experience was typical........................................ 60

10

6.  2017-18: John Doe 12's experience was typical...................................... 62

11

7.  2016-18: John Doe 13's experience was typical...................................... 66

8.  2015-16: John Doe 14's experience was typical...................................... 69

12

9.  2011-14: John Doe 5's experience was typical........................................ 71

13

10.  2012-14: John Doe 6's experience was typical........................................ 76

14

11.  2014: John Doe 7's experience was typical. ........................................... 80

15

12.  2013: John Doe 8's experience was typical. ........................................... 82

13.  2000: John Doe 9's experience was typical. ........................................... 85

16

14.  1999-2000: John Doe 11's experience was typical................................. 88

17

F.  Plaintiffs and the Class Were Injured and Continue to be Injured...................... 91

V.  TOLLING OF THE STATUTE OF LIMITATIONS ......................................... 92

18

A.  USF and the NCAA normalized the USF Coaches' sexual misconduct............. 93

19

B.  John Does 4-14 could not have known about the NCAA's deliberate
    indifference to the USF Coaches' sexual misconduct until the filing of the

20

Related Litigation. .................................................................................. 95

21

C.  The NCAA should be estopped from asserting statute of limitations
    defenses.................................................................................................... 98

22

VI.  CLASS ALLEGATIONS ....................................................................... 98

VII.  CLAIMS FOR RELIEF ........................................................................ 100

23

VIII.  PRAYER FOR RELIEF......................................................................... 122

24

IX.  DEMAND FOR TRIAL BY JURY ........................................................... 123

25

26

27

28

1   Plaintiffs John Doe 1, John Doe 2, John Doe 3, John Doe 4, John Doe 5, John Doe 6, John

2   Doe 7, John Doe 8, John Doe 9, John Doe 10, John Doe 11, John Doe 12, John Doe 13, and John

3   Doe 14[1] bring this action against the National Collegiate Athletic Association ("NCAA" or

4   "Defendant"). Plaintiffs are current and former NCAA student-athletes who were harmed as a

5   result of the NCAA's deliberate choice to remain silent in the face of rampant sexualized abuse

6   by coaches at NCAA member institutions. Through this lawsuit, Plaintiffs seek justice for

7   themselves and for all others harmed by the NCAA's failure to exercise its duty to protect

8   student-athletes from such abuse.

9   **I.      INTRODUCTION**

10      1.      The NCAA had and has an ongoing duty to protect the health and safety of

11  student-athletes at member institutions. Indeed, its former President, Mark Emmert, testified

12  before Congress that the NCAA has "a clear, moral obligation to make sure that we do everything

13  we can to support and protect student-athletes."[2]

14      2.      In exercising that duty, the NCAA promulgated rules requiring it to "adopt

15  legislation to enhance member institutions' compliance with applicable gender-equity laws."[3]

16  Gender equity includes the right to be free from sexual harassment and other sexualized conduct,

17  which deprives students of equal access to education.[4] Despite this mandate to ensure gender

18  equity, however, the NCAA failed to adopt or implement *any* rules prohibiting sexual harassment

19  and retaliation.

20      3.      The NCAA's duty—and failure—to protect the health and safety of student-

21  athletes affects these athletes during an incredibly vulnerable period in their lives. NCAA student-

22

23  _____

24  [1] The Plaintiffs' numbered designations correspond to the John Doe numbered designations under which the
    Plaintiffs sued in *John Doe 1, et al. v. National Collegiate Athletic Assoc.,* No. 3:22-CV-1559-LB (N.D. Cal.) (the

25  "Related Litigation"). The court there granted Plaintiffs' motions to proceed anonymously, Related Litigation, ECF
    Nos. 14 & 63, and this Court has since granted the same request by Plaintiffs here, ECF No. 24.

26  [2] U.S. Senate Comm. on Commerce, Science, and Trans., *Promoting the Well-Being and Academic Success of
    College Athletes,* at 60:25-61:1 (July 9, 2014), https://bit.ly/3i596YO (last visited Mar. 8, 2023).
    [3] 2.3.2 NCAA Legislation (adopted Jan. 11, 1994),

27  https://web3.ncaa.org/lsdbi/bylaw?bylawId=2461&division=1&adopted=0 (last visited Feb. 9, 2022); NCAA,
    *Gender Equity and Title IX,* https://www.ncaa.org/about/resources/inclusion/gender-equity-and-title-ix (last visited

28  Mar. 8, 2023).
    [4] Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. §§ 1681, *et seq.*

athletes—who are typically living away from home for the first time—arrive at college expecting to develop into the best athletes they can under the supervision of educated, skilled, and fully vetted athletics department personnel committed to their best interests. Many student-athletes dream of playing their sports professionally after college and are taught from a young age to trust their coaches to help them realize those dreams. These student-athletes, therefore, accord their coaches and trainers deference, respect, and loyalty.

4.      This trust—coupled with the NCAA's failure to promulgate rules for schools to report abuse and deter perpetrators—created and perpetuated a continuing cycle of abusive coaches who move unchecked among NCAA member schools. Without NCAA reporting requirements, colleges and universities can ignore coach misconduct. Even if a school does take action against a coach, if the NCAA takes no action against a perpetrator, the perpetrator can then move on to another college or university and gain access to a fresh population of unsuspecting student-athletes primed to afford them complete trust. This places student-athletes at NCAA member schools—including Does 1-3, who still attend NCAA member schools—at a substantial and heightened risk of sexual, physical, and/or emotional abuse and misconduct. Instead of overseeing a system that prioritizes the protection of student-athletes' well-being, the NCAA oversees one that prioritizes the protection of its reputation and, hence, its ability to generate revenue from NCAA conferences and events.

5.      Within this culture of impunity, the University of San Francisco ("USF") employed two baseball coaches for over 22 years despite knowing that these coaches created an intolerable sexualized environment within USF's Division I ("DI") baseball team. From 1999 to 2022, Head Coach Nino Giarratano and Assistant Coach Troy Nakamura wielded their power to subject their players to recurring sexualized and psychological abuse resulting in emotional distress so severe that multiple players contemplated suicide.

6.      John Does 1, 2, and 3 filed their original complaint against the NCAA, USF, and their baseball coaches on March 11, 2022 in the Northern District of California. Related Litigation, ECF No. 1. The complaint was later amended to include additional plaintiffs, *id.*, ECF No. 38, and on January 4, 2023, the district court granted the NCAA's motion to dismiss based on

personal jurisdiction without prejudice to the filing of this case in the Southern District of Indiana. *Id.*, ECF No. 88.

7. Through this lawsuit, Plaintiffs seek for themselves and all others similarly-situated: (i) to hold the NCAA accountable through a declaratory judgment that the NCAA has a legal duty to protect student-athletes from sexual misconduct, including sexual harassment and retaliation; (ii) an order requiring the NCAA to discharge this duty, including by adopting practice and policy changes to protect student-athletes from sexual misconduct and psychological abuse by member institutions' athletic department personnel, to ensure this does not happen again; and (iii) compensation from the NCAA for Plaintiffs' injuries from the intolerable sexualized environment, psychological abuse, and retaliation to which Plaintiffs were subjected.

8. First, Plaintiffs seek a declaratory judgment that the NCAA owed a legal duty to protect student-athletes at member institutions from playing their sport in an intolerable sexualized environment that included psychological abuse and retaliation, and that the NCAA breached that duty.

9. Second, Plaintiffs seek injunctive and equitable relief requiring the NCAA to implement and enforce rules and bylaws considered generally-accepted best practices in this area. That includes, *inter alia*: prohibiting sexual harassment and/or sexual abuse of student-athletes by athletics department personnel; prohibiting romantic or sexual relationships between athletics department personnel and student-athletes; requiring NCAA member institutions to immediately report to the NCAA any allegations of harassment or abuse of a student-athlete by athletics department personnel; requiring that all reports be independently investigated; implementing public sanctions on member institutions and athletics department personnel where allegations are substantiated; banning athletics department personnel found to be in violation from further working or volunteering for any member institution; mandating training; and protecting student-athletes from retaliation and coercion to leave their teams, enter the NCAA transfer portal, and/or forego their scholarships without an independent ombudsman and advocate for the student-

athletes.[5]

10.     Third, Plaintiffs seek money damages from the NCAA for the psychological abuse and repeated inappropriate sexual misconduct they suffered, and compensation for lost guaranteed scholarship money, other out-of-pocket costs, and impairment of their baseball careers, including playing Major League Baseball. Among other damages, as a result of the abuse inflicted on them, Plaintiffs suffered and continue to suffer severe emotional and physical pain, including shock, emotional distress, physical manifestations of emotional distress including embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life and baseball. Plaintiffs were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, will sustain loss of earnings and earning capacity, and/or have incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

11.     Pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2), Plaintiffs bring this as a class action for violations of common law. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because: (a) there are at least 100 class members; (b) the matter in controversy exceeds $5 million, exclusive of interest and costs; and (c) at least one member of the Class is a citizen of subject of a foreign state and NCAA is a citizen of at least one state.

## II.     JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because: (a) there are at least 100 class members; (b) the matter in controversy exceeds $5 million, exclusive of interest and costs; and (c) at least one member of the Class is a citizen or subject of a foreign state and NCAA is a citizen of at least one state.

13.     This Court has personal jurisdiction over the NCAA because the NCAA's principal place of business is in this District and because NCAA's alleged actions and omissions

---

[5] The transfer portal is an NCAA mechanism for players to make themselves available to other schools; however, to enter the transfer portal, the student-athletes must give up their current scholarships.

by failing to address sexual abuse and harassment occurred in this District.

14.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2) because the NCAA resides in this District and a substantial part of the events and omissions giving rise to the claims occurred in this District.

**III.     PARTIES**

A.     **Plaintiffs**

15.     **John Doe 1** is a citizen and resident of California and citizen of the United States. John Doe 1 was a freshman at USF in the fall of 2020 and attended USF remotely through the 2022 academic year. He transferred from USF because of the actions and inactions of the Defendant and currently plays DIII baseball at another NCAA member institution.

16.     **John Doe 2** is a citizen and resident of California and citizen of the United States. John Doe 2 was a freshman at USF in the fall of 2020. John Doe 2 transferred out of USF in January 2022 due to the actions and inactions of the Defendant and currently plays DI baseball at another NCAA member institution.

17.     **John Doe 3** is a citizen and resident of California and citizen of the United States. John Doe 3 was a freshman at USF and member of the baseball team in the fall of 2021, and attended USF remotely through the 2021 academic year. He transferred after his freshman year because of the actions and inactions of Defendant, played DI baseball at another NCAA-member institution during his sophomore year, and will continue playing college baseball.

18.     **John Doe 4** is a citizen and resident of Washington and a citizen of the United States. John Doe 4 was a freshman at USF in the fall of 2017 but transferred out of USF after his first year in 2018 due to the actions and inactions of Defendant.

19.     **John Doe 5** is a citizen and resident of Washington and a citizen of the United States. John Doe 5 attended USF from 2012 to 2014. At the end of the 2014 spring season, John Doe 5 quit USF's baseball team due to the actions and inactions of Defendant.

20.     **John Doe 6** is a citizen and resident of California and a citizen of the United States. Though John Doe 6 attended USF from 2012 to 2015, he quit the baseball team after two years due to the actions and inactions of Defendant.

21.     **John Doe 7** is a citizen and resident of California and a citizen of the United States. John Doe 7 committed to play baseball at USF where he started in 2014 but stayed only one semester due to the actions and inactions of Defendant.

22.     **John Doe 8** is a citizen and resident of Colorado and citizen of the United States. John Doe 8 attended USF for one semester in 2013 but left due to the actions and inactions of Defendant.

23.     **John Doe 9** is a citizen and resident of California and a citizen of the United States. John Doe 9 left USF after the 2000-01 academic year due to the actions and inactions of Defendants.

24.     **John Doe 10** is a citizen and resident of California and a citizen of the United States. John Doe 10 attended USF and was a member of the baseball team from 2017 to 2018. Upon completion of his 2018 spring semester, John Doe 10 transferred from USF due to the actions and inactions of Defendant.

25.     **John Doe 11** is a citizen and resident of Missouri and a citizen of the United States. John Doe 11 attended USF from 1999 to 2000, then transferred after completing just his freshman year due to the actions and inactions of Defendant.

26.     **John Doe 12** is a citizen and resident of Texas and a citizen of the United States. John Doe 12 attended USF and was a member of the baseball team from 2017 to18; he transferred after his freshman year due to the actions and inactions of Defendant.

27.     **John Doe 13** is a citizen and resident of Hawaii and a citizen of the United States. John Doe 13 attended USF his freshman and sophomore years and was a member of the baseball team from 2016 to2018; he then transferred due to the actions and inactions of Defendant.

28.     **John Doe 14** is a citizen and resident of Arizona and a citizen of the United States. John Doe 14 was a select walk-on at USF in the fall of 2015 through part of spring 2016; he transferred due to the actions and inactions of Defendant.

B.     **Defendant**

29.     **Defendant National Collegiate Athletic Association (NCAA)** is an unincorporated association that acts as the governing body of college sports. The NCAA is

comprised of 1,098 colleges and universities and 102 athletic conferences across three divisions: Division I, Division II, and Division III.[6] DI institutions are the most visible collegiate athletic programs.[7] The NCAA's principal office is located in Indianapolis, Indiana.

C.      **Unnamed Relevant Parties**

30.      **University of San Francisco (USF)** is a California corporation located at 2130 Fulton Street, San Francisco, California 94117. USF is a DI member institution of the NCAA, a member of the NCAA's West Coast Conference, and the only DI university in San Francisco. USF is a party to the Related Litigation.

31.      **Nino Giarratano (Coach G)** is a resident of San Francisco, California. Coach G was the head coach of the USF baseball team from 1999 until March 13, 2022, when USF announced Coach G had been fired. Coach G is a party to the Related Litigation.

32.      **Defendant Troy Nakamura (Coach Naks)** is a resident of Pacifica, California. Coach Naks was an assistant to Coach G for 15 years at USF until he was promoted to Associate Head Coach in the summer of 2013. USF announced on January 13, 2022 that Coach Naks is no longer associated with the USF baseball program. Coach Naks is a party to the Related Litigation.

33.      Coach G and Coach Naks are sometimes collectively referred to herein as the "USF Coaches."[8]

IV.      **FACTS**

A.      **Student-Athletes Are at Heightened Risk for Sexual Harassment, Exploitation, and Mental Abuse by Coaches.**

34.      Nancy Hogshead-Makar, a 1984 Olympic gold medalist in swimming and the CEO of Champion Women, a non-profit providing legal advocacy for athletes, explains the tremendous power differential present in relationships between coaches and athletes: "There's no balance of power, there's power one way, which is the coach has all the power and the athlete

---

[6] NCAA, *What is the NCAA?*, http://www.ncaa.org/about/resources/media-center/ncaa-101/what-ncaa (last visited June 12, 2023).
[7] NCAA, *Overview*, https://www.ncaa.org/sports/2021/2/16/overview.aspx (last visited July 9, 2022).
[8] Plaintiffs' claims against USF and the USF Coaches are proceeding separately in the Related Litigation.

does not . . . . [The coach] has her scholarship, her ability to continue her education."[9]

35.    This power imbalance extends beyond the sport and to the personal lives of the student-athletes: "[C]oaches have power over athletes' lives far exceeding the mechanics of practicing and competing in a sport. A coach's power over athletes can extend to virtually all aspects of the athlete's life in such ways that clear boundaries are hard to delineate. This near-total control is rarely questioned."[10]

36.    "The athlete's dependence on the coach makes it enormously difficult for the athlete to control the boundaries of the relationship or speak up to a coach who oversteps."[11] This dependency is often even more acute in student-athletes entering college for the first time.

37.    All college students are encouraged to develop a clear sense of self, commitment, and direction. Emerging adults engage in a variety of developmental tasks such as identity formation, becoming personally competent, developing interpersonal relationships, and planning for the future.[12]

38.    While engaged in this period of self-exploration, student-athletes must also balance a unique set of often-competing circumstances including, but not limited, to their athletic and academic endeavors. They must balance social activities against the isolation of athletic pursuits; maintain mental equilibrium in the face of athletic success or shortcomings; play notwithstanding physical infirmities and injuries; and, often, reconcile the termination of an athletic career to set goals for the future.[13]

39.    The NCAA acknowledges the uniquely important process of identity formation for NCAA student-athletes, because "NCAA research has shown academic outcomes (grades, graduation and eventual graduate degree attainment) are strongly related to identity as a student

---

[9] John Barr & Nicole Noren, *Outside the Lines: Track & Fear*, ESPN, http://www.espn.com/espn/feature/story/_/id/18900659/university-arizona-coach-threatened-one-athletes-blackmail-violence-death-school-stopped-him (quoting Nancy Hogshead-Makar).
[10] Deborah L. Brake, *Going Outside Title IX to Keep Coach-Athlete Relationships in Bounds*, 22 MARQUETTE SPORTS L. REV. 395, 405 (Jan. 1, 2012) (footnotes omitted).
[11] *Id.* at 406.
[12] Emily Benton Heird & Jesse A. Steinfeldt, An Interpersonal Psychotherapy Approach to Counseling Student-Athletes: Clinical Implications of Athletic Identity, 16 J. C. COUNSELING 143-57 (2013).
[13] Joy Gaston Gayles, *Engaging Student Athletes*, STUDENT ENGAGEMENT IN HIGHER EDUCATION: THEORETICAL PERSPECTIVES AND APPROACHES FOR DIVERSE POPULATIONS 209-21 (Stephen John Quaye et al. eds., 2nd ed. 2015).

1    while in college, even after taking prior academic performance into account."[14]

2        40.    For student-athletes, this crucial developmental period necessarily includes

3    significant time spent with teammates and coaches. While other college students can test their

4    emerging identities through school-based and friendship networks, the college athlete typically

5    spends significant time separated from these networks while they train and compete. Student-

6    athletes often spend hours a day with their coaches on the practice field, in the training room, and

7    in meetings.

8        41.    This dynamic with their coaches renders student-athletes uniquely vulnerable to

9    sexual harassment and abuse. As researchers suggest, "the culture of sport, specifically the power

10   invested in the coach, facilitates an environment conducive to, and tolerant of, sexual

11   exploitation."[15]

12       42.    This power imbalance is especially dangerous for athletes close to the upper

13   echelon of their sport. As one author explains:

> [A]thletes may be more susceptible to the grooming process which
> precedes actual sexual abuse when they have most at stake in terms
> of their sporting careers, that is when they have reached a high
> standard of performance but are just below the elite level. We call
> this the 'stage of imminent achievement' (SIA). . . . For these
> athletes, the personal costs of dropping out of their sport might be
> deemed to be higher than for others. The novice athlete can drop out
> without loss of face, can leave to find another coach or another sport
> without loss of reputation and has invested least, in terms of time,
> effort, money and family sacrifices. The top athlete, on the other
> hand, has a proven record, has already attained some of the rewards
> of success, and may be less dependent upon his or her coach for
> continued achievement at that level. . . . The increased self esteem
> and personal confidence which accrues to the successful elite
> performer (after SIA) may provide them with the necessary personal
> resources to stand on their own[.]

\*          \*          \*

> The elite young athlete treads a fine line between success and failure.
> Physical injuries or illness can occur at any time, destroying years of

[14] NCAA, *Do NCAA Student-Athletes View Themselves As Students Or Athletes?* (Aug. 2013), http://www.ncaa.org/about/resources/research/do-ncaa-student-athletes-view-themselves-students-or-athletes (last visited Jan, 29, 2022).

[15] Joy D. Bringer, Celia H. Brackenridge, & Lynn H. Johnston, *Defining Appropriateness in Coach-Athlete Sexual Relationships: The Voice of Coaches*, 8 J. SEXUAL AGGRESSION, at 3 (2002), (unpublished manuscript), https://www.tandfonline.com/doi/abs/10.1080/13552600208413341.

training. Psychological damage can be caused by the withdrawal of the coach's attention or interest. In short, the young athlete often needs the attention of the coach in order to maintain form and the chance to succeed. In these circumstances it is not difficult for a coach with sexual motives to groom and gain compliance from the athlete.[16]

43.     Furthermore, "[t]he style of coaching that is most conducive to forming coach-athlete sexual relationships is more closely associated with male coaches: authoritarian, requiring unquestioning submission to the coach's authority, and exercising near total control over athletes' lives."[17] Thus, "having a male coach with an authoritarian coaching style is a high risk factor for coach-athlete sexual abuse."[18]

44.     The fact that college athletes are over the age of 18, however, does not make any sexual relationship or sexual activity with a coach consensual. According to many experts, the implicit power in the coach-athlete relationship negates consent.[19]

45.     A coach with sexual motives is able to groom and gain his athlete's compliance because of the power differential between a coach and the student-athlete, which makes consent even between adults impossible. From a very young age, athletes are taught to look up to and respect their coaches, to view them as upstanding adults who serve as mentor, trainer, counselor, and sometimes even surrogate parent, and to accord them unquestioning authority.

46.     In 2012, the NCAA acknowledged a coach's ability to wield tremendous emotional control and power over his student-athletes:

In the most tangible terms, the student-athlete depends on the coach for: a place on the roster; playing time; training and skills-building opportunities; visibility and references that can lead to professional opportunities; and, in Division I and II programs, scholarships that can mean the difference between being able to afford a college education or not. In exercising this power, the coach commonly exerts broad control over a student-athlete's life, including in such areas as physical fitness, diet, weight, sleep patterns, academic habits, and social life. For intercollegiate athletes, the magnitude of the coach's control will likely exceed that of any other single individual at that student-athlete's institution. For many, it will

---

[16] Celia Brackenridge & Sandra Kirby, *Playing Safe: Assessing the Risk of Sexual Abuse to Elite Child Athletes*, INT'L REVIEW FOR THE SOCIOLOGY OF SPORT: SPECIAL ISSUE ON YOUTH SPORT 13 (1997), https://bit.ly/3MBMlvJ.
[17]  Brake, *supra* note 10, at 403.
[18] *Id.* & n.35 (citations omitted).
[19] Brake, *supra* note 10, at 399.

exceed the extent of control any individual has ever had over them at any point in their lives, with the exception of their parents.[20]

47.     This dependence and power differential created by the coach-athlete relationship enables predators who work with student-athletes (like Jerry Sandusky, Larry Nassar, Robert Anderson, and Coach Naks) to perpetuate their abuse and thrive for decades.

B.     **By the 1990s, National Governing Bodies (NGBs)[21] Prohibited Sexual Harassment by Coaches of Athletes, Recognizing the Power Disparities and Unequal Bargaining Positions.**

48.     Historically, the NCAA and other sporting organizations ignored instances of coaches engaging in sexual improprieties with their athletes. Karen Morrison, the NCAA director of gender inclusion, explained the "'hesitancy to prescribe what people consider to be the personal lives of their coaches,'" when both parties are consenting adults.[22] However, by the 1990s, multiple studies challenged organizations denying the existence of sexual abuse in sport.[23] The results of these studies "speak to the intensity of the coach-athlete bond, and the difficulty of setting boundaries in the relationship" which explain why many athletes do not recognize harassing or abusive behavior when they experience it.[24] In response to these findings, many sports organizations—but not the NCAA—adopted rules to: prohibit coaches from engaging in sexual relationships with athletes; to protect athletes from sexual harassment; and to preserve the safety and well-being of athletes.

**1.     In 1992, the United States Olympics Committee established a code of ethics prohibiting sexual harassment.**

49.     In 1992, the United States Olympics Committee ("USOC," now the United States

---

[20] Deborah L. Brake & Mariah Burton Nelson, *Staying in Bounds* at 15 (citations omitted), http://ncaa.org.s3.amazonaws.com/documents/2021/1/18/Staying_2Bin_2BBounds_2BFinal.pdf (last visited Feb. 3, 2022).

[21] NGBs are non-profit, non-governmental organizations responsible for promoting and developing a specific sport within a country.

[22] Allie Grasgreen, *Out-of-Bounds Relationships*, INSIDE HIGHER ED. (May 1, 2012), https://www.insidehighered.com/news/2012/05/01/ncaa-asks-colleges-prohibit-romantic-relationships-between-athletes-coaches.

[23] *See, e.g.*, Brackenridge, *supra* note 16, at 9 (citing studies in the United States, including: Lisa Pike-Masteralexis, *Sexual Harassment and Athletics: Legal and Policy Implications for Athletic Departments*, 19 J. SPORT & SOCIAL ISSUES 141-156 (1995); Karen A.E.Volkwein et al., *Sexual Harassment in Sport - Perceptions and Experiences of Female Student-Athletes*, 32 INT'L REVIEW FOR THE SOCIOLOGY OF SPORT 283-295 (1997).

[24] Brake, *supra* note 10, at 400.

Olympics & Paralympic Committee or "USOPC") developed a Coaching Ethics Code to "provide[] a common set of values upon which coaches build their professional work" as "[i]t is the individual responsibility of each coach to aspire to the highest possible standards of conduct."[25]

50.     USOPC's Coaching Ethics Code includes Ethical Standard 1.08, "Sexual Harassment," which defines and prohibits sexual harassment as follows:

> (a) Coaches do not engage in sexual harassment. Sexual harassment is sexual solicitation, physical advances, or verbal or nonverbal conduct that is sexual in nature, and that either:
>
> > (1) is unwelcome, is offensive, or creates a hostile environment, and the coach knows or is told this;
> >
> > (2) is sufficiently severe or intense to be abusive to a reasonable person in the context. Sexual harassment can consist of a single intense or severe act or of multiple persistent or pervasive acts.
>
> (b) Coaches accord sexual-harassment complaints and respondents dignity and respect. Coaches do not participate in denying an athlete the right to participate based upon their having made, or their being the subject of, sexual harassment charges.[26]

51.     Ethical Standard 1.14, "Exploitative Relationships," recognizes that because of the power differential, sexual or romantic relationships between a coach and athlete would likely impair judgment and become exploitative:

> (a) Coaches do not exploit athletes or other participants over whom they have supervisory, evaluative, or other authority.[27]

**2.     In 1998, USA Swimming prohibited inappropriate sexual conduct.**

52.     In 1998, USA Swimming adopted a code of conduct that provided for discipline in cases of "sexual contact or advances directed toward an athlete by a person who, in the context of

---

[25]United States Olympic & Paralympic Committee Coaching Ethics Code, https://www.teamusa.org/USA-Karate/Officials-and-Coaches/Coaches-Resources/USOC-Coaching-Ethics-Code (Introduction) (last visited Jan. 31, 2022).
[26] *Id.,* Ethical Standard 1.08.
[27] *Id.,* Ethical Standard 1.14.

swimming, was in a position of authority over that athlete."[28]

53.     In 2002, the prohibition against sexual advances was modified to include "other inappropriate sexually oriented behavior or action" and to explicitly apply to coaches. Specifically, Article 304.3.5 prohibited: "Any sexual contact or advance or other inappropriate sexually oriented behavior or action directed towards an athlete by a coach, official, trainer, or other person who, in the context of swimming, is in a position of authority over that athlete."[29]

54.     In 2010 (effective 2011), USA Swimming added an "Athlete Protection Policy" and "Sexual Misconduct Reporting Requirement" to its rulebook. These changes required reports of sexual misconduct and prohibited retaliation for reporting.[30]

55.     In 2012 (effective 2013), USA Swimming clarified that "sexual misconduct" included "other oral, written, visual, or physical conduct"[31] and added a prohibition against bullying.[32] The definition of physical abuse was also expanded to prohibit bullying by a coach.[33]

### 3.     In 2007, the International Olympic Committee issued a consensus statement on sexual abuse in sport.

56.     In 2007, the International Olympic Committee ("IOC") issued a "Consensus Statement" on "Sexual Harassment and Abuse in Sport" that highlighted the power differences between athletes and authority figures and recommended that ***all sport organizations*** develop policies to protect athletes from sexual abuse and harassment.[34]

57.     In urging coaches and other authority figures to "stay within the boundaries of a professional relationship with the athlete[,]" the statement noted the profound, negative impacts sexual harassment and abuse has on athletes' physical and psychological health, which can result

---

[28] Gunderson Nat'l Child Protection Training Ctr., *When the Athlete Is a Child: An Assessment of USA Swimming's Safe Sport Program,* at 9 (Jan. 27, 2014), https://www.usaswimming.org/docs/default-source/safe-sportdocuments/safe-sport-basics/2014-vieth-report.pdf (quoting USA Swimming Code of Conduct, § 304.3 (1998 ed.)) (last visited Feb. 1, 2022).
[29] *Id.* at 9 & n.30 (quoting USA Swimming Code of Conduct, § 304.3 (2002 ed.)).
[30] *Id.* at 11-12 (quoting USA Swimming Code of Conduct, § 304.3.5 (2011 ed.)).
[31] *Id.* at 12 & n.45 (quoting USA Swimming Code of Conduct, § 304.3.5, which is now § 304.8 (2013 ed.)).
[32] *Id.* at 12 & n.46 (quoting USA Swimming Code of Conduct, § 304.3.7 (2013 ed.)).
[33] *Id.* at 12-13 & n.47 (quoting USA Swimming Code of Conduct, § 304.3.13 (2013 ed.)).
[34] *See* Int'l Olympic Comm., *IOC Adopts Consensus Statement on "Sexual Harassment and Abuse in Sport,"* at 3-5 (Feb. 8, 2007), https://bit.ly/3IUdlEg (last visited Jan. 31, 2022).

impaired performance and dropout:

> Clinical data indicate that psychosomatic illnesses, anxiety, depression, substance abuse, self-harm and suicide are some of the serious health consequences. Passive attitudes/non-intervention, denial and/or silence by people in positions of power in sport (particularly bystanders) increases the psychological harm of sexual harassment and abuse. Lack of bystander action also creates the impression for victims that sexually harassing and abusive behaviours are legally and socially acceptable and/or that those in sport are powerless to speak out against it.[35]

**4.   In 2018, the Energy and Commerce Committee investigated and set out best practices for NGBs to prohibit coach misconduct and track wrongdoing.**

58.   On December 20, 2018, the United States Energy and Commerce Committee (the "Committee") released a report entitled, "Nassar and Beyond: A Review of the Olympic Community's Efforts to Protect Athletes from Sexual Abuse" (the "Nassar and Beyond Report").[36] The report followed a yearlong investigation based on the scandals in gymnastics, swimming, and taekwondo.

59.   The Committee found a number of systemic failures at NGBs contributing to the widespread instances of sexual abuse that "should be concerning not only to Olympic athletes, but also amateur athletes, parents, and anyone who has a loved one involved in amateur sports."[37]

60.   First, the Committee noted that its "most troubling" finding was that the Olympic community inappropriately prioritizes "reputation and image"—and specifically "medals and money"—"at the expense of the safety and well-being of athletes."[38] This same criticism can be applied to the NCAA's placement of revenue above its duty to protect its student-athletes.

61.   Second, despite USOPC's effort to establish minimum standards and an NGB Athlete Safety Policy, each NGB continued to have its own governance structure and applicable

---

[35] *Id.* at 4-5.

[36] Energy & Commerce Comm. Press Release, *Committee Report Details Sexual Abuse in Organized Sports* (Dec. 20, 2018), https://republicans-energycommerce.house.gov/news/committee-report-details-sexual-abuse-in-organized-sports/ (last visited Feb. 2, 2022).

[37] Energy & Commerce Comm., *Nassar and Beyond: A Review of the Olympic Community's Efforts to Protect Athletes from Sexual Abuse* ("Nassar and Beyond")*,* at 3 (Dec. 20, 2018), https://gameover.childusa.org/reader.php?path=/wp-content/uploads/EC-USOC-Report-12.20.18-Final-REV.pdf (last visited June 15, 2023).

[38] *Id.*

bylaws and policies resulting in inconsistencies in publicly identifying those disciplined or banned and policies to handle reports, complaints or allegations of abuse to USOPC and law enforcement.[39] Here, again, this criticism is applicable to the NCAA, which purports to push responsibility for sexual abuse policies onto its 1,200 member institutions.

62.     Third, the Committee found that some NGBs did not employ simple measures, such as background checks and public banned lists.[40] The NCAA also fails to impose simple reporting and tracking procedures for coaches who abuse athletes.

63.     The Committee noted the creation of the United States Center for SafeSport ("USCSS") on March 3, 2017 as a centralized and neutral organization to oversee education programs for safe sports and to adjudicate claims of sexual misconduct as a step toward establishing consistency and accountability, showing that best practices include a central and neutral oversight organization.[41]

64.     USCSS created the SafeSport Code for the U.S. Olympic and Paralympic Movement ("SafeSport Code"), which sets out "expectations for Participants related to emotional, physical, and sexual misconduct in sport, including bullying, hazing, and harassment." Prohibited conduct in the SafeSport Code includes sexual misconduct, emotional and physical misconduct, including stalking, bullying, hazing, and harassment, aiding and abetting, and misconduct related to reporting.[42]

65.     In the SafeSport Code, "Sexual misconduct" is defined to include sexual or gender-related harassment and bullying or hazing, or other inappropriate conduct of a sexual nature.[43] Misconduct related to reporting occurs when an adult participant in sport fails to report actual or suspected sexual misconduct to the Center.[44]

66.     Despite many NGBs' long-standing efforts to create and implement effective

---

[39] *Id.*
[40] *Id.* at 3-4.
[41] U.S. Center for SafeSport, *About*, https://uscenterforsafesport.org/ (last visited Jan. 31, 2022).
[42] United States Center for SafeSport, SafeSport Code for the U.S. Olympic and Paralympic Movement § IX (effective Apr. 1, 2021), https://uscenterforsafesport.org/wp-content/uploads/2021/04/SafeSportCode2021_040121_V3.pdf (last visited Jan. 31, 2022).
[43] *Id.,* § IX.C.1.
[44] *Id.,* § IX.F.

1   measures to address sexual abuse and harassment, the NCAA still has yet to set standards of

2   conduct governing abusive coaches.

3        C.     **Despite Widespread Recognition that Protection of Student-Athletes Is**

4               **Paramount, the NCAA Knowingly Declined to Act, Placing Student-Athletes**

               **at a Substantial and Heightened Risk of Sexual, Physical, and/or Emotional**

5               **Abuse and Misconduct.**

6              **1.**     **The NCAA had and has a duty to protect the physical and educational**

7                        **well-being of student-athletes.**

       67.     Founded in 1906 "to keep college athletes safe[,]" the NCAA's website notes that

8   it is "working hard" to protect the hundreds of thousands of NCAA-affiliated athletes "physically

9   and mentally, on the field and off."[45] Indeed, "[n]early half a million college athletes make up the

10   19,886 teams that send more than 57,661 participants to compete each year in the NCAA's 90

11   championships in 24 sports across 3 divisions."[46]

12       68.     When a student-athlete elects to attend a DI school, they sign a National Letter of

13   Intent ("NLI")—a valid, binding contract. The student-athlete trades their athletic contributions

14   for an education: he or she agrees to attend a particular NCAA institution full-time as a student-

15   athlete, receiving in return athletics financial aid for a particular number of years and the ability to

16   participate and compete in NCAA athletics. The NLI for the 2020-2021 Academic Year is

17   attached hereto as Exhibit A. This is substantially the same contract that John Does 1-3 signed, as

18   well as other Plaintiffs as alleged herein.

19       69.     The NCAA controls the entirety of the NLI program: it hosts the NLI website,

20   prepares the standardized NLI form; dictates when the NLI may be signed and who may be

21   present when it is; determines when the NLI may be released, declared invalid, or voided;

22   establishes an appeal process for NLI releases; requires all members of the NLI program to offer

23   athletics scholarships (which are funded in part or whole by the NCAA and must be consistent

24   with NCAA rules); and prohibits other institutions from recruiting that student-athlete once the

25

26

27

---

28   [45] NCAA, *Well-Being*, http://www.ncaa.org/health-and-safety (last visited Feb. 1, 2022).
     [46] NCAA, *supra* note 6.

NLI is signed. Following execution, the NLI must be filed with the relevant DI Conference.[47]

70. Each academic year, the student-athlete also signs a Student Athletic Statement. The Student-Athlete Statement is issued and required by the NCAA, and student-athletes must sign it to be eligible to participate in intercollegiate competition. The Student-Athlete Statement for the 2020-2021 academic year, also called Form 20-1a, is attached hereto as Exhibit B. This is substantially the same contract that John Does 1-3 signed, as well as all Plaintiffs.

71. The Student-Athlete Statement references and incorporates the NCAA Division I Manual, which is comprised of the NCAA Constitution, Operating Bylaws, and Administrative Bylaws (collectively, the "Manual").[48]

72. The cited version of the Manual controlled John Does 1-3 during their first year at USF and it sets forth student-athlete obligations and NCAA promises. Once a student-athlete participates in NCAA sports, they are bound by the Manual which dictates NCAA student-athlete behavior.

73. For example, student-athletes must meet eligibility requirements established by the NCAA, their institution, and the applicable athletic conference;[49] act with honesty and sportsmanship;[50] act ethically;[51] comply with drug provisions;[52] not violate the principle of amateurism;[53] comply with recruiting requirements;[54] not receive any "extra benefit" (as defined by the NCAA) for their athletic contributions;[55] and comply with disciplinary action for failures to comply.[56]

74. The Manual also imposes obligations on the NCAA that include maintaining

---

[47] See, e.g., National Letter of Intent, http://www.nationalletter.org; Quick Reference Guide to the NLI, http://www.nationalletter.org/documentLibrary/nli-guide.pdf (last visited June 12, 2023).
[48] NCAA Division I Manual (effective Aug. 1, 2020), found at https://www.ncaapublications.com/productdownloads/D121.pdf (last visited June 12, 2023).
[49] NCAA Bylaws, Art. 3, § 3.1.2.4, Art. 12, § 12.7, found at https://www.ncaapublications.com/productdownloads/D121.pdf (last visited June 12, 2023).
[50] *Id.,* Art. 10, § 10.01.
[51] *Id.,* § 10.1.
[52] *Id.,* § 10.2.
[53] *Id.,* Art. 12, § 12.1.
[54] *Id.,* Art. 13, § 13.01.
[55] *Id.,* Art. 16, § 16.01.
[56] *Id.* Art. 10, § 10.4.

control over and responsibility for intercollegiate sports and the participating student-athletes.

The NCAA Constitution states in pertinent part:

> **1.2 Purposes.** [*] The purposes of this Association are:
>
> (a) To initiate, stimulate and improve intercollegiate athletics programs for student athletes . . . ;
>
> (b) To uphold the principal of institutional control of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this Association; . . . [and]
>
> (h) To legislate, through bylaws or by resolutions of a Convention, upon any subject of general concern to the members related to the administration of intercollegiate athletics[.][57]

75.    Article 2.2 specifically provides for the well-being of the NCAA's student-athletes, including in the areas of health and safety and student-athlete/coach relationships:

> **2.2    The    Principle    of    Student-Athlete    Well-Being.**    [*] Intercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational wellbeing of student-athletes. (Revised: 3/8/06)
>
> \*        \*        \*
>
> **2.2.3 Health and Safety.** [*] It is the responsibility of each member institution to protect the health of, and provide a safe environment for, each of its participating student-athletes. (Adopted: 1/10/95)
>
> **2.2.4    Student-Athlete/Coach    Relationship.**    [*]    It    is    the responsibility of each member institution to establish and maintain an environment that fosters positive relationship between the student-athlete and coach. (Adopted: 1/10/95)[58]

76.    Moreover, when it comes to gender equity, which includes protection from sexual abuse and harassment, the NCAA has expressly undertaken the duty to adopt rules to ensure member institutions' compliance with gender equity laws. Article 2.3.2 of the NCAA Constitution provides in pertinent part:

> **2.3.2 NCAA Legislation.** [*] The Association should not adopt legislation that would prevent member institutions from complying with applicable gender-equity laws, and should adopt legislation to enhance member institutions' compliance with applicable gender-equity laws. (Adopted: 1/11/94)[59]

---

[57] *Id.,* NCAA Const., Art.1, §§ 1.2(a), (b) & (h),
[58] *Id.*, Art. 2, §§ 2.2, 2.2.3 & 2.2.3.
[59] *Id.,* Art. 2, § 2.3.2.

77.      In addition to its Constitution, the NCAA has consistently recognized and publicly proclaimed its duty to provide a safe environment for student-athletes. Former President Mark Emmert proclaimed in Congressional testimony that the NCAA has "a clear, moral obligation to make sure that we do everything we can to support and protect student-athletes."[60]

### 2. The NCAA regulates coaches in a myriad of ways—except when it comes to sexual harassment and sexual abuse of student-athletes.

78.      Despite its promises to protect student-athletes and its conscious decision to expressly regulate coaches' conduct in a myriad of other ways, the NCAA remains unwilling to address sexual misconduct in any meaningful way.

79.      For example, Article 10 of the NCAA Bylaws, "Ethical Conduct," applies to coaches of intercollegiate athletics, among others. It provides a detailed list of unethical conduct, which includes, among other things, sports wagering, providing banned substances, providing a prospective or current student-athletes improper inducements or extra benefits, and facilitating a meeting between a student-athlete and an agent.[61] Institutional members such as coaches who violate this provision are subject to disciplinary or corrective action.[62]

80.      Article 11 of the NCAA Bylaws, entitled "Conduct and Employment of Athletics Personnel," further explains in painstaking detail the responsibilities and obligations of coaches and other athletics personnel. The section regulates coaching bonuses and other compensation, education requirements and compensation restrictions for certain types of coaching personnel, responsibility for violations of NCAA regulations, marketing to sports agents, the use of the NCAA name, the use of tobacco, required contractual provisions, recruiting, scouting, and limitations on the number and duties of coaching and other staff members.[63] Again, coaches and

---

[60] U.S. Senate, *supra* note 2, at 60:25-61:1.
[61] NCAA Bylaws, Art. 10, § 10.1.
[62] *Id.,* § 10.4.
[63] *See, generally.,* NCAA Bylaws, Art. 11.

other athletic personnel are subject to disciplinary or corrective action for violating these Bylaws.[64]

81.     Yet, the Manual is utterly silent on limitations on coaches with respect to: sexual harassment or abuse of student-athletes and sexual relationships with student-athletes; internal or external reporting of coaches who engage in such behavior; the necessity for independent investigation of coaches who engage in such behavior; a centralized reporting repository so that complaints about coaches can be tracked between and among schools; and mandatory training of coaches relating sexual harassment or abuse of student-athletes.

82.     A recent example of the perils created by the NCAA's lack of a reporting policy involves former Baylor football coach Art Briles, who left Baylor in the midst of a scandal because he failed to report sexual assaults but was hired by Grambling State after a stint as a high school coach.[65]

83.     While the NCAA freely metes out punishments for student-athletes for poor academic performance, historically disciplined athletes for profiting off their own likenesses, and regulated the student-athletes' daily lives in a myriad of ways, the NCAA's Manual does not contain any penalties for sexual, violent, or criminal conduct by coaches or other personnel in NCAA athletics programs.

> **3.     Student-athletes suffer in the vacuum created by the NCAA's failure to regulate abuse by coaches.**

84.     Despite USOPC's adoption of a coaching code of ethics in 1992 prohibiting sexual harassment and sexual relationship between coaches and athletes during the coaching

---

[64] *Id.,* § 11.1.1.
[65] Alanis Thames, *Art Briles, Who Coached Baylor During Sexual Assault Scandal, Is Hired at Grambling State*, N.Y. TIMES (Feb. 24, 2022), https://www.nytimes.com/2022/02/24/sports/ncaafootball/art-briles-grambling-state-baylor.html.  Briles resigned four days later in the midst of public outrage—but not because the NCAA had policies in place. Alanis Thames, *Art Briles Resigns From Grambling State*, N.Y. TIMES (Feb. 28, 2022), https://www.nytimes.com/2022/02/28/sports/football/art-briles-grambling-state.html.

relationship, the NCAA took no action for 20 years and then fell short once it did.

85.     Between 1992 and 2020, multiple accounts of inappropriate sexual conduct by athletics department personnel in NCAA programs emerged. A sampling of non-exhaustive incidents follows.

86.     In 1998, two soccer players, Debbie Keller and Melissa Jennings, brought suit against University of North Carolina soccer coach Anson Dorrance alleging sexual misconduct including uninvited sexual comments, inappropriate advances, and retaliation. In denying Dorrance's Motion to Dismiss, the Fourth Circuit noted that Dorrance regularly "bombarded players with crude questions and comments about their sexual activities and made comments about players' bodies that portrayed them as sexual objects. In addition, Dorrance expressed (once within earshot of Jennings) his sexual fantasies about certain players, and he made, in plain view, inappropriate advances to another."[66] Keller settled in 2004; Jennings settled for $385,000 in 2006 with an admission by the coach that he had "participated with members of the UNC-Chapel Hill women's soccer team in group discussions of those team members' sexual activities or relationships with men."[67]

87.     Also in 1998, two former tennis players sued Jesse Dwire, the women's tennis coach at Syracuse University, alleging that Dwire massaged, fondled, and propositioned them, and that Dwire and the university retaliated against the players after they pursued a complaint through the school's grievance system. According to one news source: "the lawyer for [the plaintiffs], said Syracuse officials, aware that the National Collegiate Athletic Association has no policy on sexual harassment, had ignored complaints about Dwire's sexual improprieties for years."[68]

88.     In 2011, a former University of South Carolina women's soccer player sued the university, alleging she received unwanted sexual advances by the assistant coach and that her

---

[66] *Jennings v. Univ. of N.C.*, 482 F.3d 686, 691 (4th Cir. 2007).
[67] Doug Lederman, *North Carolina and Coach Settle Sexual Harassment Suit*, INSIDE HIGHER ED. (Jan. 15, 2008), https://www.insidehighered.com/news/2008/01/15/north-carolina-and-coach-settle-sexual-harassment-suit.
[68] Robin Finn, *Growth in Women's Sports Stirs Harassment Issue*, N.Y. TIMES (Mar. 7, 1999), https://www.nytimes.com/1999/03/07/sports/out-of-bounds-a-special-report-growth-in-women-s-sports-stirs-harassment-issue.html.

academic advisor admitted that the coach had sexually harassed other students. She also alleged that the university failed to renew her scholarship in retaliation for her complaint.[69]

89.    In June 2012, Pennsylvania State University's ("Penn State") Jerry Sandusky was convicted of 45 counts of child sexual abuse and sentenced to 30 to 60 years in prison. Several top Penn State officials, including its president and athletic director, were also criminally convicted for their roles in covering up the crimes:

a.    Since 2001, Penn State had been aware that Sandusky committed sexual acts on a young boy in a shower. Yet the university did nothing, which allowed Sandusky to abuse ten young football players over at least a 15-year period.[70]

b.    On July 23, 2012, in response to public pressure, the NCAA sanctioned Penn State because of its "conspiracy of silence" relating to Jerry Sandusky's sexual abuse of boys. The NCAA's penalties included a $60,000,000 fine (equating to one year's gross revenue from the university's football program) to endow a fund supporting sexual abuse survivor assistance programs; a ban on Penn State's participation in post-season football games for four years; a reduction in football scholarships from 25 to 15 per year for four years; and vacating all the team's wins from 1998 (when university officials first heard Sandusky might be sexually abusing young boys) to 2011.[71]

c.    The NCAA announced that its punishment of Penn State was intended to "driv[e] cultural change," because of the "tragic damage that has been done to the victims or their families." Then-NCAA President Mark Emmert

---

[69] WISNews, *Former USC Women's Soccer Player Files Lawsuit* (updated Dec. 21, 2011), https://www.wistv.com/story/16301453/former-usc-womens-soccer-player-files-lawsuit/.
[70] John Barr, *How Key Figures From Jerry Sandusky's Crimes View Joe Paterno's Legacy, 10 years after his downfall*, ESPN (Apr. 18, 2022), https://www.espn.com/college-football/story/_/id/33743088/how-key-figures-jerry-sandusky-crimes-view-joe-paterno-legacy-10-years-downfall.
[71] Mark Memmott, *Penn State Fined $60M, Banned From Bowls, Wins From 1998 On Vacated*, NPR (July 23, 2021), https://www.npr.org/sections/thetwo-way/2012/07/23/157222533/penn-state-fined-60m-banned-from-bowls-wins-from-1998-on-vacated.

stated:

> All involved in intercollegiate athletics must be watchful that programs and individuals do not overwhelm the values of higher education. In the Penn State case, the results were perverse and unconscionable. No price the NCAA can levy will repair the grievous damage inflicted by Jerry Sandusky on his victims. However, we can make clear that the culture, actions and inactions that allowed them to be victimized will not be tolerated in collegiate athletics.[72]

d. Yet some of the penalties, "which came outside the typical enforcement process," were later rescinded when private emails released after the settlement "suggested the NCAA [] strong-armed the university into accepting the punishments." As Gabe Feldman, director of Tulane's Sports Law Program, noted: '"The lesson here is the N.C.A.A. needs to strictly follow its own rules, and making exceptions for exceptionally bad or criminal conduct can lead to problems.'"[73]

90. Larry Nassar, like Sandusky, is also serving a prison sentence for sexually abusing hundreds of student-athletes under his care. Over 350 athletes, including Olympic champions Simone Biles, Gabby Douglas, and Aly Raisman, publicly accused the long-time doctor for USA Gymnastics and Michigan State University. Following numerous sexual assault charges, and emotional testimonies from many victims, Nassar received a sentence of up to 175 years in prison. Nassar, also like Sandusky, thrived unchecked for over twenty years:[74]

a. At least 14 individuals at Michigan State, including its President Lou Anna Simon, athletic trainers, and assistant coaches, had been notified of sexual misconduct reports concerning Nassar as far back as 1988 but Michigan State took no action for years. Instead, it chose to protect its reputation (and

---

[72] Remarks by Mark Emmert, *Penn State Hit With Severe NCAA Sanctions: $60 Million Fine, Wins Vacated, 4-Year Bowl, Playoff Ban*, YOUTUBE (July 23, 2012), https://www.youtube.com/watch?v=MGItBWWTN0k (last visited Feb. 9, 2022).

[73] Marc Tracy, *In Michigan State Investigation, N.C.A.A. Moves Beyond Its Comfort Zone*, NEW YORK TIMES (Jan. 24, 2018), https://www.nytimes.com/2018/01/24/sports/ncaa-investigation-michigan-state.html.

[74] In February 2019, Nassar was sentenced to 40-175 years after pleading guilty to seven counts of criminal sexual misconduct in Ingham County, Michigan. Two weeks later, he was sentenced to 40-125 years for pleading guilty to three counts of criminal sexual conduct in Eaton County, Michigan.

endowments).[75]

        b.     As with Penn State, the NCAA announced an investigation into Michigan State's handling of the allegations against Nassar in January 2018 only after Nassar was convicted and sentenced. The goal of the investigation was to determine if Michigan State violated any NCAA rules.[76]

        c.     In August 2018, the NCAA ended its investigation, finding that Michigan State had not violated any of the NCAA's Bylaws. The NCAA stated that despite the allegations of abuse (and Nassar's criminal convictions), the NCAA had "not substantiated violations of N.C.A.A. legislation."[77]

91.     In May 2019, an independent investigative report issued by the law firm Perkins Coie revealed that Ohio State coaches and athletics administrators knew for two decades that a team doctor, Richard Strauss, was molesting NCAA student-athletes on the wrestling team.[78]

92.     In August 2020, former NCAA student-athletes from the University of Michigan alleged they were sexually abused by wrestling, football, hockey and track teams' physician Dr. Robert Anderson during physical exams. He reportedly abused hundreds of student-athletes over the course of 37 years.[79]

93.     This pandemic of abuse fills the void left by the NCAA's willful and deliberate choice not to prohibit sexualized misconduct by NCAA coaches.

94.     As a result of the NCAA's actions and inactions, student-athletes were and still are at a substantial and heightened risk of sexual, physical, and/or emotional abuse and misconduct, above the societal baseline at NCAA member institutions.

---

[75] Kim Kozlowski, *What MSU Knew: 14 Were Warned of Nassar Abuse*, THE DETROIT NEWS (Jan. 18, 2018), https://www.detroitnews.com/story/tech/2018/01/18/msu-president-told-nassar-complaint-2014/1042071001/.
[76] Faith Karimi & Wayne Sterling, *NCAA Investigating Michigan State Over Larry Nassar Case*, CNN (Jan. 24, 2018) https://www.cnn.com/2018/01/24/us/ncaa-msu-nassar-investigation/index.html.
[77] Marc Tracy, *N.C.A.A. Drops Michigan State Inquiry Over Nassar*, NEW YORK TIMES (Aug. 30, 2018), https://www.nytimes.com/2018/08/30/sports/ncaa-michigan-state-nassar.html.
[78] Caryn Trombino & Markus Funk, Perkins Coie LLP, *Report of the Independent Investigation Sexual Abuse Committed by Dr. Richard Strauss at The Ohio State University* at 1 (May 15, 2019),https://compliance.osu.edu/assets/site/pdf/Revised_report.pdf (last visited Feb. 1, 2022).
[79] *37 Years of Sexual Abuse: This is the Dr. Robert Anderson Story*, THE MICHIGAN DAILY (Nov. 4, 2021), https://www.michigandaily.com/news/robertanderson/.

1

**4.     Even when the NCAA addresses abuse, the NCAA's policies and pronouncements lack teeth.**

2

3      95.     Belatedly, and without imposing mandates that would protect its student-athletes,

4   in 2012, the NCAA finally acknowledged that "sexual relationships between coaches and student-

5   athletes have become a serious problem."[80]

6      96.     In an NCAA publication, two experts explained that these same principles that

7   forbid sexual relationships in other settings involving asymmetrical relationships—such as

8   lawyer-client, physician-patient, judge-party/lawyer, or clergy-parishioner—should apply to

9   coaches and players as well:

10
11
12
13
14
15

> All of these examples involve relationships that are too fraught with power imbalances for consent to be meaningfully and reliably given. While being a coach is, in many respects, different from other professions, it shares the defining features that make consent to enter into a sexual relationship inherently problematic. At the core of the coach-athlete relationship is a duty of care and an imbalance of power. In many respects, the relationship of dependence is even more acute here than it is in these other settings due to the breadth of control that the coach has over the life and education of the student-athlete.[81]

16      97.     After 2014, though the NCAA ostensibly began taking an increasingly visible

17   stance on sexual assault prevention, its policies and pronouncements were toothless. In 2014, the

18   NCAA Executive Committee issued a Statement on Sexual Violence Prevention and Compliance

19   Resolution:

20
21
22
23
24
25
26
27
28

---

[80] Brake, *supra* note 20, at 4.
[81] *Id.*, at 26.

**2014 NCAA EXECUTIVE COMMITTEE SEXUAL VIOLENCE PREVENTION AND COMPLIANCE RESOLUTION**

WHEREAS NCAA Constitution Article 4.1.2 charges the NCAA Executive Committee with identifying core issues that affect the Association as a whole and with overseeing Association-wide issues and ensuring that each division operates consistent with the basic purposes, fundamental policies and general principle of the Association;

WHEREAS the Executive Committee regularly takes action to preserve and enhance student-athlete health, safety and well-being and promote nondiscriminatory and effective learning and competitive environments;

WHEREAS NCAA Constitution Article 2.2.3 requires each member institution to protect the health of, and provide a safe environment for, each of its participating student-athletes;

WHEREAS the U.S. Department of Education Office for Civil Rights has issued guidance related to sexual harassment, bullying and violence against all students under Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 et seq, which applies to all educational activities, including athletics programs, of higher education institutions receiving federal financial assistance and which states that sexual violence includes rape, sexual assault, sexual battery, sexual coercion and gender-based harassment.

Now, Therefore, Be It Resolved, that the Executive Committee recognizes the importance of addressing the abhorrent societal issue of sexual violence, especially when it occurs on our campuses. The Executive Committee acknowledges

that it is our members' collective responsibility to maintain campuses as safe places to learn, live, work and play. The Executive Committee expects NCAA members to ensure that the values and principles articulated in the Constitution to protect the health and safety of student-athletes, operate fairly and ethically, and further to ensure that student-athletes are neither advantaged nor disadvantaged by special treatment and that institutions' athletics departments must:

- Comply with campus authorities and ensure that all athletics staff, coaches, administrators and student-athletes maintain a hostile-free environment for all student-athletes regardless of gender or sexual orientation; know and follow campus protocol for reporting incidents of sexual violence; report immediately any suspected sexual violence to appropriate campus offices for investigation and adjudication.

- Educate all student-athletes, coaches and staff about sexual violence prevention, intervention and response.

- Ensure compliance with all federal and applicable state regulations related to sexual violence prevention and response.

- Cooperate with, but not manage, direct, control or interfere with, college or university investigations into allegations of sexual violence, ensuring that investigations involving student-athletes and athletics department staff are managed in the same manner as all other students and staff on campus.

98.     Yet the resolution continues to lay responsibility for protecting NCAA student-athletes on colleges and universities: "[I]t is our members' collective responsibility to maintain campuses as safe places to learn, live, work and play." [82] The resolution sets out four unremarkable mandates for the institutions' athletics departments: (i) "Comply with campus authorities and ensure that all athletics staff, coaches, administrators and student-athletes maintain a hostile-free environment for all student-athletes;" (ii) "Educate all students-athletes, coaches and staff about sexual violence prevention, intervention and response;" (iii) "Ensure compliance with all federal and applicable state regulations related to sexual violence prevention and response;" and (iv) "Cooperate with, but not manage, direct, control or interfere with, college or university investigations."[83]

99.     In 2016 (updated 2022), and in furtherance of the above resolution, the NCAA's Sport Science Institute published a document entitled "Sexual Violence Prevention: An Athletics'

---

[82] NCAA, *Sexual Violence Prevention, An Athletics Took Kit for a Healthy and Safe Culture* (2d ed.), Appendix A, at 35 (Oct. 2016) ("Toolkit 2d ed."), https://www.naspa.org/images/uploads/events/NCAA_2016_Sexual-Violence-Prevention-Tool-Kit.pdf.

[83] *Id.*

Tool Kit for a Healthy and Safe Culture" ("Tool Kit").[84]

100.    In it, the NCAA broadly defines "sexual misconduct" to include "sexual and gender-based harassment, sexual assault/sexual violence, stalking and intimate partner violence."[85] Again, however, the NCAA foists responsibility for ensuring college student-athlete environments are safe and healthy solely on the institutions themselves: "Member schools have a responsibility to protect the health of and provide a safe environment for each of their participating student-athletes."[86]

101.    And even though the NCAA acknowledged that coaches have an "influential" relationship over student-athletes,[87] the NCAA identifies coaches as those tasked with "preventing and responding to sexual violence,"[88] thereby ignoring the fact that coaches may very well be perpetrators of sexual harassment and other sexual misconduct.

102.    Moreover, the goals outlined in the policy are not mandatory, but "aspirational," requiring annual attestations from each university chancellor/president, athletics director, and Title IX coordinator regarding compliance with the universities' own policies.[89]

103.    Despite the NCAA's awareness of sexual violence affecting its student-athletes, it has resisted any meaningful reform despite calls by eight U.S. senators and its own Commission to Combat Campus Sexual Violence (the "Commission").[90] Instead, in 2018, the NCAA disbanded its Commission, and the NCAA promised only to continue to "monitor and track on sexual violence issues." No additional reform efforts have been made.[91]

---

[84] NCAA, *Sexual Violence Prevention, An Athletics Took Kit for a Healthy and Safe Culture* (3d ed.) ("Toolkit 3d ed."), https://ncaaorg.s3.amazonaws.com/ssi/violence/SSI_SexualViolencePreventionToolkit.pdf (last visited July 14, 2022). On its website, the NCAA states that the "NCAA Sports Science Institute promotes health and safety through research and training on . . . sexual assault and more." NCAA, *How We Support College Athletes*, https://www.ncaa.org/sports/2015/12/1/about-resources-media-center-ncaa-101-how-we-support-college-athletes.aspx (last visited Feb. 3, 2022).
[85] Tool Kit 2d ed., *supra* note 82, at 3.
[86] Tool Kit 3d ed., *supra* note 84, at History.
[87] *Id.,* at 2.
[88] *Id*., at "History."
[89] *Id.,* at 4, 6, 23.
[90] *See* Kenny Jacoby, *NCAA Board of Governors to Review Policies Regarding Sexual Assault Amid Congressional Pressure on 'Predator Pipeline'*, USA TODAY (Jan. 16, 2020), https://www.usatoday.com/story/sports/college/2020/01/16/ncaa-predator-pipeline-focus-congressional-bill-athletes-sexual-assault/4492088002/ (citing NCAA committee minutes).
[91] *Id.*

104.     The NCAA's unwillingness to effectively protect student-athletes from predatory coaches and trainers is even more egregious in light of its imposition of reporting requirements for student-athletes (but not coaches and trainers) who have had claims of sexual misconduct against them investigated. In 2019, *USA Today* reported on what it termed the "Predator Pipeline," by which sexually violent student-athletes (not unlike coaches) are allowed to migrate from one NCAA school to another and remain eligible to play:

> No matter if a school suspends, dismisses or expels athletes for sexual misconduct, NCAA rules provide avenues for them to return to the field on a new team within a year and sometimes immediately; players routinely exploit the NCAA's own loopholes to circumvent penalties; a handful of the NCAA's Division I conferences have adopted their own policies ban athletes with past behavioral problems, but definitions of culpability vary, and most rely on the honor system, not record checks, to verify recruits.[92]

105.     Similarly, in the wake of the *USA Today* investigatory report and introducing legislation, U.S. Representative Donna Shalala stated:

> College sports, as overseen by the NCAA, have undergone a massive transformation in recent years . . . . As profits, compensation for coaches, and spending on luxurious athletic facilities have ballooned, the association has repeatedly failed to address systemic problems with respect to the health and well-being of student athletes . . . . It is time for Congress to intercede in order to protect college athletes and maintain the integrity of college sports once and for all.[93]

106.     In response to *USA Today's* yearlong investigation, as of the 2021-22 school year, the NCAA now requires college *athlete* transfers to disclose to schools whether their conduct has previously resulted in an investigation, discipline through a Title IX proceeding, or a criminal conviction for sexual violence. Schools are also required to take reasonable steps to confirm this information.[94]

107.     Yet, the NCAA declines to impose those very same requirements on coaches and

---

[92] Kenny Jacoby, *NCAA Looks the Other Way as College Athletes Punished for Sex Offenses Play On*, USA TODAY (Dec. 12, 2019), https://www.usatoday.com/in-depth/news/investigations/2019/12/12/ncaa-looks-other-way-athletes-punished-sex-offenses-play/4360460002/.
[93] J. Brady McCollough, *Congressional Commission Proposed to Address NCAA's 'Systemic Problems*,' L.A. TIMES (Dec. 19, 2018), https://www.latimes.com/sports/story/2019-12-19/congressional-commission-proposed-to-address-ncaas-systemic-problems.
[94] Hulst & Handler, LLP, *Investigation Report Regarding Allegations of Sexual Misconduct Involving the University of San Francisco Men's Soccer Team* 43-44, n.67 (Jan. 11, 2021), https://bit.ly/3vN0wrB.

other athletics department personnel who commit the same or similar acts and continue to enjoy perhaps even greater immunity as they migrate from one NCAA institution to another throughout their careers.

> **5.     Because of its keen awareness of the problem it fostered and its desire to avoid liability, the NCAA continues to increase decentralization to the detriment of its student-athletes, placing student-athletes at a substantial and heightened risk of sexual, physical, and/or emotional abuse and misconduct.**

108.     Despite its "clear, moral obligation" to protect the health and well-being of its student-athletes, the NCAA's lawyers have created a strategy to avoid liability that directly contradicts positions the NCAA has taken to recruit student-athletes.

109.     For example, in the appeal to the California Supreme Court in *Brown v. USA Taekwondo*, the NCAA filed an amicus curiae brief in support of the sports organization respondent, USA Taekwondo ("USAT").[95] In *Brown*, the California appellate court found that USAT owed a duty of care to plaintiffs who were sexually abused by a coach under USAT's control, but that USOPC owed no similar duty.[96]

110.     In its amicus curiae brief, the NCAA took the position that sports organizations have no legal duty to protect their athletes from sexual abuse by coaches. Sidestepping the fact that it has not promulgated ***any*** policies prohibiting such abuse, the NCAA argued that it has "limited ability" to "enforce appropriate policies and best practices."[97] The NCAA also denied it could impose mandatory reporting on its member institutions regarding abusive coaches, claiming that it cannot "monitor the day-to-day conduct of coaches."[98]

111.     In staking out this position, the NCAA omitted its detailed proscriptions governing

---

[95] Application to File Amicus Curiae Brief & Brief of Amicus Curiae of the National Collegiate Athletic Association in Support of Respondent the United States Olympic Committee, 2020 WL 5705929 ("NCAA Brief").
[96] *Brown v. USA Taekwondo*, 40 Cal. App. 5th 1077, *as modified on denial of reh'g*, (2019), *aff'd* 11 Cal. 5th 204 (2021).
[97] NCAA Brief, 2020 WL 5705929, at *27.
[98] *Id.,* at *26.

the day-to-day conduct of those very same coaches—including with regards to their tobacco use—whom the NCAA can and does sanction.[99]

112.    The NCAA's argument that "the NCAA's members have decided that they—rather than the NCAA itself—are better positioned to ensure the health and safety of the student-athletes they enroll"[100] reveals the slippery slope on which the NCAA stands. This is because the NCAA member institutions have the strongest incentive to cover up coaches' bad behavior to preserve institutional reputations and attendant alumni donations, athletic revenue, and enrollment.

113.    The Penn State, Michigan State, Michigan, and Ohio State cases demonstrate that the NCAA's argument that it has "limited ability to take on that burden"[101] rings hollow in light of the NCAA's wealth, reach, micro-management of both coaches and athletes for minor infractions, and its nearly 60-member enforcement staff to investigate potential violations of amateurism and academic eligibility rules.

114.    The NCAA's conscious decision to decentralize and further foist responsibility to protecting student-athletes from sexual harassment and abuse at its member institutions, divisions, and conferences is at odds with best practices on how to protect student-athletes from sexual harassment and abuse.

115.    As stated above, one "troubling" finding of the Committee's 2018 Nassar and Beyond Report related to USOPC's prioritizing reputation and image over athlete safety. USOPC determined that it "does not have athletes" to protect from sexual abuse, and instead, that protecting the athletes was the responsibility of each NGB. Yet the NGBs—like NCAA member institutions—are incentivized to protect their reputations at the expense of the athletes.

---

[99] *See, e.g.,* NCAA Bylaws, Art. 10, §10.4 and Art. 11, §11.1.1.
[100] NCAA Brief, 2020 WL 5705929, at *27.
[101] NCAA Brief, 2020 WL 5705929, at *27.

116.     Another finding of the Nassar and Beyond Report was that despite USOPC's governance support, each of the 48 NGBs had its own policies and procedures, creating inconsistencies in critical areas, such as whether to publish the names of those previously disciplined or banned from a sport and how to handle sexual abuse complaints.[102] Because of the disparate rules and enforcement thereof, abusers were able to thrive. This is not unlike the NCAA squarely placing student-athlete safety and policies in the hands of its 1,200 colleges and universities.

117.     Thus, the NCAA's decentralization is contrary to empirical evidence concerning best practices and will continue to lead to inadequate protection of student-athletes from sexual assault, abuse, and harassment.

118.     The NCAA's strategy in furtherance of its attempt to disavow liability is all the more evident with the NCAA's enactment of a new constitution. Claiming to "better meet the needs of our student-athletes," the NCAA announced the adoption of a new constitution on January 20, 2022. The NCAA constitution supposedly "underscores the importance of both physical and mental health and emphasizes diversity, inclusion and gender equity."[103]

119.     Yet the NCAA's new constitution is only 19 pages, as compared to the prior constitution's 43 pages. While the preamble to the constitution states that the "basic purpose" of the NCAA "is to support and promote healthy and safe intercollegiate athletics,"[104] this new constitution further decentralizes decision-making, and attempts to pin responsibility for student welfare on the member institutions.

---

[102] Nassar and Beyond, *supra* note 37, at 45-61.
[103] Corbin McGuire, *NCAA Members Approve New Constitution*, NCAA (Jan. 20, 2022), https://www.ncaa.org/news/2022/1/20/media-center-ncaa-members-approve-new-constitution.aspx.
[104] NCAA Constitution, Preamble (effective Aug. 1, 2022), https://ncaaorg.s3.amazonaws.com/governance/ncaa/constitution/NCAAGov_Constitution121421.pdf.

D.      **With the NCAA's Blessing, the University of San Francisco Permitted Sexual Exploitation of Student-Athletes on and off the Field.**

1.      **Coach Naks created an intolerable sexualized environment that Coach G not only tolerated, but participated in.**

120.    During the time Coach Naks was at USF, USF described his duties as follows: "In addition to guiding the Dons[105] on the base paths, Nakamura's other on-field duties include coaching third base, overseeing the team's SPARQ (Speed, Power, Agility, Reaction, and Quickness) training and leading the team's visualization and imagery training program."[106]

121.    Further, in July 2020, USF's Executive Senior Associate Athletic Director described Coach Naks as "an amazing man who truly defines what it means to be a Diamond Don."[107]

122.    In a November 2020 interview, Coach G described Coach Naks as follows:

> Oh boy, Troy and I have you know we've been together for 22 years here at USF. So um what a great relationship and just Troy's loyalty to me is why he's here. Troy's had plenty of opportunities right and he's always wanted to stay and it's it's it's [sic] wonderful that he's wanted to be here in the Bay Area and be my right-hand man. I could never express how appreciative I am of Troy as a a, as a person, as a friend, as a coach, uh as a mentor, as someone to to [sic] spend this time with. I mean he's just wonderful. He he leads in a lot of ways. He does a lot of things for me and I never have to question it . . .  Me and Troy spend more time together than than [sic] me and my wife most of the time and more emotional wins and losses there too. A lot of times where we've been up at the top and we've been down and we've . . . . Oh it's it's [sic] I can't thank him enough. He's he's he's [sic] the best.[108]

---

[105] Members of USF baseball team are referred to as the Diamond Dons. *See, e.g.*, Diamond Dons Take Two (Feb. 18, 2017), https://usfdons.com/news/2017/2/18/baseball-diamond-dons-take-two.aspx.

[106] Profile: Troy Nakamura, https://usfdons.com/sports/baseball/roster/coaches/troy-nakamura/66 (last visited Jan. 26, 2022).

[107] Tuesday Testimonial: Troy Nakamura (July 28, 2020), https://www.youtube.com/watch?v=Rtd_HrkWW9w (last visited Jan. 28, 2022).

[108] Tuesday Testimonial: Baseball Head Coach Nino Giarratano (Nov. 3, 2020), https://www.youtube.com/watch?v=tvdyIFXEYq0&list=PLQJ7Y9Sjcc_ivhkGCZkiQKJlfrE7Qll5D (last visited July 12, 2022).

123.    Coach Naks was also an integral part of recruiting high school players. In fact, in 2013, Coach G promoted Coach Naks to associate head coach for "play[ing] a critical role in the recruitment and development of student-athletes."[109]

124.    Coach Naks had therefore established himself as a trusted coach and advisor before most Plaintiffs even stepped on campus.

125.    Plaintiffs arrived on campus their freshman year ready to work and succeed. All had successful careers in high school and on travel teams that were touted by USF publicly when they committed. Coach G or Coach Naks assured all of them that they would be major additions to the USF baseball team, were integral to the team's future success, and had the skills to make it to the next level. All had aspirations of playing Major League Baseball.

126.    However, within the first couple of months of Plaintiffs' arrival on campus— sometimes days—the USF Coaches' mental (and sometimes physical) abuse began. Plaintiffs were isolated and told they were worthless or that they "fucking suck so much." The USF Coaches told players they could not and would not succeed and were routinely called "pussies" and "faggots," and told they were throwing or hitting like a "pussy" or "bunch of pussies." John Doe 2 was called a "fucking cunt," within earshot of the opposing team's fans. They were repeatedly berated, beaten down, and forced to practice even when physically injured.

127.    Each of the Plaintiffs desired to make it to the next level, so most independently asked the coaches for help and direction. But Coach G and Coach Naks regularly responded to these requests by telling Plaintiffs that these requests were a waste of time; that they were not good enough or that their personalities did not fit with the team; that they were "toxic," a "cancer," or "worthless;" that they would never make it in DI baseball; that they might as well leave; that they should give up their scholarships; and that they would never make it as professional baseball players. Coach G even told one player he might as well kill himself.

128.    Against this backdrop of mental abuse, the coaches also engaged in inappropriate sexual conduct, created an intolerable sexualized environment, and retaliated against the players.

---

[109] Profile: Troy Nakamura, *supra.*

129.   For example, Coach Naks would gesture to the undergraduate dormitories overlooking the baseball field and said: "Sometimes girls will stand at their windows, pull up their shirts, and show their boobs. We're here to play baseball, so just look at them and jerk off about it later. Trust me, I want to fuck them too." Coach Naks persistently encouraged female students at these same open dorm windows to flash their breasts by whistling and lifting his shirt to suggest the females do the same. Coach G would laugh.

130.   The coaches also subjected the team's pitchers to strip games during practice. During certain drills, any pitcher who made an error at practice would have to take off an item of clothing. There were times the players had to strip down to their underwear and the coaches and other players would laugh.

131.   During team gift exchanges, coaches would give out sex toys. For example, a coach gave one player a life-sized, blow-up female sex doll. The coach told the player that if he did not bring the doll to practice the next day, he would make him run. The player was forced to walk home from practice with the doll, and on his way home, he was stopped by a police officer who yelled at him for possessing the doll and popped it.

132.   Yet another example is that, from the outset of John Does 1, 2, and 3's freshman years in 2020 and 2021, Coach Naks started practices or particular drills with a "café" exercise. The point of the exercise was to loosen up the players before they started practice. The café exercise involved Coach Naks identifying a dinner theme, such as a barbecue or fast food dinner. Then, each person, including both coaches and players, would go around the circle and identify what they would bring to the barbecue, such as a type of drink or food.

133.   The players quickly learned that Coach Naks would always sexualize the exercise—and that Coach Naks encouraged the other players and coaches to sexualize their answers, too. Coach Naks would refer to women's body parts he wanted to eat, bodily fluids and secretions he wanted to drink, or other sexual innuendo. For example, Coach Naks would say he wanted to eat "Jennifer Aniston's boobs" or "slurp whipped cream from Pamela Anderson's crotch."

134.   Coach G was included in these café exercises, witnessed the way Coach Naks

spoke and encouraged sexual banter, and did nothing to stop it. In fact, Coach G engaged in the same behavior, naming women's body parts or fluids he wanted to eat or drink.

135.   All of the players were affected. For example, John Doe 1 was extremely bothered—and tried to stick to appropriate answers, such as milk or soda. When John Doe 1—or any other player—did not play along, however, he was laughed at by the coaches and others who were forced to join in the conduct and pressured to play along. Plaintiffs felt pressured to stay when these exercises were happening, given that the coaches demanded the players' participation.

136.   Coach Naks sexualized other exercises as well. For example, while players would do their daily butterfly stretches, the coaches on at least a weekly basis would ask, "Where are your butterflies flying to?" Coach Naks would respond with sexual comments like, "They're going to get some strippers," or, "They're going to strippers' asses." The players felt extreme pressure from Coach Naks to respond to the coaches' question in a sexual manner because he would get angry with players who did not.

137.   Plaintiffs' discomfort and reluctance to participate in such bizarre behavior was apparent to the USF Coaches, whose abuse and taunting escalated as a result.

138.   Coach Naks' inappropriate sexual banter was not limited to the exercises. He would also regularly talk about the fact that he was bisexual, how little clothing female students on campus would wear during warm weather, and what sexual acts he would like to perform on young women he saw on campus. At one point in time, Coach Naks moved to live on campus, and his comments about the women on campus became increasingly sexual and distressing to the players. Their discomfort with such conversation was apparent.

139.   Coach G heard and participated in these conversations.

140.   The inappropriate things Coach Naks did or said that day—and what seemed like every day—was a regular topic of conversation among the players.

141.   Coach Naks' sexually charged behavior was not limited to the way he spoke. He also engaged in calculated displays of nudity on and off the field, exposing himself to the players and other coaches.

142.   For example, another exercise the coaches required before most practices was the

performance of skits. Players were split up into four groups at first, second, third, and home bases, and had to improvise skits for the team judged by Coach G.

143.    As with the café exercises, Coach Naks would regularly sexualize the skits. He did so at least twice a week by instructing players to perform sexualized skits and/or by participating in the skits in a sexual manner himself.

144.    For example, on multiple occasions, Coach Naks would pretend he was at a buffet by having a player do a handstand, grabbing that player's legs and splitting them open, then pretending to eat spaghetti from that player's genital region. Many players would be visibly disgusted and upset and would turn their heads away when Coach Naks performed this skit.

145.    On another occasion, Coach Naks performed his own skit in which he instructed a player to get on his hands and knees and then proceeded to ride that player as though the player was a bull and Coach Naks was having sex with it.

146.    During another practice, Coach Naks told his group that he would take care of the group's skit for the day. When it was Coach Naks' group's turn to perform, Coach Naks crawled out of the dugout naked, moved to a kneeling position in front of the players, and swung his penis around. Plaintiffs and some other players looked away in disbelief, embarrassment, and disgust.

147.    Rather than condemn Coach Naks' actions, Coach G kissed the cross on his necklace and jokingly mimed looking up at the sky to ask God for forgiveness.

148.    This was not the first time Coach Naks crawled on to the field naked. Each Plaintiff reports often seeing Coach Naks naked or holding a bat between his legs and pretending it was his erect penis. On another occasion, a player fielding ground balls after practice heard Coach Naks call his name and looked to see Coach Naks standing on a table completely naked and swinging his penis in a helicopter motion while yelling: "Hey, [Player X]!"[110]

149.    Coach G knew that Coach Naks' actions were wrong. Coach G would say to older players, "We could get fired for this." He also told the players that his wife was mad at him because his job was in jeopardy due to Coach Naks' nudity and behavior on the field and around

---

[110] To protect their privacy, Plaintiffs do not use any USF baseball players' real names.

the players. Yet Coach G condoned and even facilitated Coach Naks' behavior by playing along with and normalizing it.

150.    Coach Naks took these grooming actions on the field and extended them to more intimate settings. For example, the coaches would often shower with the players in the players' locker room. They would also walk around the player's locker room, either naked or barely dressed, and make comments about the size of players' penises.

151.    Coach Naks often asked players if he could shower in their dormitory, which was comprised of all first-year students, or in their hotel room at an away game. During one instance in a players' hotel room, after Coach Naks got out of the shower, he walked around naked in the room, exposing himself to the players while talking about his bisexuality.

152.    No one was immune from the sexualized environment, which was used as a weapon to psychologically harass those who would not conform in order to force them off the team. In addition to the examples above, the sexualized environment became the centerpiece of so-called "team bonding" exercises and presentations the coaches endorsed. The coaches were present and participated in them at the expense of players who would not conform.

153.    For example, the coaches ran military training-type exercises at 6:00 a.m. on Saturday mornings where, at the beach, players would strip down to their underwear and float in the water with linked arms. Upon the players emerging from the water, the USF Coaches would comment on how shriveled up all the players' penises were.

154.    The USF Coaches were also present for and condoned sexualized and degrading skits and presentations roasting freshmen teammates each year at the team's annual Rookie Show, including skits that depicted teammates having mock anal sex, pictures of players with graphics mocking their genital area, naked pictures of one administrator (who the players cat-fished).

155.    In addition to the team building events, there were annual coach-sanctioned hazing parties thrown at the expense of the incoming freshmen that included sexualized traditions in which they would have to engage.

156.    These are just a few examples of the completely inappropriate sexual misconduct that created an intolerable sexualized environment the players had to endure—and participate in

to survive—on a near-daily basis. Rather than create fun, relax the players, or build rapport among teammates, this environment made the players stressed, upset, and unable to concentrate. This behavior occurred year after year, and any player who did not endorse this atmosphere or participate in the customs was singled out by the coaches for further abuse and retaliation (including being forced off the team).

### 2. The NCAA knew or should have known of the abuse and retaliation of the baseball players at USF.

157.    The NCAA knew or was on notice of the abuse occurring on the USF baseball team.

158.    First, the NCAA had actual notice at least as early as 2014 through USF's NCAA Faculty Athletic Representative.

159.    According to the NCAA, "[a]n NCAA Faculty Athletic Representative is a member of the faculty at an NCAA member institution who has been designated by the institution to serve as a liaison between the institution and the athletics department, and also as a representative of the institution in conference and NCAA affairs."[111]

160.    The NCAA Faculty Athletic Representative should "play a leading role in the areas of academic integrity, governance and commitment to rules compliance, and commitment to equity, which includes student-athlete welfare."[112]

161.    Moreover, the NCAA Faculty Athletic Representative is to be included in any NCAA official inquiries to determine if rules violations have occurred.

162.    The NCAA Faculty Athletic Representative is also supposed to take part in, or review, the mandated exit interviews with DI athletes when they depart in order to assess "student perceptions of the health of the athletics programs, especially with regard to their interactions

---

[111] Faculty Athletics Representative Handbook (NCAA Jan. 1998) ("FAR Handbook"), at 5, available at https://www.sportsconflict.org/wp-content/uploads/2014/03/FAR-Handbook.pdf (last accessed February 1, 2023); *see also* NCAA Bylaw, § 4.02.2.
[112] FAR Handbook, at 7.

1   with coaches and with the operating policies of the program."[113]

2       163.    Due to the importance of control over the integrity of NCAA athletic programs and

3   student welfare, the NCAA holds the NCAA Faculty Athletic Representative responsible if they

4   do not properly exercise their duties, explaining: "Faculty athletics representatives are expected to

5   take an active role in the institutional control of the intercollegiate athletics program on their

6   campuses. Neither a lack of active involvement of the faculty athletics representative in the

7   institutional compliance effort, nor unfamiliarity on the part of the faculty athletics representative

8   with NCAA regulations is excused by the NCAA, should a major violation occur at the

10  institution."[114]

11      164.    To that end, the NCAA encourages the NCAA Faculty Athletics Representative to

12  "play a central role in any major institutional inquiries into alleged or suspected rules violations,"

13  and participate in the "preparation of written reports of infractions … to the NCAA."[115]

15      165.    In an NCAA "Checklist of Faculty Athletics Representative Duties," the NCAA

16  requires that the Faculty Athletics Representative to [r]eport all secondary and major violations to

17  the NCAA…."[116] The types of student welfare situations in which a Faculty Athletics

18  Representative should participate includes sexual violence in athletics.[117]

19      166.    In May of 2014, a USF baseball player's parents sent the USF NCAA Faculty

20  Athletic Representative and USF's Associate Athletic Director a letter detailing the fact that the

22  USF baseball coaches were engaged in abusive behavior.[118]

---

[113] FAR Handbook, at 13.
[114] FAR Handbook, at 13.
[115] FAR Handbook, at 14.
[116] FAR Handbook, at 20.
[117] *See generally* Sexual Violence Prevention: An Athletics Tool Kit for a Health and Safe Culture 3d. ed. (NCAA May 2022), available at *https://ncaaorg.s3.amazonaws.com/ssi/violence/SSI_SexualViolencePreventionToolkit.pdf* (last accessed February 1, 2023).  Prior versions in 2016 and 2019 recognized the same.
[118] The baseball player is identified as "John Doe 6" in the California lawsuit and will be similarly referred to as such herein.

167.   The NCAA Faculty Athletic Representative notified the Athletic Director, Scott Sidwell.

168.   Among other things, John Doe 6's parents wrote:

**Hostile Environment**

With the change in the coaching personnel this year there has been a significant change in the way the program has been managed, and this has created a 'hostile environment' for the athletes, especially the Pitching Squad. Players are being called out and they are told they are 'pathetic', 'weak-minded', 'a cancer to the team', and that they 'need to understand that their baseball career is over'. This is completely unacceptable behavior from any coach, especially a college coach at an institution such as USF, which subscribed to fair play, high values and ethics.

169.   John Doe 6's parents complained of an "abusive situation" and stated: "To tell a player you have no value to the team, and then to take a player's scholarship when you gave him no real opportunity to prove his value, is an obvious indicator of an extremely poor coach/program[.]"  John Doe 6's parents highlighted the questionable "ethical and moral conduct" of the coaches and the fact that other players were likely in the same plight as their son.

170.   John Doe 6's parents also highlighted the fact that Coach G's wife, who was an employee of USF and an academic advisor to baseball players including John Doe 6, retaliated against players who would not endorse her husband's behavior. For example, when registering for Spring 2014 classes, John Doe 6 was assured by Coach G's wife that he was on track for graduating in May 2015. However, he was later told by Coach G's wife that he was now short one class and so had to "overload" his schedule to graduate on time.

171.   John Doe 6's parents also pointed out the attrition rates of players leaving the baseball program: "Think about how many young men are leaving the team this year with a complete and utter distaste for the USF baseball program."

172.   In the face of these complaints—complaints about a hostile environment, abuse, ethical and moral misconduct, retaliation, and high turn-over rates—neither the NCAA nor the NCAA Faculty Athletics Representative took action to investigate or stop the ongoing abuse. However, the complaint did or should have put the NCAA on notice of abuse within the USF

baseball program *at least as early as May 2014*.

173.    Second, at the end of 2016, the NCAA Faculty Athletics Representative interviewed John Doe 13 in connection with an incident that occurred at Coach G's house during the annual holiday party. John Doe 13 was challenged to spank the team nutritionist at the party as a part of freshman hazing. John Doe 13 was unwilling, but knew that if he did not, he could be mandated by the upperclassmen to drink alcohol or perform 25 mostly sexual tasks on a scavenger hunt during finals week. So John Doe 13 placed his hand on the nutritionist's lower back, and she was mortified and demanded to know in front of all present who put him up to it.

174.    The incident became known to USF's administration and Athletics Department, and the NCAA's Faculty Athletics Representative at USF interviewed John Doe 13. Based upon information and belief, a Title IX investigation was initiated.

175.    *In 2016,* the NCAA was again put on notice of the sexual abuse and misconduct occurring within the USF baseball program, but did nothing to stop it.

176.    Third, even without John Doe 6's parents pointing out the high attrition rates and despite the knowledge of USF's NCAA Faculty Athletic Representative, who has a duty to monitor exits from the athletics program, the NCAA had actual or constructive of the high rate of transfers within the USF baseball program based on the statistics, alone.

177.    It is well known that coaches in the NCAA can "run off" players they do not like or they are retaliating against for reasons stated in this lawsuit. Being run off the team occurs when a coach kicks the player off the team for reasons other than those that are academic or disciplinary, *i.e.*, reasons not within the student-athlete's control.

178.    In the 1999 academic year, when Coach G first became head coach of the USF baseball program, only one of 15 players returned for their sophomore year.

179.    Of the 12 or 13 players who entered USF baseball program in 2013, only five played baseball at USF for all four years of college, and one of those players was Coach G's son. Every other player transferred.

180.    Of the 16 freshman recruits in the 2020 USF baseball class, eleven have left as of today, including John Does 1 and 2. The fact that nearly 70% of the 2020 recruiting class left or

intends to leave is a testament to the USF Coaches' sexual misconduct, ruthlessness, retaliation, and callous treatment of the USF players.

181.   According to the NCAA, based on a 2018 study from the National Student Clearinghouse, just 13% of then-current DI student-athletes in all sports transferred from another school.[119]

182.   The 2018-19 percentage of four-year college transfers among DI student-athletes on baseball teams was even lower—just 2.3%, or the fourth lowest rate out of all 38 NCAA DI men and women's sports:[120]

**2018-19 Percentage of Four-Year College Transfers among Division I Student-Athletes**

| Men's Sport | 4-year | Women's Sport | 4-year |
|---|---|---|---|
| Soccer | 18.6% | Beach Volleyball | 18.4% |
| Basketball | 15.3% | Tennis | 14.1% |
| Tennis | 13.8% | Basketball | 11.9% |
| Golf | 8.3% | Volleyball | 9.7% |
| Track and Field | 8.1% | Golf | 9.0% |
| Cross Country | 7.2% | Softball | 8.5% |
| Football (FCS) | 7.2% | Track and Field | 7.1% |
| Wrestling | 6.8% | Soccer | 7.0% |
| Ice Hockey | 6.7% | Cross Country | 6.3% |
| Skiing | 6.1% | Bowling | 5.5% |
| Swimming | 5.7% | Skiing | 4.8% |
| Volleyball | 5.4% | Water Polo | 4.6% |
| Football (FBS) | 4.6% | Fencing | 4.4% |
| Lacrosse | 3.6% | Ice Hockey | 4.4% |
| Fencing | 2.8% | Swimming | 4.4% |
| Rifle (co-ed) | 2.4% | Field Hockey | 4.0% |
| Baseball | 2.3% | Lacrosse | 3.1% |
| Gymnastics | 2.0% | Rowing | 3.0% |
| Water Polo | 1.8% | Gymnastics | 1.6% |

[119] NCAA, *Research on Student-Athlete Transfers*, https://www.ncaa.org/sports/2019/8/5/research-on-student-athlete-transfers.aspx (last visited Jan. 27, 2022).
[120] NCAA, Transfer Composition of Division I Teams, 10 (July 2020), https://ncaaorg.s3.amazonaws.com/research/transfers/RES_TransCompD1TeamsSlides.pdf (last visited Jan. 27, 2022).

183.    In fact, the overall trend from 2004 to 2019 was a significant decrease in the transfer rate among NCAA DI baseball teams:[121]



184.    One of the largest amateur baseball scouting organizations ranked USF's 2020 recruiting class #80 in the nation among DI baseball programs.[122] USF was one of only two West Coast Conference baseball programs ranked in the top 100 and USF was ranked higher than programs such as Michigan State, Rice, and UCSB.[123]

185.    The data show that these highly-regarded recruits transferred out of USF at an abnormally high transfer rate and the NCAA ignored the data.

186.    Specifically, in order to transfer, players and their teams must notify the NCAA. The NCAA has a central clearinghouse for tracking transfers.

187.    All transfers must go through the NCAA Transfer Portal. The NCAA uses this data not only to track individual student-athletes as they move between schools, but also to "understand Division I student-athlete transfer trends by year, sport and scholarship status."[124]

188.    Thus, the high rate of transfer from USF's baseball team beginning with Coach

---

[121] *Id.* at 13.
[122] Perfect Game, *College Recruiting Rankings: Class of 2020*, https://www.perfectgame.org/rankings/Recruiting/Rankings.aspx?g=2020 (last visited Mar. 11, 2022).
[123] *Id.*
[124] https://www.ncaa.org/sports/2022/4/25/transfer-portal-data-division-i-student-athlete-transfer-trends.aspx (last visited February 1, 2023).

G's tenure as head coach was a red flag which put the NCAA on notice that serious issues existed and warranted investigation. Nonetheless, the NCAA took no action.

E.   **Plaintiffs are Current and Former NCAA Student-Athletes who were Damaged as a Result of the NCAA's Deliberate Choice To Do Nothing in the Face of NCAA Coaches' Sexualized Misconduct.**

1.   **2020-22: John Doe 1's experience was typical.**

189.   John Doe 1 was a standout on his high school baseball team, was recruited by many schools, and given offers by multiple schools, including Ivy League schools.

190.   Coach Naks scouted and met John Doe 1 at a 2019 tournament in Arizona while John Doe 1 was in his junior year of high school. Impressed by John Doe 1's play, Coach Naks invited him to an official visit at USF two weeks later, where John Doe 1 met the entire coaching staff.

191.   USF heavily recruited John Doe 1 based on his baseball skills and experience. The coaches sold John Doe 1 on representations that USF's Jesuit culture set the team apart from all others, all the teammates loved each other, and the coaches treated the players as "family." Coach Naks emphasized USF's four core values, including trust and accountability. He said that John Doe 1 would be a "cornerstone" of the USF baseball team.

192.   USF offered John Doe 1 guaranteed four-year athletic and academic grants-in-aid (scholarships) of approximately $60,000 per year. On October 7, 2019, Coach Naks sent a letter to John Doe 1 along with his official offer. In the letter Coach Naks wrote, "I do not believe I mentioned to you that we are one of the few schools out there that offer 4-year guaranteed contracts. If you sign a National Letter of Intent with the [USF] Dons, your scholarship is guaranteed to you for the entire time you are on the Hilltop. It cannot be reduced for any reason, only increased. Like I mentioned, we have a tradition of reinvesting in our family for guys that take care of business on the field, in the classroom and ***protect the culture***." (Emphasis added). This guarantee was dispositive in John Doe 1's decision to sign with USF, and he signed an NLI.

193.   The retaliation and emotional and sometimes physical abuse against John Doe 1 began as soon as it became apparent to the coaches that he would not play along with the sexually charged behavior on the field and/or that John Doe 1 was discussing ways to get the behavior to

- 44 -

stop.

194.    For example, John Doe 1 injured his hand the fall of his freshman year, but he was told to continue playing. Eight days later, he injured his ACL and meniscus and underwent surgery to repair both injuries.

195.    When John Doe 1 returned following surgery, the coaches, including Coach G, interfered with his doctor's orders and would yell at him for either doing too much physical therapy or not the right kind of therapy. Despite his injury, John Doe 1 would show up to practice early and before anyone else—yet he was yelled at for being tardy. Coach G demanded that John Doe 1 practice 100% with the team even though John Doe 1's doctor prohibited that.

196.    The USF Coaches regularly told John Doe 1 that he was not working hard enough and that would never be good enough. Coach Naks regularly berated John Doe 1 at practice and in his office.

197.    At the end of his freshman year, and after John Doe 1's parents learned of several of the above-described incidents, John Doe 1's mom left several voicemails for USF's Athletic Director ("AD"), Joan McDermott, which were not returned.

198.    Under the USF Nondiscrimination Based on Sex and Gender, Sexual Harassment, and Sexual Misconduct Policy ("Title IX Policy"), the AD is considered a "Mandatory Reporter" and should have immediately followed up with John Doe 1's mother and reported the substance of John Doe 1's complaints to USF's Title IX office.[125] The AD's failure to do so was, itself, a violation of USF's Title IX Policy.[126]

199.    Not only did the AD not report John Doe's mother's complaint, John Doe 1 believes the AD shared the complaint with Coach G and Coach Naks because the abuse against John Doe 1 escalated throughout the summer of 2021.

200.    Specifically, during the summer between his freshman and sophomore year, Coach

---

[125] USF, Nondiscrimination Based on Sex and Gender, Sexual Harassment, and Sexual Misconduct for All Students, Employees, and Third-Parties, Title IX Policy 2 (effective Aug. 14, 2020), https://myusf.usfca.edu/sites/default/files/users/jvarga/Interim%20Policy%20and%20Procedures%2008.14.2020.pdf (last visited Feb. 9, 2022).
[126] *Id.* at 21.

Naks called John Doe 1 multiple times and told him not to come back. Every time, John Doe 1 told Coach Naks he intended to return to school as he had a four-year scholarship and wanted to honor his commitment to the team. In response, Coach Naks told him he was "the most irrational person he had ever met." Coach Naks also said, "The people here don't believe in you." Coach Naks told him he was "tearing up the fabric of the program and not protecting the culture." Coach Naks threatened, "I am going to make sure it is not an enjoyable experience for you." He would keep John Doe 1 on the phone for 30 minutes at a time, relentlessly threatening and berating him if he would not agree to transfer from USF. He also refused to allow John Doe 1 to discuss the matter with his parents, demanding an immediate answer.

201.    Coach G also called John Doe 1 several times that summer. He told John Doe 1 that he would never play at USF again, that he was "toxic" to the program, and that he might as well leave. Coach G called him a "fucking pussy," told him he was being "fucking selfish for keeping his scholarship," and that he was hurting the rest of the team by not agreeing "to give his scholarship to someone who would buy into the culture of the program."

202.    John Doe 1 did not want to leave USF. He liked his teammates, and if John Doe 1 chose to leave, he would lose his scholarship and valuable playing time under the NCAA's transfer rules. Staying and succeeding at USF both academically and on the baseball team was also important to John Doe 1 because he wanted to become the best possible player and aspired to play professional baseball.

203.    John Doe 1 returned for the fall season his sophomore year. Both Coach G and Coach Naks largely ignored John Doe 1 from a coaching perspective, refusing to help him. At the end of the fall season, all the coaches held exit interviews with every player to discuss their futures.

204.    At John Doe 1's exit interview, each coach told him that he should leave. Coach G told him that the relationship between the coaches and John Doe 1 had become "toxic." Coach G told him that he was being "very selfish" for staying at USF and not agreeing to enter the transfer portal and relinquish his scholarship. John Doe 1 insisted he was not going to leave.

205.    Shortly after the exit interview, the AD reached out to John Doe 1 and told him she

understood he was going to enter the transfer portal to leave USF. John Doe 1 was surprised by the AD's call, given that he had not agreed to go into the portal nor to give up his scholarship.

206.    John Doe 1's mom spoke with the AD and reminded the AD that she had tried to contact her in the spring of 2021 about the problems her son was experiencing on the baseball team, but the AD had never responded.

207.    During one of the calls between John Doe 1's mom and the AD in December of 2021, the AD disclosed that USF's Title IX office had already been alerted to issues on the baseball team and that John Doe 1 would be contacted and interviewed as part of the investigation.

208.    Specifically, during John Doe 1's sophomore year, a teammate and friend reported to USF about the USF Coaches' misconduct. Upon information and belief, it was to USF's Title IX office.

209.    After that call between John Doe 1's mom and the AD, John Doe 1 learned he was excluded from an upcoming team meeting where the AD shared the status of the investigation and suspension of the coaches with the other players.

210.    Three weeks later (in January 2022), neither John Doe 1 (nor many of the other players) had been contacted regarding the Title IX investigation. John Doe 1 contacted the AD to express concern that he had not yet been interviewed. He was only called for a cursory interview after his mom inquired with the AD herself.

211.    On January 11, 2022, USF issued the following statement to student-athletes via email:

> Dear Members of the USF Baseball Team,
>
> On Dec. 17, 2021, after receiving complaints from members of the USF community, USF baseball head coach Nino Giarratano and associate coach Troy Nakamura were suspended with pay, pending results of an internal investigation. Conducted by USFs Office of Human Resources, the investigation was focused on reports of incidents within the baseball program when the coaches [*sic*] language, behavior, and/or actions were inappropriate and did not reflect USFs mission and values.
>
> As a result of that investigation, Coach Nakamura is no longer associated with the USF baseball program, effective immediately. Coach Giarratano was officially reprimanded for inappropriate

behavior related to the reported incidents.

While the investigation did not find evidence of a widespread harmful culture within the baseball program, the reported incidents indicated that coaches showed poor judgment and lack of supervision. The university has taken immediate action to address this. Procedures are being put in place to ensure baseball team members are ensured a respectful, safe environment with proper oversight, direction, and mentoring by their coaches. The wellbeing of all students at USF is our highest priority.

The Athletic Department and the university is grateful to members of the community who came forward with concerns, and provided information. We are also grateful to the staff in Human Resources who conducted a thorough, swift and comprehensive investigation.

212.    In light of USF's attempt to close out these issues without acknowledging that sexually abusive behavior was indeed widespread on the baseball team and that its investigation was not thorough, it is unsurprising that USF's administration has continued to engage in retaliation.

213.    For example, right after the above announcement, the AD contacted John Doe 1 to inform him that while Coach Naks had been terminated, Coach G would stay on. She stated that Coach G would be on a year-to-year contract and would not be allowed to travel or hold meetings without an administrator present. John Doe 1 asked the AD how Coach G felt about John Doe 1 remaining on the team, and the AD said she would speak to Coach G and follow up with John Doe 1 "in a couple of days."

214.    In the interim, USF posted a message on Instagram, congratulating John Doe 1 and three other players for maintaining a 4.0 GPA in the fall semester. Just an hour later, the post was taken down. On information and belief, it was taken down because Coach G continued his campaign of retaliation and wanted to force John Doe 1 to leave USF by discrediting his accomplishments and deflating his confidence.

215.    Given his anxiety about returning to USF's campus and being subjected to Coach G's abuse, John Doe 1 tried to register for online classes for the spring 2021 semester but was unable to register for a full course load. He signed up for class waitlists, emailed professors, and had multiple calls with his advisor, but was still unable to register for enough classes. After

additional complaints, USF finally helped John Doe 1 by assigning him an academic success coach.

216.    After almost two weeks, John Doe 1 still had not heard back from the AD, so John Doe 1 called her. The AD told John Doe 1 that Coach G did not want him to return to the team, and that she was going to stand behind Coach G's decision that John Doe 1 should leave the team. The AD thus adopted and furthered the abusive coach's retaliation against a student-athlete brave enough to call out the coaches for their illegal behavior.

217.    USF encouraged John Doe 1 to sign a document to enter the transfer portal so he could play baseball at another college or university. Contrary to the assertions USF made to John Doe 1, that document contained a place for John Doe 1 to sign and agree that USF could revoke his scholarship. John Doe 1 refused to sign that portion of the document. In January 2022, John Doe 1 entered the NCAA transfer portal, finished the school year at USF remotely, and transferred to another school in the fall of 2022 for which he currently plays NCAA Division III baseball.

### 2.    2020-22: John Doe 2's experience was typical.

218.    USF heavily recruited John Doe 2 based on his baseball skills and experience. The coaches at USF portrayed the USF baseball team as a cohesive, caring culture where everyone cared about each other's successes and had each other's backs.

219.    John Doe 2 committed to play baseball at USF in his senior year of high school and signed an NLI. John Doe 2 was offered (and accepted) guaranteed four-year athletic and academic grants-in-aid (scholarships) in an amount of $75,000 per year to attend USF. John Doe 2 received the largest scholarship ever awarded by USF for an outfielder.

220.    The retaliation and emotional abuse against John Doe 2 began as soon as it became apparent to the coaches that he would not play along with the sexually charged behavior on the field and/or that he and his teammates were discussing ways to stop the behavior.

221.    Throughout the fall of 2020, Coach G and Coach Naks did not provide John Doe 2 with opportunities to play, nor did they provide coaching direction. While Coach G texted John Doe 2 that he was doing great, those accolades did not transfer to opportunities to practice or

1   playing time on the field.

2          222.   At the time, in the fall of 2020, John Doe 2 did not understand why he was not

3   afforded playing time and practice opportunities. John Doe 2 had dreams of playing baseball

4   professionally, and he wanted to do all that he could to better himself as a ball player and athlete

5   while at USF.

6          223.   During the spring of 2021, Coach Naks began verbally abusing John Doe 2. By

7   way of example only, at an away game, Coach Naks screamed at John Doe 2, calling him a

8   "fucking cunt" while they were in the dugout. Parents from the opposing team reported the event

9   to several USF parents, and John Doe 2's parents learned about the shocking conduct. John Doe 2

10  was humiliated.

11         224.   In the spring of 2021, Coach G brought John Doe 2 in for an early exit interview.

12  Coach G told John Doe 2 that he wanted him gone from the team because John Doe 2 was "too

13  nice and too respectful," presumably for the intolerable sexualized environment the USF Coaches

14  had created. Coach G told John Doe 2 that he did not like him and that John Doe 2 did not have

15  the type of personality Coach G wanted. Coach G tried to force John Doe 2 to verbally agree to

16  leave the team and to give up his scholarship. John Doe 2 was stunned and upset. He was not

17  prepared to leave the team or give up his scholarship, particularly without speaking with his

18  parents.

19         225.   On May 30, 2021, John Doe 2's parents requested "an urgent in person meeting"

20  with USF's AD. The subject line of the email stated, "URGENT MEETING REQUEST." The

21  AD never responded to this email.

22         226.   Shortly after his early exit interview, John Doe 2 showed up to take the bus to an

23  away game, but the team did not have him on the player list or assigned seating chart. John Doe 2

24  understood this was because Coach G was retaliating against him by trying to run him off the

25  team.

26         227.   In the summer of 2021, Coach G repeatedly called John Doe 2, asking him if he

27  was returning to the team. John Doe 2 told him he was. Coach G became very upset, telling John

28  Doe 2 that he was making a terrible decision, that he did not belong at USF, and that he was

going to be cut from the team as soon as he got back to campus.

228.   In the fall of 2021, Coach G largely ignored John Doe 2 when it came to providing coaching direction. John Doe 2 would ask Coach G what he could do to get more playing time and how he could improve. Coach G would respond that John Doe 2's playing ability was fine, but that he just did not have room for him.

229.   Coach G and Coach Naks clearly communicated that they hated John Doe 2, that they wanted him to leave, and that they would not give him any coaching direction. John Doe 2 became extremely stressed. He was upset that no matter how hard he worked—and even though his playing ability was not in question—the coaches wanted him to leave. His grades suffered, and he began isolating himself. He felt degraded given that he had to suffer through the sexualized conduct and harassment at practice, with little to no coaching, and then be told his personality was the problem because he would not play along.

230.   John Doe 2 became physically ill from the stress, resulting in five emergency room visits during the fall of 2021; by the end of fall 2021, Coach G's campaign to force John Doe 2 of the team succeeded. John Doe 2 determined that his physical and mental health was suffering too much and advised USF that he intended to transfer and lose his scholarship.

231.   John Doe 2 spoke with both the AD and assistant AD regarding his reasons for leaving USF. During his call with the AD, the AD told John Doe 2 that she knew things were going on with the coaches on the team and implied that both Coach G and Coach Naks were going to be terminated.

232.   In December 2021, John Doe 2 learned of a Zoom meeting the AD was holding with the team that he had not been invited to. Like John Doe 1, he reached out to the AD asking to be included.

233.   During this Zoom meeting, which was attended by over 40 people, the AD acknowledged how angry and distraught the team must be, and that she felt the same, alluding to Coach Naks' behavior and the complaints about him. She told the team that Coach G was a "great guy," that she and Coach G had been friends for years, and that they all would get through this together. She told the team that the events that had transpired were hard on her, too. She said she

had hardly slept and she loves "those guys."

234.    John Doe 2 understood from the team meeting that the AD intended to protect Coach G, despite the fact that Coach G had normalized and participated in Coach Naks' sexual harassment. John Doe 2 was upset that the AD minimized the players' experiences, including the inappropriate sexual conduct that created an intolerable sexualized environment and psychological abuse in which Coach G had engaged.

235.    John Doe 2 transferred from USF in January of 2022 to another institution to play NCAA DI baseball.

### 3.    2021-22: John Doe 3's experience was typical.

236.    John Doe 3 received approximately 10 offers, including from Ivy League schools as well as USF, which heavily recruited John Doe 3 based on his baseball skills and experience.

237.    The coaches sold John Doe 3 on the USF baseball team through representations that the baseball players were very close to each other, there was a family culture on the team, John Doe 3 could leave a legacy on the program, and he would be the "foundation of the program" for years to come.

238.    John Doe 3 committed to play baseball at USF in his junior year of high school and signed an NLI. John Doe 3 was offered (and accepted) guaranteed four-year athletic and academic grants-in-aid (scholarships) of more than $280,000.

239.    Afterwards, John Doe 3 was injured during his senior year of high school and worked extensively with a physical therapist to be ready to play baseball for USF.

240.    The summer before John Doe 3 was to begin his fall semester at USF, John Doe 3 was invited to work out with Coach G on campus numerous times. During this time, several coaches praised John Doe 3 and said they were excited to get him on campus.

241.    Just weeks later, when John Doe 3 started at USF in the fall of 2021, the USF Coaches began constantly verbally abusing him for being injured and for having to rehabilitate his arm. Coach G would yell "you pussy" at John Doe 3, and demand he throw the ball harder or differently, causing John Doe 3's arm injury to worsen. John Doe's worsening injury made him unable to throw at all for more than a month, spurring additional criticism from Coach G.

242.     Just three weeks into school, John Doe 3 asked Coach G for help. John Doe 3 wanted to become a standout player on the USF team, as he had aspirations of one day playing professional baseball. Coach G responded that it would be a waste of his time, pointless for him to help John Doe 3 out with coaching, that John Doe 3 was not and never would be one of his top five players, and so he refused to work with him.

243.     During practice, Coach G would verbally abuse John Doe 3 in front of the other players, threatening to hit him on the head with a baseball bat, and telling him he was the problem with the team. Despite the coaches' treatment, John Doe 3 strived to be successful. Every day from 7 a.m. to 6 p.m., John Doe 3 was either in class, on the baseball field, or in physical therapy. He showed up at practice, even when he could not participate in certain drills due to his injury.

244.     In a subsequent meeting in Coach G's office, Coach G called John Doe 3 a liar, when John Doe 3 told him that he had not been late for physical therapy. When John Doe 3 tried to defend himself, Coach G told him that none of his teammates or coaches liked him, that he was a waste of space, and that he was a problem for "everyone." Coach G told John Doe 3 to "get the fuck out" of the school because he did not belong there. Coach G also said that he wished he could take John Doe 3's scholarship away more than anything, and that he was the biggest mistake he had made in 22 years of coaching. Coach G called John Doe 3 a "pussy" repeatedly during this meeting.

245.     When John Doe 3 reinjured his arm soon thereafter, Coach G became angry and told John Doe 3 that there was "something seriously wrong" with John Doe 3's head.

246.     Because of his injury, Coach G told John Doe 3 not to do anything during practices, and sarcastically said that John Doe 3 could have fun and watch his teammates improve. At an away game, while John Doe 3 was observing his teammates practice, Coach G called John Doe 3 over and began yelling at him for not joining practice. When John Doe 3 responded that he (Coach G) told him not to do anything, Coach G responded, "Can't you even think? I've never in my life had someone make me so angry every day. You can't go a day without pissing me off."

247.     No matter what John Doe 3 did, the coaches berated him. For example, for one

game, the players were supposed to arrive at 8 a.m. John Doe 3 showed up at 7:53 a.m. and was the first to take batting practice. A little while later, Coach G made him leave the game because he "had arrived 10 minutes late" (which was obviously not true). Later in the game, Coach G badmouthed John Doe 3 to his teammates, asking, "Where's [John Doe 3]? He must be home taking a long nap since he's not here."

248.    The following Monday, the coaches sent John Doe 3 for a blood draw to test for drugs. John Doe 3 had not been taking drugs and understood that no other baseball player had been sent for drug testing, ever. John Doe 3 believed the USF Coaches were singling him out for abuse to get him to leave the team, and of course, John Doe 3 tested negative for drugs.[127]

249.    John Doe 3 became increasingly anxious and depressed as the semester progressed. When not in class or at practice, he stayed in his room distressed. He could not sleep or eat and felt very anxious at practices, waiting to be singled out and abused, and hoping for the practices to end.

250.    John Doe 3 was retaliated against for not participating in the sexually charged behavior in which the coaches were engaged. Most times, when a sexual conversation was occurring, John Doe 3 would distance himself by walking or turning away.

251.    During the semester, John Doe 3 complained to the Director of Player Development, who is responsible for safeguarding players' mental health. He spoke with the director for a week about the abuse before he was sent to a USF sports therapist. That USF sports therapist told John Doe 3 that his experience and those events occurring with the team were normal, and that is how most coaches act.

252.    In advance of his exit interview after the season, the coaches told the players that they needed to fill out their personal evaluation forms in advance, but that they needed to be filled out in the way that the coaches wanted them to. If they did not, the players were told that their subsequent "conversation would not be pleasant and would involve a lot of yelling." Fearing

---

[127] Notably, the NCAA Drug-Testing Program for 2020-2021 specifies urine collection, not blood draws. *See* https://ncaaorg.s3.amazonaws.com/ssi/substance/2020-21SSI_DrugTestingProgramBooklet.pdf (last visited March 27, 2022).

further verbal abuse, John Doe 3 complied with Coach G's order to fill out the form as directed.

253.    At John Doe 3's Fall 2021 season exit interview, the coaches told John Doe 3 that his scholarship was revoked and that he would not be at USF next semester. They demanded that John Doe 3 enter the transfer portal immediately and forced him to fill out another form stating that he (John Doe 3) was being cut from the team.

254.    John Doe 3 left the meeting upset and confused. He had chosen USF because of the guaranteed four-year scholarship. He did not understand how the coaches could revoke it. So, he undertook his own research online and learned that the coaches had lied about their ability to revoke the scholarship and had tricked him into writing that he was leaving on the form.

255.    John Doe 3 contacted USF's Associate AD. The Associate AD confirmed that the coaches could not take away his scholarship.

256.    John Doe 3 then contacted Coach Naks and asked how his guaranteed scholarship could be taken away. Coach Naks told him to come by the office. Coach G told John Doe 3 at that meeting that he understood John Doe 3 wanted to leave. He asked: "Are you leaving?" When John Doe 3 said he did not know, Coach G looked surprised and told him there was no point in staying as he would never be part of the baseball team. Coach G demanded an immediate answer and would not allow John Doe 3 to discuss the matter with his parents.

257.    John Doe 3 was then contacted by USF's NCAA Faculty Athletics Representative Jeremy Howell by phone to discuss why he was leaving the team. At that meeting, John Doe 3 received confirmation that USF does not drug test its players and spoke about his plans if he left USF.

258.    Following the meeting and phone calls, the USF Coaches sent John Doe 3 text messages about other schools interested in him and with requests to return his equipment.

259.    During winter break, John Doe 3 spoke with the AD, who told John Doe 3 that he could stay and finish the school year and that USF does not have pre-exit interview forms. The guaranteed scholarship was important to John Doe 3, and he did not want to relinquish it so he finished the school year remotely.

260.    Nevertheless, in March of 2022, John Doe 3 entered the transfer portal because of

the abuse inflicted upon him. He transferred after his freshman year because of the actions and inactions of Defendant, played DI baseball at another NCAA-member institution during his sophomore year, and will continue playing college baseball.

**4.      2017-18: John Doe 10's experience was typical.**

261.    John Doe 10 was a talented baseball player in high school. In 2016, after his junior year, he was named to the all-state baseball team by Cal-Hi Sports, a prestigious honor for a high school baseball player. John Doe 10 graduated in 2017 and was drafted by a Major League Baseball team but decided to attend college before going to the major leagues.

262.    John Doe 10 knew it was important to pick the right college on his path to the major leagues. His grandfather had been inducted into the Professional Baseball Scouts Hall of Fame, and his father worked as a scout for over a decade for several Major League Baseball organizations.

263.    John Doe 10 was heavily recruited but decided to attend USF based on Coach G's representations that the team was a "family," that it was built on certain pillars of faith and morals, and that Coach G cared about the players as people.

264.    John Doe 10 also established an excellent rapport with the pitching coach. Coach G and the pitching coach convinced John Doe 10 that he was the future of the USF program.

265.    John Doe 10 received athletic and academic grants-in-aid (scholarships) valued at $200,000 guaranteed for four years to play baseball at USF and earned one of three coveted starting weekend pitching spots as a freshman in 2018. He signed an NLI.

266.    Neither when John Doe 10 started at USF nor at any time thereafter does he recall being advised or learning that USF had policies governing or prohibiting sexual harassment or other sexualized misconduct by coaches, seeing any such policies displayed on campus, being told about such policies at any orientation conducted for new students, or receiving a publication that contained such policies.

267.    Neither when John Doe 10 started at USF nor at any time thereafter does he recall being advised or learning of any rules or procedures for reporting charges of sexual harassment or misconduct by coaches or for pursuing available remedies and resources, on or off campus,

seeing any such rules or procedures displayed on campus, being told about such rules or procedures at any orientation conducted for new students, or receiving a publication that contained such rules or procedures.

268.     Upon joining the USF baseball team, John Doe 10 was subjected to the intolerable sexualized environment the USF Coaches created and perpetuated. For example, during practice for the pitchers, the coaches made them play a strip game they called flinch or balk. Each pitcher would have to take off a layer of clothing during practice when they made an error. There were times when the players stripped down to their compression shorts, and the coaches and other players would laugh.

269.     The coaches would also make the players perform skits on the field during practice that were judged by Coach G. The coaches encouraged these skits to be sexual in nature. In one example, a group of players "dry hump[ed]" each other; Coach G pointed at them and yelled, "Winner!"

270.     Coach Naks would also talk about female athletes in a sexualized and offensive manner in front of the team. Coach G would talk with the players about the size or shape of individual players' penises.

271.     John Doe 10 was disgusted by the coaches' conduct, and recalls thinking, "What are we doing?" John Doe 10 therefore refused to condone this behavior but was scared that the coaches would penalize him if he formally complained. So, he remained on the team, but the USF Coaches' ongoing sexual misconduct was so distracting that he struggled to consistently perform on the mound.

272.     John Doe 10 had also been diagnosed with ADHD, executive functioning disorder, and verbal dyslexia. During his first semester of his freshman year at USF, John Doe 10 struggled with the academic workload on top of the training schedule, and his learning disabilities contributed to his difficulties.

273.     During this time, his learning disabilities became known to the team, and John Doe 10's stress was exacerbated because Coach G and Coach Naks called him a loser, made fun of his learning disabilities, and told him that ADHD is not "real".

274.     The USF Coaches retaliated against John Doe 10 for his refusal to condone and participate in the sexualized environment they had created.  For example, during a February 20, 2018 meeting, John Doe 10 shared with Coach G that he was struggling and felt like he was blacking out on the mound. Rather than help John Doe 10, Coach G berated him, telling him he was "a piece of shit," "a fuck-wit-freshman," and "a nobody."

275.     Coach G told John Doe' 10, "your family isn't shit and you aren't shit," referring to John Doe 10's grandfather and father. Coach G said: "Suck my cock," adding, "You aren't a winner, you know nothing about winning, I know everything about winning, I'm a winner, you aren't close. You're lucky I even let you be a part of this program."

276.     During Coach G's tirade, John Doe 10 asked how Coach G could say these harsh things about him when had hadn't taken the time to get to know John Doe 10 or what he was dealing with on a day-to-day basis (including with respect to his ADHD, executive functioning disorder, and verbal dyslexia) over the last seven months. In response, Coach G told John Doe 10 to "shut the fuck up," and said: "ADHD is a hoax, and you just use it as an excuse when you fail."

277.     In another example, after a Saturday doubleheader, Coach G told John Doe 10 that he was a "fucking embarrassment" and a "fucking loser" in front of the team. John Doe 10 was so visibly upset that the pitching coach told him to come to his room after the game. There, while crying hysterically, John Doe 10 confided in the pitching coach about Coach G's abuse. The following Tuesday, Coach G yelled at John Doe 10 to stop talking to the pitching coach and said, "If you can't throw strikes, you might as well fucking kill yourself." The pitching coach was not the only staff member with whom John Doe 10 shared the abuse that Coach G inflicted.

278.     During one game, Coach G became so incensed at John Doe 10 that he physically abused John Doe 10, throwing him against the wall in the dugout.

279.     Coach G's abuse and retaliation of John Doe 10 extended beyond USF. In the summer of 2018, John Doe 10 was accepted to play with a collegiate summer baseball league known for its association with top prospects and draftees to the MLB.

280.     At the end of the USF season, Coach G told John Doe 10 that he had notified the summer baseball league that he was withdrawing his referral. Coach G told John Doe 10 that

there was "no way" John Doe 10 would be good enough to play in that league and that he wasn't "going to ruin [his] relationship with" the team.  This caused John Doe 10 to miss a once-in-a-lifetime opportunity that would have advanced his professional baseball career.

281.   John Doe 10 was devastated by the combination of psychological and physical abuse. He began to believe what the coaches said about him—that he was a loser, worthless, and a bad baseball player—and to hate himself. Because John Doe 10 was depressed, he began struggling to perform and as punishment, he was not allowed to travel and received minimal play time. When he did play, and Coach G began forcing John Doe 10 to throw only fastballs, preventing him from throwing other pitches. One time John Doe 10 attempted to "shake a pitch," which means to ignore the catcher's call for the next pitch and throw a different pitch; Coach G yelled at him, saying words to the effect that if John Doe 10 did that again, Coach G would throw him off the team.

282.   John Doe 10's parents were extremely worried about him. He would call them crying, and they were concerned he would harm himself. On one occasion, he was so upset that they stayed on the phone with him until he fell asleep. On numerous occasions, John Doe 10's father would make the nearly two-hour drive to San Francisco to check on him. He would sometimes stay into the early morning hours to console John Doe 10 and ensure he would not harm himself.

283.   By the end of the year, John Doe 10 and his parents agreed that John Doe 10 needed to leave in order to protect his mental health and get the coaching support he deserved. At the exit meeting at the end of the season, John Doe 10 asked for a release from the team because of the abuse.

284.   After leaving USF, John Doe 10 focused on his mental and physical health and was able to find his passion for baseball again. He played summer ball, while he sent text messages and emails, and made phone calls to dozens of colleges in an attempt to transfer. He wrongly assumed that there would be the same interest in him as there was when he was recruited from high school, but that was not so. He only received a few walk-on offers.  He discovered that Coach G was "blackballing" him when one DI coach told John Doe 10: "I like you, but I am

friends with Nino [Giarratano], so I am not interested."

285.    John Doe 10 decided to attend a DI school where he would have to pay his own tuition and sit out for one year due to the NCAA's transfer rules. Based on his new coach's statements, it was clear that Coach G had also tried to blackball John Doe 10 from this school.

286.    John Doe 10 worked hard to recover from the abuse and setbacks USF inflicted and had a successful year at his new school and a promising summer in 2019 with his summer league team. However, because of the NCAA's transfer rule at that time, John Doe 10 had no body of work to show after his initial season at his new school. This changed his career trajectory for the MLB draft, as he was relegated to sign as an undrafted free agent by an MLB team and currently fights to be seen in the minor leagues.

### 5.    2017-18: John Doe 4's experience was typical.

287.    Being offered a spot on the USF baseball team was a dream come true for John Doe 4. He was recruited his senior year of high school and had offers to play at many DI schools but was persuaded to attend USF because the USF Coaches sold him on the school's Jesuit values and Coach G "rolled out the red carpet" during John Doe 4's visit to USF.

288.    During this visit, Coach G showed John Doe 4 and his parents his house and spoke to them about the team being a "big family" in which everyone gets along. Coach G told them that if a player cannot "go home for a holiday, there's always a seat at the [Giarratano] dinner table." John Doe 4 signed an NLI committing to play baseball as a freshman at USF in the fall of 2017.

289.    John Doe 4's dream quickly became a nightmare once John Doe 4 arrived on campus. The USF Coaches were often nude around players and would shower with them. Though John Doe 4 thought this was very strange, he attempted to accept the behavior as it was portrayed as "normal" within the team culture. This also applied to Coach Naks' more frequent nudity, for which the players even had the expression: "If Coach Naks whips his dick out, you know he's in a good mood."

290.    John Doe 4 also recalls the USF Coaches constantly talking with the players about the shape and size of the players' penises.

291. John Doe 4 did not participate in the sexualized behaviors, and the USF Coaches noticed. So, they constantly belittled him throughout the school year in an effort to force John Doe 4 off the team.

292. For example, when John Doe 4 would make a mistake, Coach G would immediately berate him, saying, for example: "Hey, [John Doe 4], why don't you just try to do one thing right instead of everything wrong. You're such a stupid fucking idiot."

293. While at bat during a scrimmage, John Doe 4 moved out of the way of a pitch. Coach G stopped the game and said, "You can't hit anyway so [getting hit by a pitch] might be your only shot to get on base. Toughen up and don't be a pussy." Later that day, with the entire team in the dugout, Coach G said, "[John Doe 4], you played like a scared bitch today. What happened? [Another teammate], too, you guys both looked like scared girls running the bases." While the team laughed, John Doe 4, mortified, was nearly brought to tears.

294. One day Coach G said to the entire team, "Last night I laid in bed and thought to myself: Tomorrow I'm going to try and not be mean to [John Doe 4]. Then I thought, no, it's just too easy to be mean to him, I don't know what it is about that guy but it's so easy to be mean to him."

295. During a rain delay affecting one game, a senior captain picked up and threw John Doe 4 on the field, then forced him to dance on the field in front of the entire USF team, the coaches, and the opposing team. Everyone, including the USF Coaches, laughed. John Doe 4 was humiliated.

296. The incessant, degrading treatment and comments worked: after his freshman year, John Doe 4 was crushed. He lost all confidence, dreaded going to practice, and wanted off the team. He was severely depressed, could not complete his homework, and would call his mother every day in tears. His parents worried that he might harm himself.

297. John Doe 4 left USF after his freshman year, played baseball near his home for two years, then transferred to another DII university to continue playing baseball.

298. In 2019, John Doe 4 sought counseling to help overcome the trauma caused by Defendant's conduct.

**6.** **2017-18: John Doe 12's experience was typical.**

299.     Baseball meant everything to John Doe 12 as a child and young adult: he was the youngest of three brothers—all of whom played baseball—and began playing baseball at the age of three on a select team coached by his father. John Doe 12's childhood dream before starting at USF was to join a DI school and then play baseball professionally.

300.     John Doe 12 was a gifted baseball player. In high school, he started varsity at shortstop all four years; played on three prestigious traveling teams; and led the state's batting statistics when he was a member of his home state's all-state team his junior and senior years.

301.     Because of his baseball skills and experience, John Doe 12 was heavily recruited by over 40 college baseball programs, including 22 NCAA DI baseball programs and five Top 20 NCAA DI baseball programs.

302.     John Doe 12 signed an NLI after his junior year of high school committing to USF because USF offered him a 4-year guaranteed scholarship of $256,000 after he was told that many other schools do not offer this kind of guarantee, which could not be taken away from him. He was told this was an investment in him and his family. John Doe 12 also chose USF because he had been told that USF was recruiting him to be a starting player.

303.     Once John Doe 12 joined the USF baseball team, he was immediately subjected to the intolerable sexualized environment the USF Coaches had created. The USF Coaches would often make comments about each other's penises, as well as those of the other players. For example, two minutes into John Doe 12's first practice with the USF team, Coach G asked John Doe 12 if he had "seen [Player Y's] piece yet." When John Doe 12 expressed confusion over what Coach G was referring to, Coach G said: "Ohhh, you'll see it soon, you better watch out." Upon information and John Doe 12's belief, Coach G had been referring to teammate Player Y's penis size.

304.     During John Doe 12's first month at USF, Coach G began talking about how small Coach Naks' penis is on the baseball mound at practice, noting that he could "barely see it." Coach G then imitated Coach Naks urinating by holding his penis with only his thumb and one finger to indicate how small it was. Coach Naks laughed and repeated the same imitation vis-à-vis

Coach G.

305.    After an away game at Oregon in 2018, the USF players showered in the Oregon visitors' locker room. The coaches showered with them. Coach G and Naks also waited in line to shower, with towels on their shoulders and genitals uncovered. They both, without refrain, looked and commented on the players' private parts. Coach G would say things such as: "How's it hanging today?" "Is it a cold one today for you? "Oh come on, you don't even use that thing." "You need a lawn mower down there." Coach Naks also laughed and swung his penis around during that time.

306.    John Doe 12 was disgusted by this behavior and declined to participate. In response, the USF Coaches immediately began abusing John Doe 12. Coach G constantly cursed at John Doe 12 and forced him to play even when he was injured or physically unwell. For example, within John Doe 12's first two weeks of practice as a freshman, John Doe 12 recalls Coach G telling John Doe 12 how much he sucked at fielding the baseball and that he was "the biggest pussy" he'd seen. Coach G told John Doe 12 that John Doe 12 "had no dick, so even if the ball did hit" him, "it wouldn't hurt" in response to John Doe 12 not fielding the ball the way Coach G wanted him to. At a practice later that fall, when John Doe 12 missed a ground ball considered unfieldable because it was hit so hard, Coach G stalked over to John Doe 12 at third base, and said, "You have no fucking balls. I have more balls than you and I have one fucking testicle, you pussy."

307.    Another incident took place in the spring of 2018 at a pre-game practice at Saint Mary's College of California ("St. Mary's"). In response to John Doe 12 missing a ground ball at third base, Coach G stopped the entire batting practice. In front of the USF baseball team, St. Mary's baseball team, and staff from both schools watching the practice, Coach G walked slowly over to John Doe 12 while cursing at him and stated: "How embarrassing is it that I have to come over here just to teach you how to field a fucking ground ball."

308.    Coach G came up behind John Doe 12, and grabbed him by the waist, which made John Doe 12 extremely uncomfortable, especially in light of the abusive environment he and other teammates had been subjected to all year. Coach G then patronizingly "taught" John Doe 12

how to field a ground ball as though John Doe 12 was a small child. This incident lasted for about 5-7 minutes, during which the St. Mary's team and staff, as well as USF's team and staff, watched and laughed at John Doe 12. After Coach G was done humiliating John Doe 12, he said, "See now, you've ruined our whole entire batting practice, look what you did[]" and walked off.

309. It was an exception for John Doe 12 to be able to leave a practice or game without getting railed against by the coaches. Statements such as "you fucking suck so much today," "you're a fucking terrible baseball player," and "you're a pussy" were common. The coaches made these statements to John Doe 12 regardless of whether John Doe 12 was performing well that day.

310. Coach G would also pull John Doe 12 out of games for no apparent reason. For example, in the spring of 2018 at a game against University of Nevada, Reno, despite John Doe 12 executing two plays perfectly, Coach G called John Doe 12 over, questioned how he could have put John Doe 12 in a game if John Doe 12 was "such an incompetent pussy," and pulled him out of the game.

311. Additionally, despite the fact that in the spring of 2018, John Doe 12 was batting .400 after the first five games, the second best average on the team at the time, Coach G benched him for the next 15 games with no explanation.

312. Instead, Coach G put a fifth-year senior second baseman in who had never batted over .250. Upon information and John Doe 12's belief, Coach G played that second baseman because he had a better relationship with that second baseman than he did with John Doe 12. That second baseman batted below .200 during those 15 games John Doe 12 was benched.

313. The night before another practice John Doe 12's freshman year, John Doe 12 came down with food poisoning. Despite the fact that he told Coach Naks that he had vomited many times the night before and could not practice, Coach Naks called John Doe 12 a "completely ball-less pussy" and said that if John Doe 12 did not practice, he would be "looked at like a pussy by everyone, especially Coach G." Because of Coach Naks' statements to John Doe 12, John Doe 12 felt the need to try to practice; John Doe 12 threw up for hours after practice and ultimately lost eight pounds in 48 hours.

314.     At a practice game towards the end of John Doe 12's freshman year, after John Doe 12 broke this throwing hand thumb, Coach G called John Doe 12 a "big pussy" and forced him to continue throwing because John Doe 12 "needed to get better" according to Coach G.

315.     The incident with his throwing hand thumb catalyzed John Doe 12's decision to quit the USF baseball team. John Doe 12 attended his exit interview at the end of his freshman year and told Coach G that he felt Coach G had treated him poorly and did not like how Coach G stripped John Doe 12 of his "confidence and dignity all-year long."

316.     In response, Coach G aggressively came at John Doe 12 and began yelling at him in a manner that made John Doe 12 fear harm from Coach G. Coach G told John Doe 12 that he had never been "worthy" of his USF scholarship and had to give it back, and that he needed to leave because there was no place left for John Doe 12 at USF; John Doe did not fit into USF's baseball program. Coach G also told John Doe 12 that he did not deserve to play at USF and called John Doe 12 "stupid" and "incapable."

317.     That meeting made John Doe 12 feel unwanted, and as though he had no choice but to relinquish his scholarship and leave USF. At the time of his exit interview, John Doe 12 was not comfortable openly discussing the sexual abuse he had been subjected to given the extreme retaliation to which he was subjected. The retaliation occurred in front of other non-defendant coaches and USF officials and no one protected him. Thus, he understood that USF condoned this behavior as the norm.

318.     Because of the USF Coaches' abuse, John Doe 12's father flew across state lines to USF 16 times over the course of John Doe 12's freshman year to provide his son emotional support out of concern for how isolating the USF Coaches' abuse was for John Doe 12 and fear that his son would harm himself.

319.     Because of the NCAA's rules, once John Doe 12 quit the USF baseball team, he had to go back to a junior college for a year. After that year, he then went back to a DI school—this time without any financial assistance—and continued to play baseball.

320.     It was only in 2019, after John Doe 12 experienced the abuse-free environments at his junior college and new DI school, that he understood that the USF Coaches' behavior was

egregious and abusive.

321.    John Doe 12 stopped playing baseball in June 2021, and then finished his last semester at his new DI school.

322.    Because of the USF Coaches' abuse, John Doe 12 ultimately gave up his lifelong dream to play professional baseball and now plans to attend law school. John Doe 12 felt the USF Coaches' emotional and sexual abuse wore him down to the point where he "could no longer become what [he] wanted to be." John Doe 12 has not yet recovered from the trauma to which the USF Coaches subjected him and still experiences the anxiety and depression he began feeling his freshman year at USF.

### 7.    2016-18: John Doe 13's experience was typical.

323.    In high school, John Doe 13 had dreams of playing professional baseball, and was heavily recruited by DI universities, including USF, because of his baseball skills and experience. Coach Naks, who was an alumnus of John Doe 13's high school, sought out John Doe 13, boasted of USF's Jesuit core-family values, and indicated that the USF baseball team was a close-knit community. John Doe 13 was told that he would be invited to family, holiday dinners and treated as a part of one, big family.

324.    John Doe 13 was offered (and accepted) renewable annual athletic and academic grants-in-aid (scholarships) of 60%, and he signed an NLI committing to USF.

325.    Once he arrived on campus, John Doe 13 was subject to "culture shock" because Coach Naks was the ringleader of non-stop sexualized misconduct and Coach G was the cheerleader who egged him on. Practices included sexualized skits several times per week, and everyone vied for Coach G to pick them as a winner to be part of the "in" crowd (i.e., in the Coaches' favor). If a player did not participate, he became part of the "out crowd" (i.e., subject to hazing and retaliation by the USF Coaches). Skits were held at the beginning of practice for the position players (non-pitchers), who Coach G and Coach Naks were in charge of, and participation was mandatory.

326.    The sexualized environment was not only limited to skits, but also included vile commentary. For example, during practices Coach Naks would talk about the co-eds on campus,

saying things such as, "Did you see that girl, she has big breasts and a big butt, and if I lived in the dorms, I'd hit that." Coach G would hear such comments and egg Coach Naks on.

327.    During this time, the USF Coaches exceeded the NCAA's practice limits every week. There were rumors that the team's coaches had been disciplined for exceeding practice hours, and it was understood by the players that if anyone claimed the team practiced more time than allowed, that player would be cut from the team.

328.    On road trips, both Coaches G and Naks would shower with the players in the opposing team's "gang showers" and would comment on players' penis sizes, saying things such as, "Wow, great size," and "Let me see what you're working with."

329.    During practices, the freshmen players were required to "cross-dress" in sexualized manners, rolling up their pants to look like panties and twisting their shirts to look like bras. There were games where they were required to take off items of clothing. Anyone who did not wholeheartedly participate in these sexualized activities was ostracized.

330.    Those who were ostracized for not participating in the sexualized atmosphere like John Doe 13 were subject to verbal abuse, harassment, and ridicule. At least once a week, Coach G would tell John Doe 13 things such as, "You can take your fat ass in a canoe and paddle back to Hawaii."

331.    During John Doe 13's Rookie Show, one skit involved a player being naked on a table and another player "playing" him like air drums. John Doe 13 was revolted.

332.    Throughout the team's hazing week—which was the same week as winter final exams—the upper-class players hosted hazing events at each of their apartments for five consecutive nights. At those hazing events, freshmen were forced to drink until they almost passed out. One night, all the freshmen players had to strip down naked in a dark living room. Another night involved one shot of red wine every minute for one hour straight. On another night, freshmen players were required to take a shot every couple steps until they finished climbing a flight of stairs at an upper-class player's apartment.

333.    An incident that haunts John Doe 13 to this day involved hazing at Coach G's home at a Christmas Party in 2016. As a freshman, John Doe 13 knew that, as part of the Coach-

sanctioned hazing of freshman, he could be called out by the upperclassmen at any time during finals to drink alcohol or perform 25 inappropriate (and typically sexual) tasks on a scavenger hunt. At Coach G's party, John Doe 13 was told to spank the female school nutritionist to avoid doing the scavenger hunt tasks, and so he placed his hand on the nutritionist's lower back towards her buttocks. The nutritionist was mortified and demanded to know in front of those assembled who put him up to it.

334.    The next day, Coach G called John Doe 13 into his office. Coach G told John Doe 13 in words or substance that John Doe 13 should accept full responsibility for the incident and not reveal that it was a part of freshmen hazing. He made it clear that John Doe 13 should not implicate the team in any way.

335.    The incident became known to USF's administration and Athletics Department at least as early as when USF's NCAA's Faculty Athletics Representative interviewed John Doe 13 in connection with this incident and, based upon information and belief, a Title IX investigation was initiated.

336.    To this day, John Doe 13 is highly ashamed of his role in the incident, and is mortified that he was living in an environment that led him to believe that slapping a woman at a party was a required part of team building in a coach's home.

337.    Coach G's son was a member of the team during John Doe 13's time at USF. He witnessed errors recorded for Coach G's son during games being removed from the box score online that night.

338.    One time, Coach G's wife, the academic advisor for the players on the team, was caught on video booing and giving John Doe 13 thumbs down when John Doe 13 was substituted in at bat for her son. John Doe 13 and his family were very upset by this showing of disrespect, which highlighted that for the Giarratano's, it was all about their son's success to the detriment of the other players.

339.    John Doe 13's freshman year was so intolerable that he began looking into transferring out of USF; however, John Doe 13 knew that if any prospective new school coach called Coach G or Coach Naks to inquire about John Doe 13's baseball abilities, the USF

Coaches would blackball him. So, John Doe 13 stayed at USF for an additional year and continued to be subjected to the same sexualized misconduct by the USF Coaches during that time.

340.    During that time, John Doe 13 was physically and emotionally distraught due to the excessive practice hours, mandatory extra training, and the psychological and mental abuse created by the sexually charged environment. John Doe 13 was so distressed he was having suicidal ideations and often told his parents he was ready to jump out of his dorm room window. The USF Coaches' conduct destroyed John Doe 13's love of the game, ruined his chances of ever playing baseball professionally, and effectively caused him to leave the team and USF after his sophomore year.

### 8.    2015-16: John Doe 14's experience was typical.

341.    John Doe 14 was recruited by a number of DI schools, including USF. John Doe 14 was swayed by Coach Naks' messaging that the baseball team was a family and team members come back for alumni events. Coach Naks said that he would always be there for John Doe 14 if he needed anything.

342.    Even though USF was interested in John Doe 14, the school did not immediately have scholarship money available for him. He was invited to be a select walk-on transfer to USF during his junior year, and was told he would be able to earn a scholarship at USF with his 4.0 GPA.

343.    Based on these promises, John Doe 14 forewent other offers, attended a junior college for two years and signed an NLI. He transferred to USF in the fall of 2015. Because of the USF Coaches' conduct, however, John Doe 14 did not even complete one academic year at USF.

344.    Upon arriving at USF, John Doe 14 experienced "immediate culture shock." Players who did not buy into the sexualized environment were name-called and singled out as lazy. John Doe 14 was constantly called "a pussy" and told that he was not working hard enough, all because he did not engage in the sexual antics.

345.    It was not unusual for Coach Naks to shower with the players–it was a weekly occurrence. And in the locker room, a host of demeaning sexual words, including "pussy" and

"faggot," were always coming out of Coach Naks' mouth.

346.    At the time, the USF baseball field was under construction and John Doe 14 would have to ride in Coach Naks' van to the practice field. When they would pass a co-ed, Coach Naks would make sexual comments about the girl and what he would like to do with her. Such commentary by Coach Naks was non-stop. Coach Naks even made sexualized comments about John Doe 14's girlfriend, making John Doe 14 extremely uncomfortable.

347.    During his time at USF, John Doe 14 would hear players on the team discuss that Coach G's son was always starting in games despite what everyone noted was mediocre performance on the field. And while John Doe 14 never saw the stats, the rumor was that Coach G was altering his son's stats to inflate his abilities.

348.    John Doe 14 was also randomly drug tested twice and was told he was being tested at the NCAA's request. Both tests occurred at 5:00 a.m. on a Sunday. There were only two or three other players who were also drug tested with him, and none of them starting players. John Doe 14 believes that he was drug tested so that if the tests were positive (they were not), the USF Coaches could have a pretext to kick him off the team mid-season.

349.    In the spring, and despite promises of a spot on the team and scholarship money, John Doe 14 was run off the team. At the time, he did not understand why he was run off the team, because his batting average was better than two of his fellow outfielders who were not cut. It was not until learning of this lawsuit that John Doe 14 realized that he was cut in retaliation for not partaking in, or condoning, the sexual antics of the USF Coaches.

350.    John Doe 14 decided to leave USF but was unable to transfer to another Division I school, as that was prohibited. He knew he could not transfer to another Division II school or to the National Association of Intercollegiate Athletics (NAIA) because both needed the coach's release, and he knew that Coach G would never release him, destroying any prospect that John Doe 14 had to play baseball at another school.

351.    John Doe 14 never received any promised scholarship money from USF, and after transferring, had to take out loans to finish his college education. He never had an opportunity to further pursue his career in baseball.

1

### 9.     2011-14: John Doe 5's experience was typical.

2      352.     John Doe 5 received numerous offers, including from USF, which heavily

3  recruited John Doe 5 based on his baseball skills and experience. The USF Coaches sold John

4  Doe 5 on the USF baseball team through representations that the baseball players were very close

5  to each other, there was a family culture on the team, and John Doe 5 would be an important

6  member of the team.

7      353.     John Doe 5 was offered renewable annual athletic and academic grants-in-aid

8  (scholarships), starting at 25% his freshman year which increased over time to nearly 100% based

9  on his performance. He accepted the offer and signed an NLI. In 2013, he received the Con

10  Dempsey Jr. Award,[128] named for a former USF baseball player who played in the MLB in the

11  1950s. The award is given every year to the USF baseball player "who comes on late in the

12  season to make a significant impact."[129] Although John Doe 5's scholarship amount increased

13  over the years, the USF Coaches treated him worse each year.

14      354.     Upon joining the USF baseball team, John Doe 5 soon learned that there was no

15  family culture and that a player's staying power on the team was dependent on participating in the

16  coaches' sexualized environment. For example, in November 2011, Coach Naks emailed John

17  Doe 5 a visualization technique that was supposed to "free you up to attack like a rabid, horny

18  Rottweiler."

19      355.     On multiple occasions, John Doe 5 witnessed Coach Naks exposing himself as a

20  joke in front of players, which was accepted as a normal part of team culture. Coach Naks also

21  frequently asked John Doe 5 and other teammates sexual questions about women. This made John

22  Doe 5, a gay man not yet out, incredibly uncomfortable. Further, John Doe 5's lack of responses

23  often resulted in his teammates ridiculing him and invasively questioning his sexuality.

24      356.     On another occasion, a pitching coach (now head coach at another university)

25  exposed himself in front of the team to pee on a scouting report of USF players to demonstrate

26

---

27  [128] The award is named after a former USF baseball player who played in the MLB in the 1950s.
    [129] SF Baseball, *BASE: Dons Hand Out Annual End-of-Year Awards* (May 20, 2019),

28  https://usfdons.com/news/2019/5/20/baseball-base-dons-hand-out-annual-end-of-year-awards (last visited July 7,
    2022).

that the opinions of other teams in those scouting reports did not matter to him.

357.    The USF Coaches and several teammates who knew John Doe 5 is gay would also single him out because of his sexuality and make him feel unsafe. For instance, each year, the USF Coaches organized a "Rookie Show" and encouraged players to provide sexualized entertainment. During John Doe 5's freshman year, two players performed a skit depicting John Doe 5 and the only other gay teammate (also not out at the time) biking to Whole Foods and having anal sex. The coaches laughed at this skit.

358.    The USF Coaches were aware that one of the baseball players who acted in the above skit punched a gay student and physically threw him out of a USF baseball party because there were no "faggots" allowed at the party. Following that incident, the USF Coaches called a player meeting—from which John Doe 5 was excluded—during which they told the players to "sweep it under the rug."

359.    John Doe 5 heard about the assault from other players and was very upset that Coach G condoned the incident by covering it up. In fact, Coach G went out of his way to cater to this player, who became a first-round MLB draft pick.

360.    Coach G and John Doe 5's teammates also often made jokes about John Doe 5 and his straight roommate dating.

361.    Because John Doe 5 saw that no one was punished after these events, John Doe 5 no longer felt safe. As a result, he began volunteering less for optional team activities, which Coach G seized on to vocalize John Doe 5's lack of commitment to the entire team on multiple occasions. For example, Coach G selected John Doe 5 to host the sexualized Rookie Show his sophomore year, but John Doe 5 declined. Coach G became irate, belittling John Doe 5 for not being a good teammate.

362.    Coach G also isolated John Doe 5 during multiple one-on-one meetings in which he told John Doe 5 that he had mental issues and needed to see a sports psychologist provided to him by USF. Despite revealing what had occurred to the USF psychologist, the psychologist never offered John Doe 5 any resources.

363.    During batting practice freshman year, John Doe 5 was joking around with a few

of his teammates while another player took batting practice from one of the other coaches in the team's batting cage. When it was John Doe 5's turn, a coach threw a hard and fast pitch at John Doe 5's face, striking him in the neck. He then called John Doe 5 a "pussy" and said that he deserved the hit for joking around.

364.    The NCAA sanctioned Coach G and USF for using too much off-season practice time during John Doe 5's tenure at USF.[130] In response to the sanctions, USF staff replaced practices with additional workouts and "non-team practices" that were ostensibly optional. However, players including John Doe 5, felt forced to go to them to avoid Coach G's retaliation for not attending. These additional unconventional practices, which included long marches and hikes, caused John Doe 5 to develop a wear and tear injury in his hip.

365.    Following his injury, USF coaching staff intimidated John Doe 5 into having hip surgery so that he could get back onto the field as soon as possible. The coaches then forced John Doe 5 to play summer baseball before recovering from the surgery. This injury, which included torn cartilage, a torn hip flexor, and hip damage, has caused life-long problems for John Doe 5.

366.    John Doe 5 did not feel comfortable talking with the AD because the AD, as it is now widely known, was already covering up a major sexual abuse scandal relating to the men's soccer team. Coach G knew this and used this information against the team to make them feel unsafe and unsupported.

367.    After one game where John Doe 5 and the only other gay player on the team played poorly, Coach G told the team that "they played like a bunch of faggots" and challenged them to tell the AD if they had a problem with how Coach G was speaking to the players, while looking directly at John Doe 5. After this game, Coach G had a meeting with both John Doe 5 and the other gay player and told them he only had room for one of them on the team—even though they played different positions and were both starters. John Doe 5 thinks Coach G said this

_____

[130] Though not the subject of this litigation, John Does 4 and 12 recall that during one of their first practices in 2017, the coaches made all players pre-sign their weekly NCAA practice hour logs for the entire semester. Though the coaches explained they did this to avoid forgetting to turn any logs in, John Does 4 and 10 later learned that the coaches did this because they made the players practice more hours each week than allowed by the NCAA. USF's conduct demonstrates its knowing flouting of its duties and the rules.

because both players were gay, making John Doe 5 feel even more isolated and threatened. Moreover, Coach G was retaliating against the players by intimidating them so that they would not file a complaint.

368.    During the spring of his junior year, John Doe 5 was batting over .300 in conference play during his first season back since his hip surgery. Despite performing well, he started to notice that (along with the consistent verbal abuse from Coach G) Coach G was now starting to regularly bench John Doe 5 in front of the team during the 7th or 8th inning of games whose outcomes were already determined to demoralize John Doe 5 and single him out because of his sexuality. However, because Coach G was not willing to risk losing a game by replacing John Doe 5, he did not do this during close or important games.

369.    John Doe 5 continued to try to ignore these events and Coach G used John Doe 5's lack of reaction to point out to the team how little John Doe 5 cared, furthering his argument that John Doe 5 was "toxic" and a "cancer" to the team as a whole.

370.    The USF Coaches' jokes about John Doe 5's sexuality, their sexually inappropriate actions, their mentally and physically abusive behavior towards the team, and their verbal and physical assaults of gay players in particular made John Doe 5 feel so extremely unsafe, he felt forced to quietly quit the program at the end of the spring 2014 season. During his time on the team, John Doe 5 became depressed and suicidal and witnessed other players become depressed and suicidal.

371.    Many teammates did not understand why John Doe 5 had left the team, and Coach G used this as further proof that John Doe 5 was not committed to the team and that Coach G had effectively excised a "cancer" from the team.

372.    John Doe 5's academic advisor was Coach G's wife, Brenda Giarratano. She used her advisory time with John Doe 5 to question what was going on with his relationship with Coach G and why it was bad. After she learned that John Doe 5 was refusing to condone Coach G's sexually abusive environment—including by deciding to leave the team—she, too, began retaliating against John Doe 5.

373.    After John Doe 5 quit the team, he applied to graduate early using college credits

he accumulated during high school through the "Running Start" program, which allowed him to take college courses at Washington community and technical colleges. Though these records were provided to USF when John Doe 5 was admitted and used to place him in certain USF classes, when John Doe 5 applied to graduate early, Coach G's wife claimed that she could not locate John Doe 5's transcripts.

374.    Upon information and belief, Coach G's wife used her power as a USF staff member with access to John Doe 5's academic records to try and prevent him from applying for and receiving early graduation as a punishment for perceived wrongs against her husband and the USF baseball program. Coach G and his family used their power to manipulate and punish USF players who they did not like and were willing to go to great lengths to assert their authority.

375.    Prior to USF, John Doe 5 had aspirations of playing MLB, and his performance during his college career certainly pointed in the direction of him being selected in the MLB draft, but Coach G told John Doe 5 that he had informed scouts that John Doe 5 had no interest in playing professionally, and that he didn't really care about baseball in general.

376.    Coach G systematically destroyed John Doe 5's love for the game and destroyed any professional prospects John Doe 5 had, thus ensuring that John Doe 5 would never play baseball again.

377.    John Doe 5 had planned to get his MBA from USF while on scholarship but lost his scholarship when he was forced to quit the program because of concerns for his personal safety. As a result, he had to pay out of pocket to continue his education.

378.    Since 2012, John Doe 5 has suffered from recurring nightmares about USF baseball, frequent anxiety attacks, and bouts of depression affecting his personal and professional relationships, as well as his ability to stay employed. He feels unable to rekindle previously significant friendships with many of his teammates who continued to play after John Doe 5 left USF. He was made to feel as though he was a pariah and would not be welcomed back because he was told that the way he left the program was disgraceful and harmful to the team.

379.    In early December of 2021, John Doe 5 finally felt he had the capacity to begin to address his mental health and began discussing his experience at USF with some of his former

teammates.

380.    In December of 2021, John Doe 5 also reached out to Coach G on LinkedIn and asked him to catch up. That same day, over the phone, John Doe 5 explained to Coach G how the incidents of abuse and the intolerable sexualized environment he experienced on the baseball team made him feel at the time, and how they continue to affect him to this day. John Doe 5 mentioned Coach G saying the team "played like faggots," and saying his teammate's assault of the gay student at the USF baseball party was an example.

381.    When John Doe 5 expressed to Coach G that Coach G's failure to punish the player who had assaulted the gay student was upsetting and contributed to his feeling that he was not safe on the team, Coach G said he could not apologize for other people's actions. Coach G's lack of remorse shocked John Doe 5.

382.    After this conversation, John Doe 5 learned of Coach G's suspension and Coach Naks' termination and realized that there were other instances of the USF Coaches' abuse he had not known about.

383.    Learning that Coach G would not be fired because USF took the positions that only Coach Naks was a problem and that there was no proof of a problematic culture on the baseball team was incredibly upsetting for John Doe 5, because he knew both Coach Naks and Coach G created and fostered the pervasive abuse Plaintiffs suffered.

384.    On Friday, March 11, 2022, when John Doe 5 read the filed Complaint brought against Defendant NCAA and the USF Coaches by John Does 1-3, he suffered a panic attack because of the trauma he endured at the hands of the USF Coaches.

**10.    2012-14: John Doe 6's experience was typical.**

385.    John Doe 6 was recruited by USF as a sophomore during high school based on his baseball skills and experience. John Doe 6 backed out of an offer he had from another DIII school, and instead went to a community college for his freshman year pursuant to an agreement with USF to accept him afterwards. John Doe 6 picked USF because he was told that the "culture" on the baseball team was such that the team is very close and supportive of each other so that each member becomes the best player that he can.

386.    After that one year, during which he was awarded Junior College All American, he transferred to USF for his sophomore year in the fall of 2012 and accepted USF's offer of annual renewable athletic and academic grants-in-aid (scholarships) of 35%. John Doe 6 signed an NLI.

387.    When John Doe 6 arrived on USF's campus, there were many sexualized events constituting part of the team's culture. For example, Coach Naks sometimes showered at the same time the players did. One time, John Doe 6 recalls seeing Coach Naks crawling on the field naked, which he found extremely bizarre.

388.    Coach Naks also spoke about trying to get the female students in the overlooking dorm rooms to flash their breasts.

389.    And although, as a pitcher, he was not required to participate in the skits, John Doe 6 would often see Coach Naks performing skits and Coach G grinning. Coach Naks was often grunting and making animal sounds. Coach Naks would sometimes hold a bat between his legs like it was a penis.

390.    John Doe 6 thought it was highly inappropriate and declined to participate in this misconduct. But he felt he could not formally speak up about this misconduct, because this behavior appeared "normal" to other non-defendant coaches and USF staff.

391.    John Doe 6 played baseball at USF for two years. His first year, he spent under the supervision and protection of the pitching coach, who never endorsed the USF Coaches' sexual abuse. However, after the pitching coach left following John Doe 6's first year, John Doe 6 had a drastically different experience in his second (junior) year because he was now subject to abuse, harassment, and retaliation for refusing to condone the USF Coaches' sexualized misconduct. For example, Coach G often called John Doe 6 a "pussy." Coach G would also say that the pitchers were throwing "like a bunch of pussies."

392.    The fall of 2013 saw a large incoming freshman class on the baseball team, and one of the freshmen was Coach G's son. John Doe 6 and other players believe the USF Coaches began to take steps to force the current players off the team to make space for the freshmen.

393.    For example, although John Doe 6 had a stress fracture in his back from his youth that the coaches and trainers knew about, the coaches and trainers demanded he do strength-

building exercises incompatible with his injury. Not wanting to contradict the authority figures he trusted, John Doe 6 followed USF staff's exercise protocol. One day while doing the exercises, he heard a pop in his back, felt a tingling sensation in his legs, and fell over. An MRI revealed a slipped disk and a herniated disk. Even though his injury was documented by an MRI, John Doe 6 had to convince the USF Coaches that he was indeed injured.

394.    John Doe 6 worked hard at rehabilitating his injury in the off-season and was cleared to start the 2014 season in the spring. Even though he had not pitched much, he was brought in to pitch in the second game of the season and, unsurprisingly, did not perform well. Coach G walked out on the mound and said, "Get off my fucking mound; you're a piece of shit and an embarrassment to the program."

395.    The next time John Doe 6 pitched, he performed very well, evidenced by a scoreless inning. Despite this, Coach G later called him into his office and said, "Unless anything drastic changes, we're going to go in another direction next year. We don't think your heart is in it. You don't have the ability to play on this team. We found our pitchers that we're going to use, and you're not one of them. You're still on the team and can come to practices, but you can't go on road trips." Though he was not permitted to travel, John Doe 6 continued to attend practices and to rehabilitate his back because he wanted to succeed on the team.

396.    At John Doe 6's exit interview with Coach G at the end of that season, Coach G said that he found John Doe 6 a summer league in the Bay Area. John Doe 6 was astounded, as he had previously understood that he was going to be cut from the team. John Doe 6 told Coach G that he got an internship in Los Angeles and found a summer league there in which to play. Coach G responded, "If you're going to do this internship and not play ball in the Bay Area, you're not going to be on the team next year," even though he had told him previously he was not on the team. Coach G added: "Since you have a career-ending injury, you should approach the NCAA to give your scholarship to them next year."

397.    John Doe 6 quit the team due to Coach G's constant abuse and belittlement throughout that year. However, he was allowed to keep his scholarship and graduate from USF because his parents complained to the school and the NCAA faculty representative about the

"hostile environment" and the fact that he was "bull[ied] to quit [the team], because an outright termination would be something that would probably be questioned."

398.    Specifically, in May of 2014, John Doe 6's parents sent the Associate Athletic Director and the NCAA Faculty Athletic Representative a letter. The NCAA Faculty Athletic Representative brought the Athletic Director, Scott Sidwell, into the conversation. Among other things, John Doe 6's parents wrote:

> **Hostile Environment**
>
> With the change in the coaching personnel this year there has been a significant change in the way the program has been managed, and this has created a 'hostile environment' for the athletes, especially the Pitching Squad. Players are being called out and they are told they are 'pathetic', 'weak-minded', 'a cancer to the team', and that they 'need to understand that their baseball career is over'. This is completely unacceptable behavior from any coach, especially a college coach at an institution such as USF, which subscribed to fair play, high values and ethics.

399.    John Doe 6's parents complained of an "abusive situation" and stated: "To tell a player you have no value to the team, and then to take a player's scholarship when you gave him no real opportunity to prove his value, is an obvious indicator of an extremely poor coach/program[.]"  John Doe 6's parents highlighted the questionable "ethical and moral conduct" of the coaches and the fact that other players were likely in the same situation as their son.

400.    John Doe 6's parents also highlighted Coach G's wife's failings as John Doe 6's academic advisor that was seemingly influenced by his status on the team:  When registering for Spring 2014 classes, John Doe 6 was assured by Coach G's wife that he was on track for graduating in May 2015. However, prior to his meeting with the baseball program he was told by Coach G's wife that he was now short one class and so had to "overload" his schedule to graduate on time.

401.    John Doe 6's parents also asked USF to look at the attrition rates of players leaving the baseball program: "Think about how many young men are leaving the team this year with a complete and utter distaste for the USF baseball program."

402.    Had USF followed up on each or any of these complaints, including the "abusive

situation" and conducted an open investigation, it would not have been able to continue to ignore and cover up the problems in the baseball program, and the sexualized misconduct in which the USF Coaches engaged would have been brought to light.

403.    However, in the face of these complaints, Scott Sidwell, USF's AD at the time, offered to continue John Doe 6's partial scholarship, but only if he did an "internship" for the baseball team. Though John Doe 6 declined the offer because he no longer wanted to be around the USF Coaches, USF continued to provide John Doe 6 his scholarship. Upon information and belief, USF continued to provide John Doe 6 a scholarship in order to perpetuate the cover up of the USF Coaches' actions, including the sexualized misconduct and that Coach G had been falsifying baseball players' statistics.

404.    Specifically, during one of the several conversations with USF, John Doe 6's parents mentioned their awareness that Coach G had been falsifying his son's baseball performance statistics. These falsified statistics had been used to the detriment of John Doe 6 and other players.

405.    Though John Doe 6 was no longer an active player on the baseball team, during his last year at USF, Coach Naks called John Doe 6 into his office and told him that he had been randomly selected for a drug screening test to be administered by the NCAA. Curiously, none of the players selected for the "random drug test" were starting players.

406.    John Doe 6 suffered an avoidable physical injury; lost all will, ambition, and love for the game of baseball; and gave up on his dream to one day play professional baseball.

**11.    2014: John Doe 7's experience was typical.**

407.    John Doe 7 was a legacy USF baseball player and student: his grandfather played baseball at USF; and his father, uncle, and cousin attended USF. While John Doe 7 had opportunities to play baseball elsewhere, he only wanted to play at USF because of this legacy. While recruiting him, Coach G told John Doe 7 that he would be treated "like family" and that "we take care of each other" and "we build people up." He signed an NLI to attend USF.

408.    When John Doe 7 arrived on campus, it was apparent that the team was not like a family. Instead, there was a great divide between the players who parroted Coach G and Coach

Naks' conduct—including the sexualized activities and the unrelenting cruelty—to stay in the coaches' good graces, and everyone else.

409.    Among other sexual misconduct, John Doe 7 endured Coach Naks' sexual displays and efforts to persuade females to expose themselves in front of dorm windows. At the time, John Doe 7 minimized these incidents because Coach G did not seem bothered by them. John Doe 7 was also mandated to participate in stripping drills where players would have to remove articles of clothing during practice when they made errors.

410.    Those players who were not a part of the "in group" because they refused to condone such misconduct were not even allowed to sit at the same table with the others (who did) and would sometimes be forced to pay for those other players' meals. John Doe 7 and his roommate would eat dinner at different times to avoid paying for other players' meals. There were also rumors that, in prior years, players had to serve meals in French maids' costumes.

411.    Another activity to keep the divide between the players was called "Kangaroo Court." Senior players would call out younger players' mistakes and impose "fines" that had to be paid on the spot. For example, they would announce, "[John Doe 7] owes $15 for missing a ground ball." The senior players would take the money for themselves. Coach G and Coach Naks participated and laughed.

412.    During his freshman year, John Doe 7 was assigned the same jersey number of a former USF player who went on to play Major League Baseball. A senior later told John Doe 7 that Coach Naks made another teammate take John Doe 7's jersey out of his locker because John Doe 7 "didn't deserve to wear that number." John Doe 7 was fined in Kangaroo Court for "losing" the jersey.

413.    If John Doe 7 did well, it was not good enough for Coach G. If he performed poorly, Coach G would say words to the effect of, "You suck and that's what I expected." Coach G often told him, "You're a pussy. You're letting your family down. You're not capable of playing baseball at this level."

414.    Coach G also used "team building" events as a tool to degrade players. In a skit teammates performed about John Doe 7 when he was a freshman in 2014, another player

portrayed John Doe 7 as the intellectually disabled character Lenny from *Of Mice and Men*. At the end of the skit, Lenny/John Doe 7 was killed with a baseball bat. Following the skit, upperclassmen showed John Doe 7 a series of video clips from all his teammates about why they hated John Doe 7, why he sucked at baseball, and why he is a bad person. This was the worst night of John Doe 7's life.

415.    Despite this unrelenting abuse, John Doe 7 continued to work hard. Taking Coach G upon his professed open-door policy, John Doe 7 attempted to meet with Coach G on several occasions to discuss how to improve John Doe 7's performance. Each time, Coach G brushed him off by telling him that Coach G was too busy and would catch up with him later. Coach G never did.

416.    John Doe 7 began experiencing anxiety and sleep deprivation. He dreaded attending practice because he feared being targeted. Older players, on multiple occasions, threatened him with violence in front of the whole team, yet the USF Coaches did nothing. He was afraid for his safety given the violent culture the USF Coaches created and perpetuated on the team.

417.    John Doe 7 was so depressed he transferred out of USF after only one semester, as did his roommate, also a freshman on the baseball team. When John Doe 7 told Coach G about his plans to transfer, Coach G responded, "I knew you weren't capable of playing here. Thank you for wasting our time."

418.    John Doe 7 then attended a local community college; yet even there, Coach G's reach extended, and John Doe 7's new teammates (who were friends with Coach G's son) were told, "[John Doe 7]'s a pussy who sucked at baseball and couldn't hang at USF."

419.    Based upon these events, John Doe 7 became severely depressed and had to work hard to overcome his emotional injuries. To this day, he regrets his decision to attend USF.

**12.    2013: John Doe 8's experience was typical.**

420.    John Doe 8 was recruited by USF during his junior year of high school based on his baseball skills and other experience. He was also actively recruited by several other schools and received an offer his junior year from Pepperdine University, another school in the same

conference as USF. However, the summer after his junior year, John Doe 8 bonded with the USF pitching coach and verbally committed to USF based on the representations the pitching coach made about the USF baseball team.

421.    The pitching coach called John Doe 8 weekly as part of the recruiting process, consistently spoke about how much John Doe 8 was wanted at USF, and how USF would help him make it to the major leagues. He told John Doe 8 that the USF baseball team is a "brotherhood" in which teammates are very close, build each other up, and spend time together off the field.

422.    John Doe 8 was offered and accepted USF's renewable annual athletic and academic grants-in-aid (scholarships) of 25%, and he signed an NLI. However, right before John Doe 8 arrived on campus, the pitching coach left USF to serve as a DI head coach in Southern California and John Doe 8 soon learned that everything he was told about the baseball program's culture was untrue.

423.    Once he joined the team, John Doe 8 was immediately subjected to the intolerable sexualized environment the USF Coaches had created. At one of John Doe 8's first practices as a freshman in 2013, Coach Naks referenced the undergraduate dormitories overlooking the baseball field and said: "Sometimes girls will stand at their windows, pull up their shirts, and show their boobs. We're here to play baseball, so just look at them and jerk off about it later. Trust me, I want to fuck them too."

424.    John Doe 8 was also subjected to strip games where each pitcher had to take an item of clothing off when they made an error during practice.

425.    During John Doe 8's freshman year in 2013, a picture of John Doe 8's girlfriend, an elite athlete, was posted on the same screen alongside a picture of a famous athlete and words to the effect of "Your girlfriend is now fucking him. Not sure why she was ever with you." John Doe 8 was appalled that he and his girlfriend were the brunt of cruel and sexualized humor condoned by the coaches.

426.    John Doe 8 was disgusted by, and refused to participate in, this sexual misconduct. The USF Coaches retaliated against him for this refusal. For example, Coach G constantly

berated John Doe 8 on the field, no matter how hard he tried. Coach G used insulting phrases including, "something is wrong with you;" "you will never go anywhere in baseball;" "we don't want you here, you need to leave;" "you are selfish;" "you are a pussy;" and "no one wants you on the team."

427.    Almost immediately, Coach G suggested John Doe 8 should give up his USF scholarship. This constant barrage of insults, no matter what John Doe 8 did, soon destroyed his confidence and his mental state. Nevertheless, John Doe 8 was determined to succeed. Coach G professed an open-door policy, and several times, John Doe 8 would ask Coach G how to take his game to the next level. Coach G's response was always the same: "I don't have time for you." Coach G called John Doe 8 "useless" and told John Doe 8 that he regretted awarding him a partial scholarship.

428.    John Doe 8 began hating going to the field each day because he was anxious about the abuse Coach G would inflict on him. Coach G would say things such as: "Don't do it like [John Doe 8]," in front of the entire team. John Doe 8 walked on eggshells at each practice, not wanting to make any mistakes, knowing that if he did, the USF Coaches would call him out in front of everybody and they would all laugh at him.

429.    John Doe 8 became severely depressed and suicidal because he was constantly berated and told that he was a failure. One day, John Doe 8 went to Coach G in tears and told him that while he was trying his hardest on the field, he was struggling with the baseball program's culture and "not in a good head space." Instead of offering even a modicum of support, Coach G responded by telling John Doe 8 that he was the problem, that his teammates did not like him, and that Coach G wished he had never offered John Doe 8 a scholarship.

430.    Coach G demanded that John Doe 8 sign papers to relinquish his scholarship. When John Doe 8 told Coach G that he wanted to talk to his parents first, Coach G responded: "You're 18 years old. Be a man and make a decision. You don't need to talk to your parents."

431.    After only one semester, John Doe 8 decided to transfer. And even though Coach G told John Doe 8 that he did not have a place on the team, Coach G refused to release him, preventing John Doe 8 from being able to talk to other DI schools and explore other options.

432.    Prior to USF, John Doe 8 never required counseling or medication. He was an upbeat positive young man when he arrived at USF. However, during his one semester at USF, John Doe 8 sought counseling, was diagnosed with severe depression and anxiety, and started taking anti-depressant medication that he continues to take. On his darkest day, John Doe 8 called a suicide hotline.

433.    Because John Doe 8 was so depressed and desperate to leave USF, John Doe 8 considered transferring to a school without a baseball program because Coach G refused to release him. However, John Doe 8's high school baseball coach was able to convince John Doe 8 to continue playing college baseball at a lower division outside USF's conference.

434.    Not only did USF force John Doe 8 to give up his scholarship, the USF Coaches made efforts to sabotage his new opportunity. In the transition to his new school, John Doe 8 learned that Coach G made an unsolicited call to John Doe 8's new coach to express his opinions to the effect of John Doe 8 being "at the bottom of USF's depth chart" and "not a fit for their program." John Doe 8 also learned that during a college baseball showcase, another USF coach made comments to one of John Doe 8's new coaches, claiming that John Doe 8 "lacked energy and competitiveness" and "was not DI material."

435.    None of these comments about John Doe 8's ability and skills were true. John Doe 8 set a record at his new school for most wins as a pitcher and was named an All-American and an All-Conference player for three years. After college, John Doe 8 was signed by an MLB team as an undrafted free agent and played professional baseball for four years.

436.    Upon information and belief, had John Doe 8 been able to continue his college career at a DI university, he would have had a greater chance of being drafted by an MLB team, and thus would have had greater earning potential.

**13.    2000: John Doe 9's experience was typical.**

437.    USF heavily recruited John Doe 9 based on his baseball skills and experience. During his junior year of high school, USF offered John Doe 9 an annual renewable scholarship of over 60% to play on the baseball team. On information and belief, John Doe 9 signed a National Letter of Intent in connection with his receipt of his USF athletic scholarship.

438.     Though St. Mary's, Cal Poly, and other DI and DII universities also offered John Doe 9 scholarships, John Doe 9 chose to attend USF because Coach G told him the baseball team was a unified brotherhood in which players supported each other to bring forth the best each could be and because of USF's Jesuit mission statement communicating Christian beliefs and a moral culture welcoming all.

439.     Upon arriving on campus, John Doe 9 soon learned this was not true. In addition to observing Coach Naks regularly encourage females in nearby dorms to flash their breasts while Coach G laughed, John Doe 9 recalls Coach Naks constantly talking about sexual topics, including his sexual escapades with his girlfriend, sexual positions, oral sex, and sexual fantasies. Coach Naks also attempted to engage John Doe 9 in discussions about John Doe 9's sexuality and his sexual experiences, asking questions like: "Tell me what your tongue did" and "What positions did you do?" Coach G also once said, "There's a lot of pussy on campus."

440.     John Doe 9 was very uncomfortable with these types of conversations, and it soon became evident to the USF Coaches that John Doe 9 would not participate in their intolerable sexualized environment. As a result, they began ostracizing John Doe 9 and tried to run him off the team. For example, once when John Doe 9 was sick and presented Coach G a doctor's note excusing him from practice, Coach G became enraged and told him that he was going to "rip his ass."

441.     John Doe 9 came to dread the nearly weekly meetings he had with Coach G in Coach G's office because he was afraid of Coach G's volatility. During these meetings, Coach G would typically threaten John Doe 9 with what he could do to John Doe 9 and his baseball career.

442.     At one of their last meetings, Coach G called John Doe 9 into his office and told him that he needed to work harder and that he (Coach G) "didn't believe his commitment to the team." John Doe 9 responded that he had been working very hard, which incensed Coach G, who jumped up, lunged across the desk, grabbed a report card from John Doe 9's hand, and ripped it up. He told John Doe 9, "You're the most condescending piece of shit I've ever met."

443.     No matter how hard John Doe 9 tried on the field, he was bullied and harassed. For example, one of John Doe 9's roles on the team was to put the baseballs away at the end of

practice. Coach G's son, a young child at the time, asked John Doe 9 to leave a few balls out so that he could play with them. John Doe 9 did, and the next day, Coach G verbally attacked him for not completing his job. To this day, John Doe 9 has never been yelled at as Coach G did that day. When John Doe 9 explained that he left the balls out for Coach G's son, Coach G said, "Leave my son alone."

444.    Coach G also unrelentingly abused John Doe 9's teammates. At their first team meeting of the season, Coach G yelled at all the players, including John Doe 9, calling them a "disgrace" and stating that he should strip them of their scholarships. He often called players "faggots," both in meetings and on the field.

445.    John Doe 9 no longer wanted to be around Coach G because he was afraid of him. By October of his freshman year, John Doe 9 was severely depressed. He stopped going to class, rarely left his dormitory, and gained weight.

446.    When John Doe 9 told his mother about Coach G's abusive behavior, John Doe 9's mother called Coach G to tell Coach G that her son was struggling and to demand the abuse to stop. Coach G claimed he had no idea what John Doe 9's mother was talking about and told her she was wasting his time. When John Doe 9's mother threatened to complain to Coach G's supervisors, Coach G said, "If you say anything to the people above me, I will make sure your son never puts a uniform on again." The next day, Coach G told John Doe 9 that he would be kicked off the team if he or his mother called the athletic department.

447.    John Doe 9's mother, however, was not deterred. She contacted the AD at the time who conveyed to her that he did not care about the USF Coaches' behavior. USF did nothing about the USF Coaches' sexual misconduct.

448.    John Doe 9 decided to give up his scholarship and leave USF to maintain his mental health. When John Doe 9 told Coach G that he wanted to retrieve his personal equipment, Coach G told him to come back later that evening, which John Doe 9 thought strange.  When John Doe 9 did come back, he noticed several of his baseball gloves had been stolen from his locker.

449.    Additionally, Coach G promised John Doe 9 an "A" for his physical education

class (baseball), but retaliated and gave him a failing grade, which lowered John Doe 9's GPA and made it more difficult for John Doe 9 to transfer.

450.    Because Coach G would not release John Doe 9 to a four-year university, John Doe 9 could only transfer to a junior college and he became a "4-2-4 Transfer." [131] The NCAA's policies concerning such transfers made it impossible for John Doe 9 to finish his college education. To return to a 4-year school, he would have to take and pay for extra classes, as he no longer had a scholarship. So, he played baseball at a junior college for one year, where he became an All-American player. However, without the ability to finish his college education, he was forced to sign a low value contract with an MLB team.

451.    In his second year of spring training for MLB, John Doe 9 suffered a serious injury to his right arm, which left him unable to continue playing baseball. As such, he became a 22-year-old unable to complete his college education and unable to earn a living playing baseball.

**14.    1999-2000: John Doe 11's experience was typical.**

452.    In 1998, during his senior year of high school, and based on his baseball skills and experience, John Doe 11 was recruited heavily by Coach G, who at the time was an assistant coach at Arizona State. In 1999, Coach G became the head coach at USF and continued recruiting John Doe 11.

453.    Coach G scheduled a USF visit for John Doe 11. John Doe 11 enjoyed the atmosphere of the university and its location, and chose to play baseball there, as opposed to any of the other schools where he could have played.

454.    John Doe 11 was offered a scholarship to play on the USF baseball team. On information and belief, John Doe 11 signed a National Letter of Intent in connection with his receipt of his USF athletic scholarship.

455.    When John Doe 11 arrived on campus, "it all began." John Doe 11 was immediately subjected to the intolerable sexualized environment the USF Coaches had created.

456.    Nothing was off-limits and John Doe 11's personal life outside of baseball became

---

[131] Planning to go Division I – 4-2-4 Transfer, http://fs.ncaa.org/Docs/eligibility_center/Transfer/DI_4-2-4_Transfer.pdf (last visited April 8, 2022).

the subject of Coach G's intense and inappropriate interest. For example, John Doe 11 began dating another student during the fall of 1999. Supposedly, another player asked this student why she was dating John Doe 11, and she responded, "Because he has a big dick."

457.    Whether she said this or not, word spread throughout the team. After one away game when John Doe 11 was in the shower and Coach G was taking a shower with the players, Coach G said, "Turn around. Let me see it. Let me see what you're working with," referring to John Doe 11's penis. The rest of the players in the shower erupted in laughter, but John Doe 11 was mortified. John Doe 11 refused to turn around and faced the wall until Coach G left the shower.

458.    After that, Coach G persistently asked John Doe 11 about his sex life in front of the other players. John Doe 11 became highly uncomfortable during practices, as Coach G would ask about the women John Doe 11 was seeing and say things like, "I heard you got some pussy last night, she's hot," or, "Tell me what you did last night." Everything always related back to sex.

459.    John Doe 11 was disgusted by, and refused to participate in, this sexual misconduct. The USF Coaches retaliated against him for this refusal. For example, Coach G would go on vicious tirades, constant yelling and screaming. Name-calling was a daily thing.  If Coach G did not like how a player was performing, he would say things such as, "You're a piece of shit" or "You're a fucking pussy."

460.    During one game, in which John Doe 11 was delayed in putting his shin guards on, Coach G screamed the following at him the entire time it took John Doe 11 to put the shin guards on: "You son-of-a-bitch. You lazy motherfucker. I don't know why you're on this team." Everyone in the dugout at the time stared at John Doe 11 during Coach G's tirade.

461.    Coach G required all players to use a certain type of baseball bat because, upon information and belief, USF had a contract with that bat manufacturer. During one practice while John Doe 11 was in the batting cage and Coach G was pitching balls, Coach G noticed John Doe 11 using his own bat (which John Doe 11 preferred and was manufactured by a different company). Coach G then threw a pitch to hit John Doe 11, which struck John Doe 11 in the back

as he turned away to avoid the ball. After commenting that John Doe 11 was not a "team player," Coach G threw another pitch hitting John Doe 11 again while making a similar comment. Coach G's third pitch hit John Doe 11 in the head, stunning him. Coach G called him a "fucking pussy" and kicked him out of the batting cage. John Doe 11 was in shock that his coach was trying to injure him with his pitches.

462.   Coach G's angry outbursts continued. A rumor had spread about an extra-marital affair in which Coach G was involved with an assistant coach's girlfriend. Coach G gathered the whole team to an indoor meeting and started screaming and threatening them, saying that what he did in his private life was none of their business and that if anyone said anything more, he would ruin their career. He said, "If you're man enough to come talk to me one-on-one, you know where my office is," which John Doe 11 took as a challenge not to talk, but to fight.

463.   John Doe 11's mental, emotional, and physical condition declined because of the USF Coaches' constant belittling. He did not want to go to practices to get screamed at, or to hear other players get screamed at. He was not excited to play baseball anymore. He lost the love of the sport. Coach G would criticize him, no matter how hard he worked, and would hurl insults all the time. He was anxious and depressed and began to suffer from panic attacks, which continue to this day. John Doe 11 began seeing a therapist early in his freshman year.

464.   For example, one day, John Doe 11 missed a weightlifting practice because of his anxiety. Furious, Coach G punished John Doe 11 by making him run "pole to pole"—more than 100 yards—80 times. Coach G threatened: "If you stop, you'll be off the team." John Doe 11 knew that Coach G's home was within eyesight of the field, so John Doe 11 ran for what seemed to be hours. Even though John Doe 11 was suffering from Coach G's constant abuse, John Doe 11 wanted to succeed with the hopes of one day playing MLB.  As he ran into the evening, his roommate brought him a hamburger, which he ate while he was running.

465.   In his second semester, John Doe 11 injured his back and was immediately ostracized. Coach G told him he was not worth playing and subsequently ignored him; the rest of his team followed Coach G's lead.

466.   John Doe 11's panic attacks became more prevalent during his second semester at

USF. John Doe 11 recalls his heart racing while he hid in his dorm room to avoid practice. Coach G would then call his dorm room, sometimes around 10:00 or 11:00 p.m., yelling, "Where were you? What were you doing?" At times, John Doe 11 would see Coach G walking on campus and turn the other way to avoid him.

467.    After the pitching incident, John Doe 11 began feeling unsafe around Coach G. During weightlifting workouts, Coach G would periodically say he wanted to fight John Doe 11 one day. Although Coach G would make the statement in a joking manner, John Doe 11 felt that Coach G was attempting to assert his dominance by challenging John Doe 11 to a fight.

468.    Depression and anxiety spread through the team. The incoming freshmen began discussing dropping out, and after the winter break, many did not return. Out of the 18 incoming freshmen in 1999, 17 did not return for their sophomore year. Upon information and belief, the one player who stayed on the team had a full academic scholarship and tolerated the abuse because he did not want to forfeit that scholarship.

469.    John Doe 11 chose to drop out of the program after his freshman year. He transferred to a junior college and played one more year of baseball before sustaining a career-ending arm injury.

470.    John Doe 11 worked hard to overcome the severe emotional injuries the USF Coaches inflicted and to come to terms with the fact that he would never be able to realize his dream of playing professional baseball.

F.    **Plaintiffs and the Class Were Injured and Continue to be Injured.**

471.    Plaintiffs' harms stem from the fact that the NCAA and its member institutions—including USF—created a system that places a higher value on institutional reputations, at the expense of the student-athletes' well-being.

472.    NCAA coaches' sexual, physical, and mental harassment and abuse of many student-athletes—including the Plaintiffs in this case—have caused the student-athletes to experience self-doubt, shame, blame, and guilt, and oftentimes require years of reflection, meditation, counseling, medication, and psychotherapy. All the while, many student-athletes

1    continue to be plagued with depression, anxiety, and suicidal thoughts.[132]

2         473.   Sexual and mental harassment and abuse of athletes result in long-term

3    posttraumatic symptomology, with core symptoms including re-experiencing, avoidance, and

4    hyperarousal symptoms.[133] Furthermore, recounting sexual abuse can lead to "double trauma,"

5    which can cause intense ruptures in day-to-day life.[134]

6         474.   Psychological damage from sexual abuse is especially harmful when the

7    perpetrator is known and trusted by the victim.[135]

8         475.   In addition to psychological injury, Plaintiffs and the Class suffered out-of-pocket

9    losses from the loss of scholarships, payments of costs-of-attendance, payments for medical and

10   psychiatric treatment, damage to their careers as college baseball players directly affecting their

11   prospects of becoming professional baseball players, and other compensatory and consequential

12   damages.

13        476.   Unless the NCAA is required to adopt, implement, and enforce appropriate

14   policies and procedures to prevent, or properly respond to, sexual misconduct and psychological

15   abuse of students and student-athletes by institution personnel, current and future students and

16   student-athletes will continue to suffer these injuries.

17   **V.   <u>TOLLING OF THE STATUTE OF LIMITATIONS</u>**

18        477.   All statutes of limitations are tolled based on the discovery rule, the doctrines of

19   equitable estoppel and/or equitable tolling, and principles of equity. John Does 4-14 did not

20   discover their claims until March 11, 2022, when the *San Francisco Chronicle* published a story

21   entitled "'Intolerable sexualized environment': Ex-USF baseball players sue coaches, school,

---

23   [132] Ingunn Bjørnseth & Attila Szabo, *Sexual Violence Against Children in Sports and Exercise: A Systematic Literature Review*, JOURNAL OF CHILD SEXUAL ABUSE, 27:4, 365-385, 365 (2018).

24   [133] Helen Owton & Andrew C. Sparkes, *Sexual Abuse and the Grooming Process in Sport: Learning from Bella's Story*, SPORT EDUC. AND SOCIETY, at 5 (July 2015) (unpublished manuscript),

25   https://www.researchgate.net/publication/281771790_Sexual_abuse_and_the_grooming_process_in_sport_Learning_from_Bella's_story.

26   [134] *See id.*

     [135] *See* Gloria Dura-Vila & Roland Littlewood, *Integration of Sexual Trauma in a Religious Narrative:*

27   *Transformation, Resolution and Growth among Contemplative Nuns* 50 TRANSCULT PSYCHIATRY 21–46 (2013); Kimberly A. Lonsway & Sgt. Joann Archambault (Ret.), *Victim Impact: How Victims are Affected by Sexual Assault*

28   *and How Law Enforcement Can Respond* 33-37 (Apr. 2006, updated Nov. 2020) https://evawintl.org/wp-content/uploads/Module-2_Victim-Impact.pdf (last visited July 14, 2022).

NCAA." Once John Does 4-14 found out the truth, they exercised diligence in filing suit.

A.     **USF and the NCAA normalized the USF Coaches' sexual misconduct.**

478.    When they joined the USF baseball team, each of the Plaintiffs was a teenager or young adult who was playing DI baseball for the first time.

479.    Coach Naks' open and public sexual behavior—either in front of or revealed to Coach G, non-defendant coaches, other USF personnel (such as the team athletic trainers and photographer), the USF NCAA Faculty Athletic Representative, and students—led Plaintiffs to believe that Coach Naks' behavior was generally accepted and that their own discomfort with the behavior was the player's personal and individual defect.

480.    Coach G's open and public participation in and encouragement of Coach Naks' sexual behavior in front of non-defendant coaches, other USF personnel (such as the team athletic trainers and photographer), and with the knowledge of students and the USF NCAA Faculty Athletic Representative led Plaintiffs to believe that Coach G's (and Coach Nak's) behavior was generally accepted and that their own discomfort with the behavior was the player's personal and individual defect.

481.    Coach G's and Coach Naks' open and public encouragement of sexual behavior by and between the players, including but not limited to sexualized hazing (including at Coach G's house and USF facilities) and sexualized skits (including on the USF baseball field), led Plaintiffs to believe that such conduct was normal and acceptable in a DI baseball program and that their own discomfort with the behavior was the player's personal and individual defect.

482.    Coach G's and Coach Naks' open and public displays of emotional and physical abuse of Plaintiffs and other players who did not participate in the sexual conduct, including emotional and physical abuse in front of non-defendant coaches, other USF personnel (such as the team athletic trainers and photographer), baseball fans, the USF NCAA Faculty Athletic Representative, and students led Plaintiffs to believe that that their own discomfort with the sexual conduct was the player's personal and individual defect and deserving of punishment.

483.    Coach G and Coach Naks gave pretextual and false explanations defending the sexual misconduct, including (but not limited to) by telling the Plaintiffs they were engaged in

team-building exercises like the Rookie show, the on-the-field pre-drill skits, the pitching exercises with associated removal of clothing, the hazing rituals, and the Saturday-morning "swims."

484.     Coach G and Coach Naks perpetuated these pretextual and false explanations defending the sexual misconduct by calling Plaintiffs "pussies" and other derogatory terms if they did not participate and otherwise communicating that Plaintiffs could not handle the "normal" way in which DI baseball teams were run.

485.     Coach G and Coach Naks also perpetuated these pretextual and false explanations defending the sexual misconduct by using physical abuse, after the Plaintiffs rejected participating in the sexual misconduct, to gaslight Plaintiffs into believing that they could not handle the "normal" way in which DI baseball teams were run.

486.     Moreover, because the USF Coaches' conduct was so widely known and talked about, they were led to believe that it could not have been misconduct.

487.     Plaintiffs believed that USF would not have retained the USF Coaches and that the NCAA would not have continued to oversee their coaching over such a long tenure unless the USF Coaches' coaching style and sexual conduct were legitimate, and thus that the sexual conduct was appropriate even if it was uncomfortable.

488.     After the filing of the Related Litigation, counsel was contacted in writing by a USF employee, on a confidential basis. This employee claimed that USF engaged in "the gaslighting of these students." They explained that the "longstanding relationships" between Coach G and Coach Naks, and between the USF Coaches and the AD, as well as "their location within the USF culture were a core reason that these severe violations and behaviors were tolerated, dismissed, and/or covered up at the expense of the physical and mental health of these student-athletes."

489.     Thus, even though Plaintiffs felt uncomfortable during the USF Coaches' actions, they were led to understand and believe that they (the Plaintiffs) were at fault for not being able to live up to NCAA DI and USF standards.

B.   **John Does 4-14 could not have known about the NCAA's deliberate indifference to the USF Coaches' sexual misconduct until the filing of the Related Litigation.**

490.   Due to USF's and the NCAA's cover-up efforts, none of the John Does 4-14 could have known of USF's and the NCAA's responsibility for the sexual misconduct before the filing of the Related Litigation.

491.   John Does 4-14 did not have reason to know nor could have known that others had previously complained to USF and the NCAA about the USF Coaches' conduct, let alone how USF or the NCAA had responded to any previous complaints.

492.   USF and the USF Coaches knowingly concealed complaints about the misconduct alleged herein, in an effort to prevent Plaintiffs and other victims of the USF Coaches' misconduct from discovering their harms and seeking legal recourse.

493.   John Does 4-14 had no reason to know that others had previously complained to USF and the USF NCAA Faculty Athletic Representative about the USF Coaches' conduct. Until the Related Litigation was filed, John Does 4-14 had no reason to know that the harm they suffered was part of a broader policy of deliberate indifference by USF and the NCAA towards the USF Coaches' decades-long pattern of sexual misconduct.

494.   Further, even if any one of John Does 4-14 had investigated further, further inquiry would have been futile because USF and the NCAA controlled their access to information.

495.   Thus, although USF administrators and the NCAA (through at least the USF NCAA Faculty Athletic Representative) knew of sexual misconduct at the time, John Does 4-14 did not know until this lawsuit was filed that USF administrators and the NCAA knew or that they enabled and perpetuated the abuse.

496.   On information and belief, discovery of information held and currently only available to the NCAA will reveal what the NCAA knew, the actions taken to hide what it knew, the falsification of investigations or evaluations, and the potential destruction (or loss) of records.

497.   However, by way of example only, Plaintiffs are aware of the following specific incidents of concealment:

498.   During the 2000-2001 academic year, John Doe 9's mother complained directly to

Coach G about the USF Coaches' misconduct. After Coach G threatened her and her son to refrain from complaining to USF, John Doe 9's mother also complained to the then-USF Athletic Director. Neither these complaints nor the results of any investigation were published at the time or subsequently, and thus, were actively concealed.

499.    In or about 2013, the USF Coaches were aware that one of the baseball players punched a gay student and physically threw him out of a USF baseball party because there were no "faggots" allowed at the party. This conduct mimicked the USF Coaches' regular use of the word "faggot" and other gender- and sexual orientation-based epithets aimed at John Doe 5 and another player. Following that incident, the USF Coaches called a player meeting—from which John Doe 5 was excluded—during which they told the players to "sweep it under the rug." Neither this incident nor the results of any investigation were published at the time or subsequently, and thus were actively concealed.

500.    Moreover, after that incident, Coach G told John Doe 5 that he had mental issues and needed to see a sports psychologist provided to him by USF. Despite revealing what had occurred to the USF psychologist, the USF psychologist never offered John Doe 5 any resources, such as disclosing any reporting mechanism for the USF Coaches' sexual harassment, sexual orientation, and discrimination.

501.    In May of 2014, John Doe 6's parents sent the USF Associate Athletic Director and the USF NCAA Faculty Athletic Representative a letter describing the USF Coaches' misconduct and pointing out the resulting attrition rates of players on the baseball team. The Athletic Director Scott Sidwell was also informed of the complaints (and would have been aware of the transfer and team withdrawal rates). Neither these complaints nor the results of any investigation were published at the time or subsequently, and thus were actively concealed. Moreover, USF touted Coach Gs' record and incoming recruits, making it appear that there were no problems with the USF Coaches or effects on players.

502.    At the end of 2016, the USF NCAA Faculty Athletic Representative became aware of a sexualized incident that occurred at Coach G's house during a Christmas party. Based upon information and belief, a Title IX investigation also occurred. Coach G instructed John Doe 13 in

words or substance to accept full responsibility and not reveal that it had anything to do with the team's freshmen hazing rituals. Neither this incident nor the results of any investigation were published at the time or subsequently, and thus were actively concealed.

503.    In the spring of 2021, at the end of his freshman year, and after John Doe 1's parents learned of several of the above-described incidents, John Doe 1's mom left several voicemails for USF's AD at the time, Joan McDermott, which were not returned.

504.    The AD also ignored a written "URGENT MEETING REQUEST" from John Doe 2's parents on May 20, 2021.

505.    None of these attempts to reach the AD (who knew that John Does 1 and 2 were baseball players) nor the results of any investigations were published at the time or subsequently, and thus, were actively concealed.

506.    In the fall of 2021, John Doe 1's mom complained of the USF Coaches' misconduct to the AD. Neither this complaint nor the results of any investigation were published at the time or subsequently (until after this lawsuit was filed in 2022), and thus were actively concealed.

507.    The players also tried to bring the misconduct to the attention of other coaches. For example, in late November 2021, eight players—including John Does 1, 2, and 3—decided to express their discomfort with the USF Coaches' inappropriate behavior. During one pre-workout skit, the players pretended to make a complaint about Coach Naks to the Title IX Office. They feigned putting Coach Naks in handcuffs and carrying him off to jail (the "Title IX Skit").

508.    Yet not a single coach followed up with the players after practice to determine whether the skit was performed seriously or in jest, nor did USF take any action to change the sexualized behavior.  Nor were the results of any Title IX or other administrative reports or investigations published at the time, and thus were actively concealed.

509.    Moreover, the widespread acceptance of the USF Coaches' sexualized conduct in full and plain view of other USF personnel and the USF NCAA Faculty Athletic Representative demonstrates that Plaintiffs had no reason to know that other student-athletes (and their parents) had complained to USF or the NCAA about the misconduct or that USF and the NCAA had

covered up any abuse or student-athletes' complaints.

510.     Given the length of time that USF and the NCAA allowed this misconduct to occur, discovery is likely to reveal additional complaints by student-athletes and their parents that USF and the NCAA covered up.

511.     Moreover, given the public displays of nudity, it is likely that USF officials, other coaches, and non-athlete students knew of, discussed, and complained of the misconduct. Thus, discovery is likely to reveal knowledge and cover-up by USF and the NCAA beyond that alleged here.

512.     USF's and the NCAA's failure to act was intended to deceive and silence those Plaintiffs and their parents to make them believe that their complaints were isolated, not actionable, and not a systemic problem, so they would not make their experiences public by complaining in other fora or otherwise filing suit.

C.     **The NCAA should be estopped from asserting statute of limitations defenses.**

513.     The NCAA should also be estopped from asserting the statutes of limitations defense where it, its agents, or its employees have prevented or deterred the filing of a timely claim by some affirmative act.

514.     Estoppel may result from misleading statements or acts about the need for or advisability of a claim.

515.     As reflected in Sections V(A) and (B) *supra,* the USF NCAA Faculty Athletic Representative led Plaintiffs to believe that there was no basis and thus need for a claim given that the USF Coaches' conduct was "normal" and did not constitute sexual abuse. Accordingly, the NCAA should be estopped on that basis from asserting a statute of limitations defense.

## VI.     CLASS ALLEGATIONS

516.     Plaintiffs bring this action against the NCAA on behalf of the following "Nationwide Class" pursuant to Federal Rules of Civil Procedure ("Rules") 23(a) and 23(b)(2): "All student-athletes who are currently participating in NCAA sports at NCAA member institutions."

517.     Plaintiffs reserve the right to modify or amend the Class definition, including the addition of one or more subclasses, after having the opportunity to conduct discovery.

518.     Excluded from the Class are Defendant and any of its affiliates, parents, subsidiaries, officers, and directors; any entity in which Defendant has a controlling interest; governmental entities; and all judges assigned to hear any aspect of this litigation and their immediate family members.

519.     Numerosity: The NCAA reports that there are more than 460,000 NCAA student-athletes competing in 24 sports every year.[136] As such, the members of the Class are so numerous joinder is impractical.

520.     Typicality: Plaintiffs' claims are typical of the claims of each Class member in that Plaintiffs, like all Class members, are or were NCAA student-athletes. Plaintiffs and the Class members were injured through the NCAA's failure to protect them, and Plaintiffs are advancing the same legal theories on behalf of themselves and the Class.

521.     Adequacy: Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests and the interests of all other members of the Class are identical, and Plaintiffs are cognizant of their duty and responsibility to the Class. Accordingly, Plaintiffs can fairly and adequately represent the interests of the Class. Moreover, Plaintiffs' counsel are competent and experienced in litigating class actions, including litigation of this kind. Plaintiffs and their counsel intend to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

522.     Declaratory/Equitable Relief: Class certification is appropriate under Rule 23(b)(2) because the NCAA acted and refused to act on grounds generally applicable to the Class as a whole, such that final injunctive relief or corresponding declaratory relief is appropriate with respect to the Class as a whole.

523.     Such declaratory relief includes, but is not limited to, finding that the NCAA owes a legal duty to protect student-athletes enrolled at member institutions and that the NCAA

---

[136] NCAA, *Student-Athletes*, http://www.ncaa.org/student-athletes (last visited Feb. 9, 2022).

1    breached that duty.

2          524.    Such injunctive relief includes, but is not limited to, requiring the NCAA to adopt,

3    implement, and enforce appropriate policies and procedures to prevent, or properly respond to,

4    sexual misconduct and psychological abuse of students and student-athletes.

5    **VII.    CLAIMS FOR RELIEF**

6                                      **COUNT I**

7                              **BREACH OF CONTRACT**
     **(JOHN DOES 1-3 AND THE NATIONWIDE CLASS FOR INJUNCTIVE OR**
8          **EQUITABLE RELIEF AND ALL PLAINTIFFS FOR DAMAGES)**

9          525.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

10         526.    Each Plaintiff and Class member entered into contracts with USF and the NCAA

11   by signing an NLI and the Student-Athlete Statement, which for the 2020-2021 academic year

12   was also called Form 20-1a.

13         527.    The NLI, as well as the Student-Athlete Statement, both for the 2020-2021

14   Academic Year, are attached hereto as Exhibits A and B, respectively. These are substantially the

15   same forms that Plaintiffs signed. Upon information and belief, the NCAA and USF possess

16   Plaintiffs' contracts.

17         528.    The NLI states that it is "[a]dministered by the NCAA…." Exhibit A, p.1. The

18   NLI provides that it becomes null and void if the student has not met "NCAA initial eligibility

19   requirements; NCAA, conference or institution's requirements for athletics financial aid; or two-

20   year college transfer requirements" by the opening day of classes. *Id.,* ¶ 7.b.

21         529.    By signing the NLI, the student-athlete agrees that the signing institution is

22   permitted to disclose to authorized representatives of its athletics conference, the NCAA, and the

23   NLI Office any documents or information pertaining to the NLI signing. Exhibit A, p.4.

24         530.    The Student-Athlete Statement is on NCAA letterhead and is "Required by:

25   NCAA Constitution 3.2.4.6 and NCAA Bylaw § 12.7.2." *See* Exhibit B, p.1.

26         531.    NCAA Bylaw § 12.7.2 requires student-athletes to sign the Student-Athlete

27   Statement. NCAA Bylaw § 12.7.2.1 states: "Failure to complete and sign the statement shall

28   result in the student-athletes ineligibility for participation in all intercollegiate competition."

532.     NCAA Constitution 3.2.4.7 requires that "[a]n active member institution shall administer annually, on a form prescribed by the Legislative Committee, a signed statement for each student-athlete that provides information prescribed in Bylaw 12.7.2."

533.     NCAA Bylaw § 12.7.2.2 states that "[t]he statement shall be administered to each student-athlete by the athletics director," and the Student-Athlete Statement states that the form must "be kept in the director of athletics' office for six years." Exhibit B, p.7.

534.     The Student-Athlete Statement requires Plaintiffs and the Nationwide Class prior to participation as an NCAA athlete, affirm in writing that they "read the Summary of NCAA Regulations, . . . or read the bylaws of the NCAA Division I Manual that address [ ] eligibility." Exhibit B, p.1. The student-athlete is "responsible for knowing and understanding the application of all NCAA Division I bylaws related to [their] eligibility." *Id.*

535.     The Student-Athlete Statement states that "[t]he conditions that you must meet to be eligible and the requirement that you sign this form are indicated" in bylaws in the Manual. *Id.,* p.2.

536.     The Student-Athlete Statement also required Plaintiffs and the Nationwide Class to "affirm that you understand that if you sign this statement falsely or erroneously, you violate NCAA legislation…." *Id.*, p.2.

537.     In the Manual, the NCAA promises to do the following for student-athletes:

    a.     "initiate, stimulate and improve intercollegiate athletics programs;"

    b.     "uphold the principal of institutional control of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this association;"

    c.     "legislate . . . upon any subject of general concern to the members related to the administration of intercollegiate athletics;"

    d.     conduct intercollegiate athletics programs "in a manner designed to protect and enhance" student-athletes' physical and educational wellbeing;

    e.     require each member institution "protect the health of, and provide a safe environment for, each of its participating student-athletes;"

f.    require each member institution "establish and maintain an environment that fosters a positive relationship between the student-athlete and coach;"

g.    require each member institution "establish and maintain an environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's educational experience;"

h.    "assist the institution in its efforts to achieve full compliance with all rules and regulations and . . . afford the institution, its staff and student-athletes fair procedures in the consideration of an identified or alleged failure in compliance."[137]

538.    In consideration for the NCAA's undertakings, each student-athlete agrees to abide by the Manual, NCAA eligibility requirements, and any other NCAA rules; to participate in an NCAA sport, which provides a benefit to the NCAA and its member institutions; and to waive certain rights, including the right to profit from participation.

539.    The NLI and the Student-Athlete Statement, which incorporate the terms and conditions of the Manual, constitute contracts between the NCAA and Plaintiffs and the Nationwide Class members, and Plaintiffs have fulfilled their obligations under the contracts by providing their services as student-athletes in the NCAA.

540.    The NCAA breached its contractual obligations to Plaintiffs and the Nationwide Class by failing to:

a.    prohibit sexual harassment and/or sexual abuse of student-athletes by athletics department personnel;

b.    prohibit any romantic or sexual relationships between athletics department personnel and student-athletes;

c.    prohibit grooming and other sexually exploitative behavior by athletics department personnel of student-athletes;

d.    require NCAA member institutions to immediately report to the NCAA

---

[137] *See* NCAA Const., Arts. 1 & 2.

any allegations of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel;

e.   maintain all reports of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel in a centralized repository so they can be tracked by the NCAA and its member institutions;

f.   require that all reports of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel be independently investigated;

g.   implement public sanctions on member institutions and athletics department personnel where allegations of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel are substantiated;

h.   ban athletics department personnel from working or volunteering for any member institution where allegations of sexual relationships, harassment, or abuse of a student-athlete by such athletics department personnel are substantiated;

i.   mandate training of athletics department personnel regarding grooming, sexual relationships with student-athletes, sexual abuse and harassment, the prohibition thereof, and reporting obligations;

j.   mandate training of athletics department personnel and student-athletes to recognize the signs of grooming and sexual abuse and harassment by athletics department personnel, and to provide confidential avenues to report the abuse;

k.   protect Plaintiffs and members of the Nationwide Class from such abuse and other foreseeable risks; and

l.   provide a safe environment for NCAA student-athletes free from sexual abuse and/or sexual harassment.

541.   Because John Does 1-3 and the Nationwide Class are at continuing risk of harm,

Plaintiffs and the Nationwide Class seek injunctive or equitable relief.

542.    As a direct result of these breaches, all Plaintiffs have suffered harm as described above including, but not limited, to the amounts of tuition and costs-of-attendance paid because of their loss of scholarships due to NCAA's actions and inactions, as well as out-of-pocket costs for therapy, counseling, and medication to address the mental anguish and despair caused by the NCAA. Plaintiffs seek damages for such harm.

## <u>COUNT II</u>

**BREACH OF ORAL CONTRACT**
**(JOHN DOES 1-3 AND THE NATIONWIDE CLASS FOR INJUNCTIVE OR**
**EQUITABLE RELIEF AND ALL PLAINTIFFS FOR DAMAGES)**

543.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

544.    To the extent written contracts between Plaintiffs and the Nationwide Class and the NCAA do not exist, the facts and circumstances set forth above establish an oral contract wherein student-athletes, in return for participation under the NCAA's governance, agreed to be bound by the NCAA's rules and expected the NCAA to provide appropriate rules and regulations to protect their health and safety to the extent possible.

545.    The NCAA breached its contractual obligations to Plaintiffs and the Nationwide Class by failing to:

      a.    prohibit sexual harassment and/or sexual abuse of student-athletes by athletics department personnel;

      b.    prohibit any romantic or sexual relationships between athletics department personnel and student-athletes;

      c.    prohibit grooming and other sexually exploitative behavior by athletics department personnel of student-athletes;

      d.    require NCAA member institutions to immediately report to the NCAA any allegations of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel;

      e.    maintain all reports of sexual relationships, harassment, or abuse of a student-athlete by athletics department personnel in a centralized repository

1    so that they can be tracked by the NCAA and its member institutions;

2    f.    require that all reports of sexual relationships, harassment, or abuse of a

3          student-athlete by athletics department personnel be independently

4          investigated;

5    g.    implement public sanctions on member institutions and athletics

6          department personnel where allegations of sexual relationships,

7          harassment, or abuse of a student-athlete by athletics department personnel

8          are substantiated;

9    h.    ban athletics department personnel from working or volunteering for any

10         member institution where allegations of sexual relationships, harassment,

11         or abuse of a student-athlete by such athletics department personnel are

12         substantiated;

13   i.    mandate training of athletics department personnel regarding grooming,

14         sexual relationships with student-athletes, sexual abuse and harassment, the

15         prohibition thereof, and reporting obligations;

16   j.    mandate training of athletics department personnel and student-athletes to

17         recognize the signs of grooming and sexual abuse and harassment by

18         athletics department personnel, and to provide confidential avenues to

19         report the abuse;

20   k.    provide an independent ombudsman when student-athletes seek to leave

21         their teams, enter the NCAA transfer portal, and/or forego their

22         scholarships;

23   l.    protect Plaintiffs and members of the Nationwide Class from such abuse

24         and other foreseeable risks; and

25   m.    provide a safe environment for NCAA student-athletes free from sexual

26         abuse and/or sexual harassment.

27   546.   Because John Does 1-3 and the Nationwide Class are at continuing risk of harm,

28   Plaintiffs and the Nationwide Class seek injunctive or equitable relief.

547.    As a direct result of these breaches, all Plaintiffs have suffered harm described above, including, but not limited to the amounts of tuition and costs-of-attendance paid because of loss of scholarships due to NCAA's actions and inactions, as well as out-of-pocket costs for therapy, counseling, and medication to address the mental anguish and despair caused by the NCAA. Plaintiffs seek damages for such harm.

## COUNT III

### BREACH OF CONTRACT AS THIRD-PARTY BENEFICIARIES
### (JOHN DOES 1-3 AND THE NATIONWIDE CLASS FOR INJUNCTIVE OR EQUITABLE RELIEF AND ALL PLAINTIFFS FOR DAMAGES)

548.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

549.    To the extent the Court finds no contracts exist, either written or oral, between Plaintiffs and the Nationwide Class and the NCAA, then the NCAA and its member institutions are contractual parties. As an express condition of its membership in the NCAA, each institution must agree to abide by its respective NCAA Division Manual, which expressly encompasses the NCAA Constitution, Operating Bylaws, and Administrative Bylaws. The Manual thus constitutes a contract between the NCAA and its member institutions, such as USF.

550.    Plaintiffs and the Nationwide Class are third-party beneficiaries of the contract between the NCAA and USF because the parties to the contract intended to benefit the student-athletes.

551.    In the Manual, the NCAA promises to do the following for student-athletes:

    a.    "initiate, stimulate and improve intercollegiate athletics programs;"

    b.    "uphold the principle of institutional control of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this association;"

    c.    "legislate . . . upon any subject of general concern to the members related to the administration of intercollegiate athletics;"

    d.    conduct intercollegiate athletics programs "in a manner designed to protect and enhance" student-athletes' physical and educational wellbeing;

    e.    require each member institution "protect the health of, and provide a safe

1   environment for, each of its participating student-athletes;"

2   f.   require each member institution "establish and maintain an environment

3   that fosters a positive relationship between the student-athlete and coach;"

4   g.   require each member institution "establish and maintain an environment in

5   which a student-athlete's activities are conducted as an integral part of the

6   student-athlete's educational experience;"

7   h.   "assist the institution in its efforts to achieve full compliance with all rules

8   and regulations and . . . afford the institution, its staff and student-athletes

9   fair procedures in the consideration of an identified or alleged failure in

10   compliance."[138]

11   552.   The NCAA breached its contractual obligations to Plaintiffs and the Nationwide

12   Class by failing to:

13   a.   prohibit sexual harassment and/or sexual abuse of student-athletes by

14   athletics department personnel;

15   b.   prohibit any romantic or sexual relationships between athletics department

16   personnel and student-athletes;

17   c.   prohibit grooming and other sexually exploitative behavior by athletics

18   department personnel of student-athletes;

19   d.   require NCAA member institutions to immediately report to the NCAA

20   any allegations of sexual relationships, harassment, or abuse of a student-

21   athlete by athletics department personnel;

22   e.   maintain all reports of sexual relationships, harassment, or abuse of a

23   student-athlete by athletics department personnel in a centralized repository

24   so they can be tracked by the NCAA and its member institutions;

25   f.   require that all reports of sexual relationships, harassment, or abuse of a

26   student-athlete by athletics department personnel be independently

27

28

[138] *See* NCAA Const., Arts. 1 & 2.

1    investigated;

2    g.    implement public sanctions on member institutions and athletics

3          department personnel where allegations of sexual relationships,

4          harassment, or abuse of a student-athlete by athletics department personnel

5          are substantiated;

6    h.    ban athletics department personnel from working or volunteering for any

7          member institution where allegations of sexual relationships, harassment,

8          or abuse of a student-athlete by such athletics department personnel are

9          substantiated;

10   i.    mandate training of athletics department personnel regarding grooming,

11         sexual relationships with student-athletes, sexual abuse and harassment, the

12         prohibition thereof, and reporting obligations;

13   j.    mandate training of athletics department personnel and student-athletes to

14         recognize the signs of grooming and sexual abuse and harassment by

15         athletics department personnel, and to provide confidential avenues to

16         report the abuse;

17   k.    provide an independent ombudsman when student-athletes seek to leave

18         their teams, enter the NCAA transfer portal, and/or forego their

19         scholarships;

20   l.    protect Plaintiffs and members of the Nationwide Class from such abuse

21         and other foreseeable risks; and

22   m.    provide a safe environment for NCAA student-athletes free from sexual

23         abuse and/or sexual harassment.

24   553.   Because Plaintiffs and the Nationwide Class are at continuing risk of harm, John

25   Does 1-3 and the Nationwide Class seek injunctive or equitable relief.

26   554.   As a direct result of these breaches, all Plaintiffs have suffered harm as described

27   above, including, but not limited, to the amounts of tuition and costs-of-attendance paid because

28   of loss of scholarships due to the NCAA's actions and inactions, as well as out-of-pocket costs for

therapy, counseling, and medication to address the mental anguish and despair caused by the NCAA. Plaintiffs seek damages for such harm.

## COUNT IV

### GROSS NEGLIGENCE
### (JOHN DOES 1-3 AND THE NATIONWIDE CLASS FOR INJUNCTIVE OR EQUITABLE RELIEF AND ALL PLAINTIFFS FOR DAMAGES)

555.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

556.    At all relevant times, the NCAA owed a duty to Plaintiffs and the Nationwide Class to implement and enforce rules and bylaws to, *inter alia*:

    a.    prohibit sexual harassment and/or sexual abuse of student-athletes by athletics department personnel;

    b.    prohibit grooming and other sexually exploitative behavior by athletics department personnel of student-athletes;

    c.    require NCAA member institutions to immediately report to the NCAA any allegations of sexual harassment, or abuse of a student-athletes by athletics department personnel;

    d.    maintain all reports of sexual harassment or abuse of a student-athlete by athletics department personnel in a centralized repository so that they can be tracked by the NCAA and its member institutions;

    e.    require that all reports of sexual harassment or abuse of a student-athlete by athletics department personnel be independently investigated;

    f.    implement public sanctions on member institutions and athletics department personnel where allegations of sexual harassment or abuse of a student-athlete by athletics department personnel are substantiated;

    g.    ban athletics department personnel from working or volunteering for any member institution where allegations of sexual harassment, or abuse of a student-athlete by such athletics department personnel are substantiated;

    h.    mandate training of athletics department personnel regarding grooming, sexual abuse and harassment, the prohibition thereof, and reporting

obligations;

    i.     mandate training of athletics department personnel and student-athletes to recognize the signs of grooming and sexual abuse and harassment by athletics department personnel, and to provide confidential avenues to report the abuse;

    j.     protect Plaintiffs and the Nationwide Class from such abuse and other foreseeable risks;

    k.    protect Plaintiffs and the Nationwide Class from coercion to leave their teams, enter the NCAA transfer portal, and/or forego their scholarships without an independent ombudsman and advocate for the student-athletes; and

    l.     provide a safe environment for NCAA student-athletes free from sexual abuse and harassment.

557. The NCAA's duty arose from the following:

    a.    The NCAA's Constitution and Bylaws, which, among other things, establish a duty to protect the health and well-being of NCAA student-athletes, including in the areas of health and safety and in gender equity, which includes student-athlete/coach relationships;

    b.    The NCAA's website, which establishes a duty to exercise reasonable care concerning the health and well-being of its student-athletes in connection with its sports; and

    c.    The NCAA positioning itself as the exclusive authority in intercollegiate athletics to preserve amateurism.

558. The NCAA acted recklessly and indifferently in its position as the regulatory body for college athletics among its member institutions and its student-athletes, including Plaintiffs and the Nationwide Class.

559. The NCAA knew or should have known that its actions and inactions in the area of gender equity with respect to sexual abuse and harassment by athletics department personnel of

student-athletes created an unreasonable risk of harm to Plaintiffs and the Nationwide Class, such that the risk was so great that it was highly probable that harm would result.

560.    The NCAA has been aware of sexual misconduct by its coaches for decades, yet has ignored previous calls by eight United States senators and its own Commission to fix the problem. In fact, the NCAA disbanded the Commission in 2018, promising only to continue to "monitor and track on sexual violence issues."

561.    The NCAA knew or should have known that the power differential between coaches and trainers on the one hand, and student-athletes on the other, so favors athletics department personnel that student-athletes cannot effectively protect themselves from inappropriate conduct or from retaliation. This power disparity negates any purported consent by the student-athlete.

562.    The NCAA thus owed its student-athletes a duty to protect them from the foreseeable risk of coaches or trainers taking advantage of the power differential for improper purposes.

563.    The NCAA knew or should have known that college athletics attracts sexual predators who secure jobs as coaches and trainers at NCAA member institutions to have nearly unfettered access to victims, and so owed its student-athletes a duty to protect them from the foreseeable risk of such coaches or trainers.

564.    Plaintiffs had a reasonable expectation that the NCAA would require its member institutions to employ (and that its member institutions would actually employ) skilled, trained, competent, and ethical coaches and trainers in connection with NCAA sports, who would coach and train student-athletes without committing sexual harassment; sexual, physical, and psychological abuse; or molestation against them.

565.    Plaintiffs also had a reasonable expectation that the NCAA would inform Plaintiffs and the public of sexual harassment, sexual, physical, and psychological abuse, and molestation committed by NCAA coaches and trainers.

566.    The NCAA willfully disregarded precautions that would reasonably protect Plaintiffs and the Nationwide Class and their safety and well-being by failing to:

a.   prohibit sexual harassment and/or sexual abuse of student-athletes by athletics department personnel;

b.   prohibit sexual and romantic relationships between student-athletes and athletics department personnel;

c.   prohibit grooming and other sexually exploitative behavior by athletics department personnel of student-athletes;

d.   require NCAA member institutions to immediately report to the NCAA any allegations of sexual harassment, or abuse of a student-athletes by athletics department personnel;

e.   maintain all reports of sexual harassment or abuse of a student-athlete by athletics department in a centralized repository so they complaints can be tracked by the NCAA and its member institutions;

f.   require that all reports of sexual harassment or abuse of a student-athlete by athletics department personnel be independently investigated;

g.   implement public sanctions on member institutions and athletics department personnel where allegations of sexual harassment or abuse of a student-athlete by athletics department personnel are substantiated;

h.   ban athletics department personnel from working or volunteering for any member institution where allegations of sexual harassment, or abuse of a student-athlete by such athletics department personnel are substantiated;

i.   mandate training of athletics department personnel regarding grooming, sexual abuse and harassment, the prohibition thereof, and reporting obligations;

j.   mandate training of athletics department personnel and student-athletes to recognize the signs of grooming and sexual abuse and harassment by athletics department personnel, and to provide confidential avenues to report the abuse;

k.   protect Plaintiffs and the Nationwide Class from such abuse and other

foreseeable risks;

l.      protect Plaintiffs and the Nationwide Class from coercion to leave their

teams, enter the NCAA transfer portal, and/or forego their scholarships

without an independent ombudsman and advocate for the student-athletes;

and

m.      provide a safe environment for NCAA student-athletes free from sexual

abuse and harassment.

567.   The NCAA's reckless conduct as described above demonstrated a willful disregard

for substantial risks to Plaintiffs and the Nationwide Class; as well as a willful disregard for

necessary precautions to reasonably protect Plaintiffs and the Nationwide Class; and were

substantial contributing causes of Plaintiffs' sexual harassment, and sexual and psychological

abuse.

568.   Because John Does 1-3 and the Nationwide Class are at continuing risk of harm,

Plaintiffs and the Nationwide Class seek injunctive or equitable relief.

569.   As a direct and/or proximate result of Defendant's actions and inactions, all

Plaintiffs were damaged and continue to be damaged. Plaintiffs seek compensation for such harm.

<u>**COUNT V**</u>

**NEGLIGENCE**
**(JOHN DOES 1-3 AND THE NATIONWIDE CLASS FOR INJUNCTIVE OR**
**EQUITABLE RELIEF AND ALL PLAINTIFFS FOR DAMAGES)**

570.   Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

571.   At all relevant times, the NCAA owed a duty to Plaintiffs and the Nationwide

Class to implement and enforce rules and bylaws to, *inter alia*:

a.      prohibit sexual harassment and/or sexual abuse of student-athletes by

athletics department personnel;

b.      prohibit grooming and other sexually exploitative behavior by athletics

department personnel of student-athletes;

c.      require NCAA member institutions to immediately report to the NCAA

any allegations of sexual harassment, or abuse of a student-athletes by

1        athletics department personnel;

2        d.    maintain all reports of sexual harassment or abuse of a student-athlete by

3        athletics department personnel in a centralized repository so that they can

4        be tracked by the NCAA and its member institutions;

5        e.    require that all reports of sexual harassment or abuse of a student-athlete by

6        athletics department personnel be independently investigated;

7        f.    implement public sanctions on member institutions and athletics

8        department personnel where allegations of sexual harassment or abuse of a

9        student-athlete by athletics department personnel are substantiated;

10       g.    ban athletics department personnel from working or volunteering for any

11       member institution where allegations of sexual harassment, or abuse of a

12       student-athlete by such athletics department personnel are substantiated;

13       h.    mandate training of athletics department personnel regarding grooming,

14       sexual abuse and harassment, the prohibition thereof, and reporting

15       obligations;

16       i.    mandate training of athletics department personnel and student-athletes to

17       recognize the signs of grooming and sexual abuse and harassment by

18       athletics department personnel, and to provide confidential avenues to

19       report the abuse;

20       j.    protect Plaintiffs and the Nationwide Class from such abuse and other

21       foreseeable risks;

22       k.    protect Plaintiffs and the Nationwide Class from coercion to leave their

23       teams, enter the NCAA transfer portal, and/or forego their scholarships

24       without an independent ombudsman and advocate for the student-athletes;

25       and

26       l.    provide a safe environment for NCAA student-athletes free from sexual

27       abuse and harassment.

28    572.    The NCAA's duty arose from the following:

a.   The NCAA's Constitution and Bylaws, which, among other things, establish a duty to protect the health and well-being of NCAA student-athletes, including in the areas of health and safety and in gender equity, which includes student-athlete/coach relationships;

b.   The NCAA's website, which establishes a duty to exercise reasonable care concerning the health and well-being of its student-athletes in connection with its sports;

c.   The NCAA's positioning itself as the exclusive authority in intercollegiate athletics to preserve amateurism.

573.   The NCAA acted negligently, carelessly, and indifferently in its position as the regulatory body for college athletics among its member institutions and its student-athletes, including Plaintiffs and the Nationwide Class.

574.   The NCAA knew or should have known that its actions and inactions in the area of gender equity with respect to sexual abuse and harassment by athletics department personnel of student-athletes created an unreasonable risk of harm to Plaintiffs and the Nationwide Class, so great it was highly probable harm would result.

575.   The NCAA has been aware of sexual misconduct by its coaches for decades but has ignored previous calls by eight United States senators and its own Commission to fix the problem. In fact, the NCAA disbanded the Commission in 2018, promising only to continue to "monitor and track on sexual violence issues."

576.   The NCAA knew or should have known that the power differential between coaches and trainers on the one hand, and student-athletes on the other, so favors athletics department personnel that student-athletes cannot effectively protect themselves from inappropriate conduct or from retaliation. This power disparity negates any purported consent by the student-athlete.

577.   The NCAA thus owed its student-athletes a duty to protect them from the foreseeable risk of coaches or trainers taking advantage of the power differential for improper purposes.

- 115 -

578.   The NCAA knew or should have known that college athletics attracts sexual predators who secure jobs as coaches and trainers at NCAA member institutions to have nearly unfettered access to victims, and so owed its student-athletes a duty to protect them from the foreseeable risk of such coaches or trainers.

579.   Plaintiffs had a reasonable expectation that the NCAA would require its member institutions to employ (and that its member institutions would actually employ) skilled, trained, competent, and ethical coaches and trainers in connection with NCAA sports, who would coach and train student-athletes without committing sexual harassment; sexual, physical, and psychological abuse; or molestation against them.

580.   Plaintiffs also had a reasonable expectation that the NCAA would inform Plaintiffs and the public of sexual harassment, sexual, physical, and psychological abuse, and molestation committed by NCAA coaches and trainers.

581.   The NCAA willfully disregarded precautions that would reasonably protect Plaintiffs and the Nationwide Class and their safety and well-being by failing to:

       a.     prohibit sexual harassment and/or sexual abuse of student-athletes by athletics department personnel;

       b.     prohibit grooming and other sexually exploitative behavior by athletics department personnel of student-athletes;

       c.     require NCAA member institutions to immediately report to the NCAA any allegations of sexual harassment, or abuse of a student-athletes by athletics department personnel;

       d.     maintain all reports of sexual harassment or abuse of a student-athlete by athletics department personnel in a centralized repository so they can be tracked by the NCAA and its member institutions;

       e.     require that all reports of sexual harassment or abuse of a student-athlete by athletics department personnel be independently investigated;

       f.     implement public sanctions on member institutions and athletics department personnel where allegations of sexual harassment or abuse of a

student-athlete by athletics department personnel are substantiated;

g. ban athletics department personnel from working or volunteering for any member institution where allegations of sexual harassment, or abuse of a student-athlete by such athletics department personnel are substantiated;

h. mandate training of athletics department personnel regarding grooming, sexual abuse and harassment, the prohibition thereof, and reporting obligations;

i. mandate training of athletics department personnel and student-athletes to recognize the signs of grooming and sexual abuse and harassment by athletics department personnel, and to provide confidential avenues to report the abuse;

j. protect Plaintiffs and the Nationwide Class from such abuse and other foreseeable risks;

k. protect Plaintiffs and the Nationwide Class from coercion to leave their teams, enter the NCAA transfer portal, and/or forego their scholarships without an independent ombudsman and advocate for the student-athletes; and

l. provide a safe environment for NCAA student-athletes free from sexual abuse and harassment.

582. The NCAA's conduct as described above demonstrated a negligent disregard for substantial risks to Plaintiffs and the Nationwide Class; and a negligent disregard for necessary precautions to reasonably protect Plaintiffs and the Nationwide Class; which were substantial contributing causes of Plaintiffs' sexual and psychological abuse, and molestation.

583. Because John Does 1-3 and the Nationwide Class are at continuing risk of harm, Plaintiffs and the Nationwide Class seek injunctive or equitable relief.

584. As a direct and/or proximate result of Defendant's actions and inactions, all Plaintiffs were damaged and continue to be damaged. Plaintiffs seek compensation for such harm.

## COUNT VI

### BREACH OF FIDUCIARY DUTY
### (JOHN DOES 1-3 AND THE NATIONWIDE CLASS FOR INJUNCTIVE OR EQUITABLE RELIEF AND ALL PLAINTIFFS FOR DAMAGES)

585.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

586.    The NCAA owed a fiduciary duty to Plaintiffs and the Nationwide Class arising out of the special relationship of trust and confidence its student-athletes placed in the NCAA. This fiduciary duty formed because the NCAA actively promoted itself as providing a safe and nurturing environment for its student-athletes, and intended for Plaintiffs and the Nationwide Class to believe this so they would participate in NCAA sports.

587.    Plaintiffs and the Nationwide Class trusted that the NCAA and its member institutions would employ skilled, trained, competent, and ethical coaches and trainers in connection with NCAA sports, who would coach and train student-athletes without committing sexual assault; sexual, physical, and psychological abuse; and molestation against them.

588.    Plaintiffs and the Nationwide Class trusted that the NCAA would inform Plaintiffs and the public of any concerns relating to sexual harassment, sexual, physical, and psychological abuse, and molestation committed by NCAA coaches and trainers.

589.    The NCAA owed Plaintiffs the highest duty to protect them and other student-athletes from sexual predators such as the USF Coaches.

590.    The NCAA breached its fiduciary duty to Plaintiffs and the Nationwide Class by failing to protect them from sexual predators such as the USF Coaches, and by failing to warn them regarding the same. These breaches were substantial contributing causes of Plaintiffs' injuries.

591.    Because John Does 1-3 and the Nationwide Class are at continuing risk of harm, Plaintiffs and the Nationwide Class seek injunctive or equitable relief.

592.    As a direct and/or proximate result of Defendant's actions and inactions, all Plaintiffs were damaged and continue to be damaged. Plaintiffs seek compensation for such harm.

**COUNT VII**

**NEGLIGENT FAILURE TO WARN, TRAIN, OR EDUCATE
(JOHN DOES 1-3 AND THE NATIONWIDE CLASS FOR INJUNCTIVE OR
EQUITABLE RELIEF AND ALL PLAINTIFFS FOR DAMAGES)**

593.     Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

594.     The NCAA owed Plaintiffs and the Nationwide Class a duty to take reasonable protective measures to protect them from the risk of sexual harassment and abuse by NCAA coaches by properly warning, training, and educating Plaintiffs and the Nationwide Class about how to avoid such a risk.

595.     The NCAA also owed Plaintiffs and the Nationwide Class a duty to take reasonable protective measures to protect them from the risk of sexual harassment and abuse by their coaches by properly training and educating NCAA coaches about committing wrongful harassment and abuse of student-athletes.

596.     The NCAA breached its duties to take reasonable protective measures to protect Plaintiffs and the Nationwide Class from the risk of sexual harassment and abuse by NCAA Coaches, including by failing to supervise and stop their employees, agents and representatives, from committing wrongful harassment and abuse of student-athletes, including Plaintiffs and Class members.

597.     Because John Does 1-3 and the Nationwide Class are at continuing risk of harm, Plaintiffs and the Nationwide Class seek injunctive or equitable relief.

598.     The NCAA further breached its duties to take reasonable protective measures to protect Plaintiffs from the risk of sexual harassment and abuse by NCAA Coaches, including by failing to supervise and stop their employees, agents and representatives and the USF Coaches specifically, from committing wrongful harassment and abuse of student-athletes, including Plaintiffs and.

599.     As a direct and/or proximate result of Defendant's actions and/or inactions, all Plaintiffs were damaged. Plaintiffs seek compensation for such harm.

## COUNT VIII

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (ALL PLAINTIFFS)

600.    Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

601.    USF and the USF Coaches' extreme and outrageous conduct intentionally or recklessly caused Plaintiffs to suffer severe emotional distress. This conduct was not the type of ordinary rude or obnoxious behavior student-athletes should be expected to weather—it exceeded all possible bounds of decency.

602.    USF and the USF Coaches acted with the intention of causing, or with reckless disregard for the probability of causing, Plaintiffs to endure extreme emotional distress.

603.    Indeed, USF and the USF Coaches used student-athletes' severe distress to subdue and threaten them; to force them to leave USF, give up their scholarships, and enter the NCAA transfer portal; and to prevent them from complaining or suing over the USF Coaches' misconduct. They did so with deliberate disregard as to the high possibility such actions would result in Plaintiffs experiencing additional severe emotional distress.

604.    USF and the USF Coaches' conduct intended to cause and caused Plaintiffs suffering exceeding all bound that are usually tolerated in a civilized community.

605.    A causal nexus existed between (i) the USF Coaches' recruitment and grooming of student-athletes to participate in the NCAA and at USF; and (ii) their abuse of power to coerce and harass those student-athletes.

606.    Each act of harassment and abuse was foreseeable given, *inter alia*, the use of NCAA materials to lure victims and the commission of the acts on NCAA member institutions' property or with NCAA or NCAA member institutions' chattels.

607.    The USF Coaches' conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the NCAA's business. Assaults in the context of NCAA athletics by coaches and other athletics department personnel are exactly why student-athletes would expect the NCAA to take extra precautions, or would expect the NCAA to require member institutions to implement extra precautions to ensure that they are protected from

abuse by athletics department personnel.

608.     The USF Coaches' conduct was committed within the scope of their positions as NCAA coaches. Holding the NCAA liable furthers policy goals of prevention of future injuries and the assurance of compensation to victims, given that Plaintiffs do not have separate remedies under Title VII because they are not (currently) considered employees of the NCAA or USF, or under Title IX as to the NCAA because the NCAA does not receive federal funding.

609.     As a result of Defendant's actions and/or inactions, Plaintiffs were damaged and continue to be damaged. Plaintiffs seek compensation for such harm.

## COUNT IX

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (ALL PLAINTIFFS )

610.     Plaintiffs incorporate by reference all prior paragraphs as if set forth in full herein.

611.     USF and the USF Coaches' conduct negligently caused emotional distress to Plaintiffs, and USF and the USF Coaches could reasonably foresee that their actions would cause Plaintiffs to suffer emotional distress.

612.     Plaintiffs were in a specific zone of danger training with the USF Coaches and at risk of physical harm, causing their fear.

613.     Plaintiffs, immediately or shortly after training with the USF Coaches, suffered distress and emotional harm.

614.     A causal nexus existed between (i) the USF Coaches' recruitment and grooming of student-athletes to participate in the NCAA and at USF; and (ii) their abuse of power to coerce and harass those student-athletes.

615.     Each act of harassment and abuse was foreseeable given, *inter alia*, the use of NCAA materials to lure victims and the commission of the acts on NCAA member institutions' property or with NCAA or NCAA member institutions' chattels.

616.     The USF Coaches' conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the NCAA's business. Assaults in the context of NCAA athletics by coaches and other athletics department personnel are exactly why

student-athletes would expect the NCAA to take extra precautions or would expect the NCAA to require member institutions to implement extra precautions to ensure that they are protected from abuse by athletics department personnel.

617.     The USF Coaches' conduct was committed within the scope of their positions as NCAA coaches. Holding the NCAA liable furthers policy goals of prevention of future injuries and the assurance of compensation to victims, given that Plaintiffs do not have separate remedies under Title VII because they are not (currently) considered employees of the NCAA or USF, or under Title IX as to the NCAA because the NCAA does not receive federal funding.

618.     As a direct and/or proximate result of Defendant's actions and/or inactions, Plaintiffs were damaged and continue to be damaged. Plaintiffs seek compensation for such harm.

VIII.   **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Nationwide Class, respectfully request that the Court enter a judgment on their behalf and against the NCAA and further grant the following relief:

A.     Certify the proposed Nationwide Class pursuant to the Rules 23(a) and (b)(2);

B.     Designate John Does 1-3 as representatives of the proposed Nationwide Class and Plaintiffs' counsel as Class counsel;

C.     Declare that the NCAA owes a legal duty to protect student-athletes enrolled at member institutions, and that the NCAA breached that duty;

D.     Order injunctive relief requiring the NCAA to adopt, implement, and enforce appropriate policies and procedures to prevent, or properly respond to, sexual misconduct and psychological abuse of students and student-athletes, because: (1) there is a substantial likelihood that Plaintiffs and the Class will prevail on the merits; (2) there is a real and substantial threat that the Plaintiffs and the Class will suffer irreparable injury if the injunction is not granted; (3) Plaintiffs' and the Class's threatened injury outweighs any threatened harm to the NCAA; and (4) granting the injunction will serve the public interest.

E.     Award Plaintiffs compensatory damages, punitive damages, damages for pain and suffering and emotional distress, and any other relief to which they are entitled under the law;

G.      Award Plaintiffs and the Nationwide Class prejudgment interest, costs and attorneys' fees, where appropriate; and

H.      Award Plaintiffs and the Nationwide Class such other and further relief as the Court deems just and proper.

## IX.    **DEMAND FOR TRIAL BY JURY**

Plaintiffs, individually and on behalf of the proposed Class, respectfully request a trial by jury as to all matters so triable.

Dated: June 20, 2023                    Respectfully submitted,

By: /s/ Lynn A. Toops
Lynn A. Toops, No. 26386-49
ltoops@cohenandmalad.com
Arend J. Abel, No. 10763-49
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
Facsimile: (317) 636-2593

Elizabeth A. Fegan (*admitted pro hac vice*)
beth@feganscott.com
FEGAN SCOTT LLC
150 S. Wacker Drive, 24th Floor
Chicago, IL 60606
Telephone: (312) 741-1019
Facsimile: (312) 264-0100

Lynn A. Ellenberger (*admitted pro hac vice*)
lynn@feganscott.com
FEGAN SCOTT LLC
500 Grant Street, Suite 2900
Pittsburgh, PA 15219
Telephone: (412) 346-4104
Facsimile: (312) 264-0100

Ling S. Wang (*admitted pro hac vice*)
ling@feganscott.com
FEGAN SCOTT LLC
121 N. Washington Ave., 4th Floor
Minneapolis, MN 55401
Telephone: (651) 432-4468
Facsimile: (312) 264-0100

Jonathan D. Selbin (*admitted pro hac vice*)
jselbin@lchb.com
Jessica A. Moldovan (*admitted pro hac vice*)
jmoldovan@lchb.com
LIEFF CABRASER HEIMANN
 & BERNSTEIN, LLP
250 Hudson Street
New York, NY 10013
Telephone: (212) 355-9500
Facsimile: (212) 355-9508

Michelle A. Lamy (*admitted pro hac vice*)
mlamy@lchb.com
LIEFF CABRASER HEIMANN
 & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

*Attorneys for Plaintiffs and the Proposed Class*