UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JOHN DOE 1, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:23-cv-00542-SEB-MJD |
| | ) | |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON DEFENDANT'S MOTION TO DISMISS AND/OR STRIKE FIRST AMENDED COMPLAINT**

Now before the Court is Defendant's Motion to Dismiss and/or Strike First

Amended Complaint [Dkt. 54].  Plaintiffs in this putative class action are thirteen current

and former college student-athletes who are proceeding anonymously as John Does[1] 1–6

and 8–14,[2] and have brought this action against the Defendant National Collegiate

Athletic Association ("NCAA"), alleging that they have been harmed as a result of the

NCAA's deliberate decision to remain silent in the face of rampant sexual abuse and

harassment by various coaches at NCAA-member institutions.  Specifically, Plaintiffs

allege that the NCAA should have adopted policies to prevent harassment by their

coaches, that its failure to do so constitutes a breach of contract (Counts I–III) and

---

[1] On June 7, 2024, the Court granted Plaintiffs' Renewed Motion to Proceed Pseudonymously, holding that Plaintiffs have demonstrated that they are entitled to continue to proceed anonymously in this case under the standard recently set forth by the Seventh Circuit in *Doe v. Trustees of Indiana University*, 2024 WL 1824967, at \*4 (7th Cir. Apr. 26, 2024).

[2] On May 1, 2024, Doe 7 filed a notice of voluntary dismissal of his claims and is no longer a party to this case.

negligence (Counts IV–VII), and that the NCAA is vicariously liable for the emotional distress they allege was inflicted on them by their coaches (Counts VIII–IX).  The prospective class is a nationwide group of all student-athletes currently participating in any NCAA sport at any member institution.

The NCAA has moved to dismiss Plaintiffs' complaint on the grounds that the relevant statute of limitations bars the claims asserted by Does 4–14, that none of the Plaintiffs have standing to seek injunctive or declaratory relief, and that the remaining allegations fail to state claims under Federal Rule of Civil Procedure 12(b)(6).  To the extent any portion of the amended complaint survives dismissal, Defendants contend that the class allegations must be stricken.  Plaintiffs oppose Defendants' motion to dismiss and/or to strike.  For the reasons detailed below, we <u>GRANT</u> Defendants' Motion to Dismiss Plaintiffs' Amended Complaint.

<u>**Factual Background**</u>[3]

**The Parties**

Plaintiffs are thirteen current and former student-athletes each of whom was a member of the baseball team at the University of San Francisco ("USF") between 1999 and 2022.  Am. Compl. ¶¶ 15–28.  Does 4–6 and 8–14 are former student-athletes who allege that two of their coaches at USF, Troy Nakamura and Anthony Giarratano (the "Coaches"), engaged in conduct that created a sexualized, abusive environment, which

---

[3] Plaintiffs' prolix amended complaint spans more than 120 pages.  Following the parties' lead, we have included in this order only those facts relevant to the issues presented in Defendants' motion to dismiss and/or to strike.

caused them harm.  *See*, *e.g.*, *id.* ¶ 5.  Does 1 and 2 are current student-athletes who allege that they suffered retaliation as well as emotional and sometimes physical abuse perpetrated by the Coaches when they refused to "play along" with the sexually charged atmosphere at USF.  *Id.* ¶¶ 193, 220.  These two Plaintiffs have since transferred to other NCAA member organizations where, at least so far, they have not experienced sexual abuse or harassment but nonetheless face an increased risk of such harm in the future, given the NCAA's alleged pattern of inaction and turning a blind eye.  *Id.* ¶¶ 4, 94, 476. Plaintiffs allege that Doe 3, who has departed USF, "will continue playing college baseball," but is not a current student-athlete at any NCAA member institution.  *Id.* ¶ 260.

The NCAA is a voluntary unincorporated association geographically located in Indiana.  *Id.* ¶ 29.  Its members include approximately 1,100 colleges and universities dotted across the country who have voluntarily delegated to the NCAA the power to administer intercollegiate athletic competitions.  *Id.*

**Procedural History**

This case was originally filed in the Northern District of California by three current and nine former student athletes (Does 1–12), against the Coaches who allegedly had sexually harassed them, as well as against the NCAA, USF, and the Coaches who were responsible for that harassment.  The Northern District of California Court dismissed without prejudice all claims against the NCAA based on a lack of personal jurisdiction.  *Doe 1 v. Nat'l Collegiate Athletic Ass'n*, No. 22-cv-01559-LB, 2023 WL 105096, at *1 (N.D. Cal. Jan. 4, 2023).  Currently, certain claims against USF and the Coaches remain pending in the Northern District of California.

**The Instant Litigation**

On March 28, 2023, Does 1–12 filed their complaint in our district, adding Does 13–14 as additional Plaintiffs; they later amended their complaint on June 20, 2023. Plaintiffs' claims are framed as actions brought on their own behalf as well as brought on behalf of the prospective nationwide class of "[a]ll student-athletes who are currently participating in NCAA sports at NCAA member institutions." Am. Compl. ¶ 516. Their primary contention is that the NCAA should have adopted policies to prevent the alleged harassment by the Coaches. Accordingly, Plaintiffs nine claims include theories of relief for breach of contract (Count I); breach of implied contract (Count II);[4] breach of contract as third-party beneficiaries (Count III); gross negligence (Count IV); negligence (Count V); breach of fiduciary duty (Count VI); negligent failure to warn, train, or educate (Count VII); intentional infliction of emotional distress (Count VIII); and negligent infliction of emotional distress (Count IX). Plaintiffs seek to recover monetary damages as well as obtain injunctive and declaratory relief.

The NCAA's Motion to Dismiss and/or to Strike seeks dismissal of all the claims alleged in the amended complaint. To the extent any of Plaintiffs' claims survive dismissal, the NCAA moves to have Plaintiffs' class allegations stricken for lack of an

---

[4] Although Count II in the Amended Complaint is labeled as a breach of oral contract claim, the substance of the allegations establish an implied—not oral—contract. In their briefing in response to the NCAA's motion to dismiss, Plaintiffs never refer to the existence of an oral contract, only express and implied contracts. Thus, we interpret Plaintiffs' claim in Count II as a breach of implied contract.

adequate representative.  Plaintiffs have filed their response in opposition to the NCAA's motion, making the motion now fully briefed and ripe for ruling.

**<u>Legal Analysis</u>**

## I.     Applicable Legal Standard

Defendant has moved for the dismissal of Plaintiffs' complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction (standing) and 12(b)(6) for failure to state a claim upon which relief may be granted.  In ruling on a motion to dismiss for lack of standing under Rule 12(b)(1), we first must determine whether a factual challenge or a facial challenge to standing has been raised.  *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015).  A factual challenge rests on the argument that "there is *in fact* no subject matter jurisdiction," even if the pleadings in a formal sense are sufficient, while a facial challenge is premised on an argument that the plaintiff has not sufficiently "*alleged* a basis of subject matter jurisdiction."  *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443–44 (7th Cir. 2009) (emphasis in original).  We construe Defendant's Rule 12(b)(1) motion to be "a facial challenge because [it] contend[s] that Plaintiffs' complaint lacks sufficient factual allegations to establish standing."  *Silha*, 807 F.3d at 173.  "In reviewing a facial challenge, the court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff."  *Id.* (citing *Apex Digital*, 572 F.3d at 443–44).  "When assessing standing on the basis of the facts alleged in a complaint, this means we apply the same standard of review we use when assessing a motion to dismiss for failure to state a claim."  *Finkelman v. National Football League*, 810 F.3d 187, 194 (3d Cir. 2016).

Similarly, in addressing a motion under Rule 12(b)(6), the Court accepts as true all well-pled factual allegations in the complaint and draws all ensuing inferences in favor of the non-movant. *Lake v. Neal*, 585 F.3d 1059, 1060 (7th Cir. 2009). Nevertheless, the complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," and its "[f]actual allegations must . . . raise a right to relief above the speculative level." *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 633 (7th Cir. 2007) (citations omitted). The complaint must therefore include "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see* FED. R. CIV. P. 8(a)(2). Stated otherwise, a facially plausible complaint is one which permits "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## II.   Discussion

The NCAA's motion to dismiss targeting all the claims brought against it by Plaintiffs rests in part on its contention that Plaintiffs lack standing to seek prospective relief, which thus necessitates the striking of the class allegations. The motion also asserts that the claims brought by Does 4–6 and 8–14 are time-barred and that any claims which have survived must be dismissed for failure to state a claim under Rule 12(b)(6). As previously noted, Plaintiffs oppose the NCAA's motion on all grounds. We address the parties' arguments in turn below.

### A.   Standing Entitling Prospective Relief (Does 1–3)

6

The NCAA seeks dismissal of Does 1–3's request for injunctive and declaratory relief under Rule 12(b)(1) on behalf of themselves and the prospective class, arguing that Does 1–3 lack Article III standing to seek such relief.[5]  The NCAA argues that they lack standing to pursue injunctive and declaratory relief against it because their allegation that they face an increased risk of harm due to the NCAA's failure to enact policies preventing sexual abuse and harassment is too speculative to satisfy the concrete injury predicate to receiving an award of prospective relief.  Plaintiffs rejoin that Does 1–3's allegations of an ongoing and heightened and substantial risk of abuse above the societal baseline, coupled with actual past abuse, all of which is attributable to the NCAA's lack of regulations, is a sufficiently concrete injury for standing purposes.

Article III standing requires prospective plaintiffs to satisfy the three-part test set forth by the Supreme Court in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992). Under *Lujan*, plaintiffs must have "suffered an injury in fact" that is concrete, particularized, and actual or imminent, and not merely "conjectural" or "hypothetical." *Id.* at 560.  There must also be a causal link between the injury and the conduct alleged, and it must be "likely, as opposed to merely speculative" that the injury will be remedied by a judicial decision.  *Id.*

To establish an injury in fact based on an increased risk of future harm, as alleged in this case, the "threatened injury must be certainly impending to constitute injury in fact, and … allegations of possible future injury are not sufficient."  *Prosser v. Becerra*, 2

---

[5] It is undisputed that no other named plaintiff has standing to seek prospective relief for themself or on behalf of the putative class.

F.4th 708, 714 (7th Cir. 2021) (internal quotation marks and citation omitted); *accord Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 966 (7th Cir. 2016) (holding that there must be "certainly impending future harm" not just "allegations of possible future injury" to satisfy injury-in-fact requirement of standing) (internal quotation marks and citation omitted).  This means, there must be "a substantial risk that the harm will occur," and that risk cannot be hypothetical.  *Prosser*, 2 F.4th 708, 714, 715 (7th Cir. 2021) (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019)); *see also Lewert*, 819 F.3d at 966 (finding injury in fact when "objectively reasonable likelihood" that the threatened injury would occur).

Does 1–3 allege that from 2020 to 2022 they were subjected to emotional and physical abuse and retaliation at USF for failing to "play along" with the sexualized culture created by the Coaches, and that, as student-athletes, they face an increased risk of future sexual harassment or abuse at NCAA-member schools based on the lack of NCAA regulations preventing such harm.  Specifically, Plaintiffs allege that at least by 2012 the NCAA recognized that sexual abuse and harassment of student-athletes by college coaches had become a "serious problem" and that student-athletes are particularly vulnerable to sexual exploitation and other abuse at the hands of their coaches in part because of the power dynamics involved in those relationships.  Am. Compl. ¶¶ 46, 95.  However, twelve years later the NCAA has still not instituted any centralized regulations or reporting requirements aimed at preventing such abuse and harassment by coaches, instead continuing to "foist" responsibility for ensuring the safety of NCAA student-athletes on colleges and universities, which institutions are incented to ignore and

minimize such abuse in order to protect their reputations and retain alumni donations, athletic revenue, and enrollment. *Id.* ¶¶ 98, 112, 114. Plaintiffs maintain that, as a result of the NCAA's failure to promulgate rules for its member-schools to report abuse and deter perpetrators, abusive coaches are able to act with impunity and "move unchecked" among NCAA-member institutions, placing NCAA student-athletes at a substantial and heightened risk of future sexual, physical, and emotional abuse and harassment. *Id.* ¶¶ 2, 4.

Taking these allegations as true, as is required in a facial standing challenge, Plaintiffs fail to allege facts that plausibly suggest that the heightened risk of future abuse or harassment they allegedly face as student-athletes due to the lack of NCAA regulations aimed at prohibiting such harm satisfies the "certainly impending" or "substantial risk" standard required to establish an injury in fact under an increased risk of injury theory. We accept for purposes of deciding this motion to dismiss that NCAA student-athletes in general face an undefined "heightened" risk of abuse and harassment at the hands of coaches, given the dynamics of those relationships, which risk is exacerbated in part by the NCAA's failure to enact centralized regulations and reporting requirements. However, to satisfy the injury in fact requirement for standing to seek prospective relief, Plaintiffs must allege more than a generalized, "maybe someday" risk of future harm; rather, they must allege facts that plausibly suggest that they personally face an imminent or substantial risk of injury. *See Lujan*, 504 U.S. at 565 (observing that "some day" injuries "do not support a finding of the 'actual or imminent' injury that our cases require"). Plaintiffs have fallen well short of doing so here.

Our judicial colleague, the Honorable James R. Sweeney II, recently addressed this issue which was presented under similar circumstances in *Aldrich v. National Collegiate Athletic Association*, 565 F. Supp. 3d 1094 (S.D. Ind. 2021), *appeal docketed*, No. 21-3036 (7th Cir. Nov. 2, 2021). In *Aldrich*, the plaintiff was a member of Princeton University's rowing team and, like Plaintiffs here, had alleged that as a student-athlete she faced an increased risk of sexual assault due to the nature and power dynamics of the relationship between a college coach and athlete and the lack of NCAA regulations regarding sexual assault. However, she had never personally been abused or harassed by her college coach or threatened with such abuse or harassment, nor did she allege that any of her teammates had been so victimized. Emphasizing the required high level of risk to properly allege standing under an increased risk of injury theory, Judge Sweeney dismissed the plaintiff's claims for prospective relief for lack of standing, holding that that the risk of injury she had identified was "too speculative" and "far too generalized, broad and remote to qualify as an injury in fact." *Id.* at 1102, 1103. Any other result, Judge Sweeney opined, "would stretch the 'imminent injury' requirement beyond its purpose." *Id*.

So, too, in our case. Seeking to escape the ruling in *Aldrich*, Plaintiffs contend that the facts in that case were materially distinguishable from those at bar because Does 1–3 *do* allege that they were previously abused and subjected to harassment by their coaches while "under the NCAA's watch" as student-athletes at USF. Pls.' Resp. at 9. It is true that past wrongs can constitute relevant "evidence bearing on 'whether there is a real and immediate threat of repeated injury'" for standing purposes. *City of Los Angelos*

*v. Lyons*, 461 U.S. 95, 102 (1983).  Here, however, Does 1–3 have all now departed USF, the institution where they were allegedly subjected to harassment, and attend (or in the case of Doe 3, plan to attend) other NCAA-member organizations.  They do not allege in their complaint or their briefing that they have been subjected to or threatened with sexual harassment or abuse by their coaches at their new programs, nor do they allege that those new programs have a history of ignoring abuse and harassment or that their current coaches have been abusive to other student-athletes, either at their current institutions or previous NCAA-member organizations.

Under these circumstances, the prior abuse alleged by Does 1–3 has very limited relevance to whether there exists an imminent and substantial threat of injury going forward, involving entirely different coaching staffs at new institutions.  Without *any* allegations plausibly suggesting that the NCAA-member organizations Does 1–3 currently attend (or plan to attend) have a history of harboring abusive coaches or otherwise taking advantage of the lack of centralized NCAA regulations regarding coach-on-athlete harassment to avoid reporting or addressing abuse, the unquantified "heightened" risk of abuse or harassment due to the lack of NCAA regulations identified by Plaintiffs is simply too hypothetical and speculative to qualify as an injury in fact.  *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (holding that injury must be "actual or imminent, not conjectural or hypothetical").

To support their contention that the allegations here satisfy the injury in fact requirement for prospective relief, Plaintiffs rely heavily on two out-of-circuit district court cases, *Roe W.M. v. Devereux Foundation*, 650 F. Supp. 3d 319 (E.D. Penn. 2023)

and *Doe v. University of Tennessee*, 186 F. Supp. 3d 788 (M.D. Tenn. 2016).[6]  In

*Devereux*, three current and former residents of residential facilities for children with

psychiatric, behavioral, developmental, or intellectual disabilities sought prospective

relief against the operator of the facilities after suffering abuse by other residents and

staff, alleging that they faced a "heightened risk of abuse" going forward because the

facility operator failed to implement and enforce policies to prevent and respond to abuse.

650 F. Supp. 3d at 327.  Similarly, in *University of Tennessee*, current and former female

students who had been sexually assaulted on campus by other students sought injunctive

relief against the school, alleging that the university's policies rendered female students

vulnerable to sexual assault.  Plaintiffs here argue that, like the plaintiffs in *Devereux* and

*University of Tennessee*, they have alleged against the NCAA "well-pled claims of past

harm coupled with a policy, pattern, or practice that suggests those harms are likely to

recur," which allegations are sufficient to satisfy the actuality or imminence requirement

for prospective relief standing.  *Devereux*, 650 F. Supp. 3d at 329 (collecting cases).

We find the analyses and conclusions in both *Devereux* and *University of

Tennessee* readily distinguishable from the case before us.  There, the plaintiffs, who were

---

[6] We do not find the remaining decisions cited by Plaintiffs relevant to the standing inquiry as those cases either involved a distinguishable type of exposure to harm (*Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 631 (7th Cir. 2007); *Leslie v. Medline Indus., Inc.*, No. 20-cv-01654, 2021 WL 4477923, at *5 (N.D. Ill. Sept. 30, 2021); *Sutton v. St. Jude Med. S.C., Inc.*, 419 F.3d 568, 569, 571 (6th Cir. 2005); *Rolan v. Atl. Ritchfield Co.*, No. 1:16-CV-357-TLS, 2017 WL 3191791, at *5 (N.D. Ind. July 26, 2017); *Reilly v. Ceridian Corp.*, 664 F.3d 38, 45 (3d Cir. 2011)), applied outdated legal standards (*Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 498 (7th Cir. 2005); *Baur v. Veneman*, 352 F.3d 625, 634 (2d Cir. 2003), or did not specifically analyze standing (*303 Creative LLC v. Elenis*, 600 U.S. 570, (2023); *Helling v. McKinney*, 509 U.S. 25 (1993); *Doe v. Baylor Univ.*, 240 F. Supp. 3d 646 (W.D. Tex. 2017)).

determined to have standing for prospective relief, remained confined at or continued to attend the specific institution where they had been abused, which locations they alleged continued to maintain the longstanding policies and practices of covering up and failing to address abuse that had led to their past injuries.  In contrast, Does 1–3 are no longer enrolled at USF and thus are no longer under the control and supervision of the Coaches allegedly responsible for the past abuse they suffered as well as the university administrators they allege to have ignored and hidden the abuse, nor have Does 1–3 adduced any facts to plausibly suggest that similar conditions exist or are threatened in the athletic programs overseen by their current NCAA-member institutions.  Accordingly, the risk of future injury Does 1–3 have identified stemming from a lack of centralized NCAA regulations and reporting requirements is based on a much more "'highly attenuated' causal chain separating present reality and future harm," *Devereux*, 650 F. Supp. 3d at 331 (quoting *Clapper v. Amnesty International USA*, 568 U.S. 398, 410 (2013)), than was faced by the *Devereux* and *University of Tennessee* plaintiffs.  For these reasons, we hold that the increased risk of abuse or harassment Does 1–3 have cited fails to satisfy the "imminent injury" requirement required for Article III standing to seek prospective relief on their tort claims.

Plaintiffs alternatively argue that Does 1–3 have established prospective standing based on their breach of contract claims.  The Amended Complaint alleges that the NCAA breached its contractual obligations to Plaintiffs by failing to regulate sexual misconduct by coaches, which breach ultimately resulted in Plaintiffs having been subjected to abuse and harassment by the Coaches at USF.  Does 1–3 argue that, because

the NCAA continues to breach its contractual obligations, they remain exposed to an increased risk of sexual misconduct sufficient to satisfy the injury-in-fact requirement for prospective standing.  However, in our view, this theory fails for the same reasons detailed above, namely, that any increased risk of abuse or harassment to which Does 1–3 remain exposed at their new universities by their new coaches is too speculative and uncertain to constitute an imminent injury as required for prospective standing.

For these reasons, we conclude that Does 1–3 lack the requisite standing to seek injunctive relief in this case.  Since no other Plaintiff has standing either, the Court shall strike the request for injunctive relief from the Amended Complaint.

### B.   Statute of Limitations (Does 4–6 and 8–14)

We turn next to address the issue of the statute of limitations.  Although statutes of limitations arguments generally are not appropriate for consideration in the context of motions to dismiss, such a defense can be addressed at an early stage of the litigation "where the allegations of the complaint set forth everything necessary to satisfy the affirmative defense." *Sidney Hillman Health Ctr. of Rochester v. Abbot Labs., Inc.*, 782 F.3d 922, 928 (7th Cir. 2015) (quotation marks and citation omitted).  That said, so long as a plausible theory of relief has been advanced that would defeat a statute of limitations defense, "questions of timeliness are left for summary judgment (or ultimately trial), at which point the district court may determine compliance with the statute of limitations based on a more complete factual record." *Id.* (citation omitted).

In diversity jurisdiction cases (such as this), the Court applies state based statutes of limitations.  *Klein v. George G. Kerasotes Corp.*, 500 F.3d 669, 671 (7th Cir. 2007).

Thus, we "look[] to Indiana law for the statute of limitations, its exceptions, and its rules on equitable relief." *Aldrich*, 565 F. Supp. 3d at 1104. "Indiana courts view statutes of limitations favorably, finding that such rules 'rest upon sound policy and tend to the peace and welfare of society.'" *Id.* (quoting *Shideler v. Dwyer*, 417 N.E.2d 281, 283 (1981)).

As relevant here, the statute of limitations under Indiana law governing tort claims is two years. *See* IND. CODE § 34-11-2-4 ("An action for … injury to person or character … must be commenced within two (2) years after the cause of action accrues."). Indiana applies a ten-year statute of limitations to actions based on contracts in writing and a six-year limitations period to actions alleging breach of an oral contract. IND. CODE § 34-11-2-11; IND. CODE § 34-11-2-7. However, even if the statute of limitations is determined to have run, a plaintiff may still have an actionable claim if an equitable doctrine, such as fraudulent concealment or equitable estoppel, applies to toll the limitations period. *Aldrich*, 565 F. Supp. 3d at 1104.

Here, the NCAA argues that all claims raised by Does 4–6 and 8–14 are barred as untimely.[7] Specifically, the NCAA contends that: (1) the tort claims alleged by Does 4–6 and 8–14 are beyond Indiana's two-year limitations period for such claims; (2) the contract claims alleged by Does 4–6 and 8–14 are premised on tort harms and thus governed by the two-year limitations period applicable to tort claims, rather than the more generous limitations periods that typically govern contract claims in Indiana; and (3) there is no justification for tolling the statute of limitations periods. Plaintiffs rejoin

---

[7] The NCAA does not challenge the claims raised by Does 1–3 on untimeliness grounds.

that: (1) under the discovery rule, the claims alleged by Does 4–6 and 8–14 did not accrue until 2022, and are therefore timely; (2) even if the discovery rule does not apply, the contract claims raised by Does 4–8, 10, and 12–14 are timely because they fall within the six- or ten-year limitations period applicable to contracts in Indiana; and (3) regardless of the applicable limitations period, all their claims are timely because equitable tolling principles apply.  We address each of these arguments in turn below.

### 1.  Applicable Limitations Periods

It is undisputed that a two-year statute of limitations applies to the tort claims alleged by Does 4–6 and 8–14, and that more than two years elapsed between the commencement of this lawsuit and the most recent instance of abuse alleged by these plaintiffs.  Accordingly, the statute of limitations forecloses the gross negligence, negligence, breach of fiduciary duty, failure to supervise, intentional infliction of emotional distress, and negligent infliction of emotional distress claims alleged by Does 4–6 and 8–14.  Thus, the only remaining issues are whether the discovery rule or an equitable tolling doctrine suspends the two-year limitations period.  We address those issues in detail below.

Regarding the contract claims as alleged by Does 4–6 and 8–14 in Counts 1 through 3 of the Amended Complaint, the parties disagree as to the applicable statutes of limitations.  Indiana applies a ten-year statute of limitations to actions based upon contracts in writing and a six-year limitations period to actions alleging breach of an oral contract.  IND. CODE § 34-11-2-11; IND. CODE § 34-11-2-7.  Does 4–6 and 8–14 maintain that these six- and ten-year limitations periods apply to their contract claims, which make

the breach of contract claims alleged by Does 4–8, 10, and 12–14 timely, regardless of whether the discovery rule or any equitable tolling doctrine applies. The NCAA responds that because the contract claims alleged by Does 4–6 and 8–14 sound in tort, Indiana's two-year limitations period governing tort claims applies, rendering their breach of contract claims untimely.

Under Indiana law, "[t]he substance of a cause of action, rather than its form, determines the applicability of the statute of limitation." *Powers & Sons Const. Co. Inc. v. Healthy E. Chi.*, 919 N.E.2d 137, 142 (Ind. Ct. App. 2009) (quoting *Cooper Indus., LLC v. City of South Bend*, 899 N.E.2d 1274, 1284 (Ind. 2009)). Thus, "[w]here the characterization of the claim matters for purposes of deciding which statute of limitations should be applied, the Supreme Court of Indiana consistently stresses that 'the applicable statute of limitations should be ascertained by reference to the nature of the harm alleged rather than by reference to theories of recovery.'" *Lewis v. Methodist Hosp., Inc.*, 326 F.3d 851, 853 (7th Cir. 2003) (quoting *Whitehouse v. Quinn*, 477 N.E.2d 270, 273 (Ind. 1985)). However, "[i]n considering how to classify a claim for statute-of-limitations purposes, the Supreme Court of Indiana has warned that Indiana courts (and thus federal courts sitting in diversity that are applying Indiana law) must not collapse all breach of contract claims into tort claims" as "[d]oing so would impermissibly effect a judicial repeal of the separate statutes of limitations that the Indiana legislature has enacted for breach of contract and oral contract claims." *Id.* (citing *Lawyers Title Ins. Corp. v. Pokraka*, 595 N.E.2d 244, 247 (Ind. 1992)).

17

Here, the gravamen of Plaintiffs' lawsuit is in tort, as they seek recovery for personal injury sustained as a result of the NCAA's failure to protect their health and safety.  However, they also allege that the NCAA had undertaken contractual obligations to protect them which duties it failed to satisfactorily perform.  Counts 1 through 3 of the Amended Complaint set out each of the elements of a breach of contract claim under Indiana law, to wit, the existence of a contract, breach, and damages.  *See Morris v. Crain*, 71 N.E.3d 871, 880 n.5 (Ind. Ct. App. 2017) (setting forth elements of breach of contract claim).   The NCAA argues that Plaintiffs' contract claims nonetheless are merely tort claims in disguise because the relief they seek, to wit, payments covering tuition and the costs of therapy, counseling, and medication due to emotional distress, are not contract remedies.

Plaintiffs' recovery on their contract claims will, of course, "be defined by the law of contract," *Schuman v. Kobets*, 716 N.E.2d 355, 357 (Ind. 1999), but the core of these claims concerns breaches of contract terms and Plaintiffs' alleged failure to receive the benefit of their bargain—a safe environment in exchange for their athletic performance. We hold that Indiana courts would characterize Counts 1 through 3 of the Amended Complaint, which allege that the NCAA unsatisfactorily performed its contractual obligations to protect their health and safety as student-athletes, as breach of contract claims for statute of limitations purposes.

## 2.  Application of the Discovery Rule

Indiana's discovery rule provides that "a cause of action for either tort or written contracts begins to run when a party knows, or in the exercise of ordinary diligence could

discover, that the contract has been breached or that an injury had been sustained as a result of the tortious acts of another." *Strauser v. Westfield Ins. Co.*, 827 N.E.2d 1181, 1185 (Ind. Ct. App. 2005) (citation omitted). "'It is not necessary that the extent of the damage be known or even ascertainable, but only that some ascertainable damage has occurred.'" *Wright v. Draeger, Inc.*, No. 1:22-cv-02144-KMB-JMS, 2023 WL 6958704, at *10 (S.D. Ind. Oct. 20, 2023) (quoting *C & E Corp. v. Ramco Indus., Inc.*, 717 N.E.2d 642, 644 (Ind. Ct. App. 1999)).

Here, Plaintiffs concede that Does 4–6 and 8–14 were aware of their abuse by the Coaches at the time it occurred. They contend, however, that Does 4–6 and 8–14 could not in the exercise of reasonable diligence have known of the NCAA's involvement in their injury until March 11, 2022, when the San Francisco Chronicle published a story entitled "Intolerable sexualized environment: Ex-USF baseball players sue coaches, school, NCAA," when they first learned that other student-athletes had previously complained to USF and USF's NCAA Faculty Athletic Representative about the Coaches' conduct, that the NCAA (or at least USF's NCAA Faculty Athletic Representative) knew about the Coaches' abuse, and that, by ignoring the known risk of such abuse, the NCAA had enabled and perpetuated it.

However, the purpose of Indiana's discovery rule is not to suspend the running of the statute of limitations "until a plaintiff discovers every defendant who might be legally liable for [their] injury." *Rieth-Riley Const. Co., Inc. v. Gibson*, 923 N.E.2d 472, 476 (Ind. Ct. App. 2010). Rather, its purpose "is to limit the injustice that would arise by requiring a plaintiff to bring [their] claim within the limitation period during which, even

with due diligence, [they] could not be aware a cause of action exists." *Id.* Thus, under Indiana law, the discovery rule does not apply "where the indeterminate fact is not the existence of an injury, but rather the identity of a tortfeasor." *Id.* at 476–77.

Plaintiffs admit that Does 4–6 and 8–14 knew that the Coaches' alleged behavior toward them was abusive and that they had experienced it as abusive as it was occurring. Their tort and contract claims against the NCAA are all predicated on the NCAA's alleged breach of its duty (contractual or otherwise) to provide appropriate rules and regulations to protect student-athletes' health and safety. Assuming the NCAA had such a duty, Plaintiffs do not argue that anything about the NCAA's presence and role as the regulatory body for college athletics among its member institutions or its failure to have in place centralized regulations and reporting requirements regarding coach-on-athlete abuse was unknown to Does 4–6 and 8–14 at the time they were subjected to the Coaches misconduct and harassment. The only facts that were unknown to Plaintiffs at the time the abuse occurred were the broad-based nature of the Coaches' misconduct and that similar complaints regarding such behavior had previously been made to USF's athletic director and to USF's NCAA Faculty Athletic Representative, but none of that information was essential to their legal claims against the NCAA. Because Plaintiffs' tort and contract claims are all predicated on the NCAA's failure to have adequate protections in place to shield them from the Coaches' abuse, which abuse was both overt and known and thus "ascertainable" at the time it occurred, we hold that Indiana's statutes of limitations began to run on those claims on the dates when Does Does 4–6 and 8–14 were first subjected to the abuse.

Plaintiffs contend that it would be "incongruous" for us to find the discovery rule inapplicable to the tort and contract claims alleged by Does 4–6 and 8–14 against the NCAA here when in their parallel litigation in the District Court for the Northern District of California, Judge Beeler applied the discovery rule to allow their claims for related institutional indifference against USF to proceed under California and federal law. *See Doe I v. Univ. of San Francisco*, 685 F. Supp. 3d 882 (N.D. Cal. 2023). Contrary to Plaintiffs' assertion, Judge Beeler did not apply the discovery rule to the tort and breach of contract claims brought against USF by Does 4–6 and 8–14, having determined, as we do here, that those tort claims "rested on known, overt abuse," which abuse "also [was] the predicate for the contract claims." Dkt. 149 at 5. The only claims to which Judge Beeler applied the discovery rule were the Title IX discrimination claims brought by Does 4–6 and 8–14 against USF and the California Education Code claims. In applying the discovery rule to those claims, Judge Beeler explained that "[w]hat distinguishes the discrimination claims … is the coverup that was the cause of the … injury," 685 F. Supp. 3d at 901, not the abuse itself. In other words, the injury underlying the California litigation was USF's deliberate indifference to the Coaches' misconduct, of which Plaintiffs had alleged that they were unaware, whereas the injury in the tort and contract claims brought against USF was tied to the known abuse.[8] Clearly, our conclusion that

---

[8] In applying the discovery rule to Plaintiffs' Title IX claims against USF, Judge Beeler relied heavily on the Sixth Circuit's opinion in *Snyder-Hill v. Ohio State University*, 48 F.4th 686 (6th Cir. 2022), which Plaintiffs cite here in support of their arguments seeking application of the discovery rule to their tort and contract claims. However, *Snyder-Hill* was limited to Title IX claims, meaning, as previously noted, the injury there, *un*like here, was the defendant's deliberate indifference, of which the plaintiffs plausibly alleged they had no knowledge at the time the

the discovery rule does not apply to the tort and contract claims alleged by Does 4–6 and 8–14 against the NCAA does not conflict with Judge Beeler's rulings in the parallel litigation.

### 3. Equitable Estoppel

Plaintiffs next contend that, despite other findings by the Court, the doctrine of equitable estoppel operates to toll the statute of limitations on the claims alleged by Does 4–6 and 8–14.  The doctrine of equitable estoppel "provides that if a party's actions prevent another party from obtaining the requisite knowledge to pursue a claim, then 'equity will toll the statute of limitations until the equitable grounds cease to operate as a reason for delay.'" *Kenworth of Indianapolis, Inc. v. Seventy-Seven Ltd.*, 134 N.E.3d 370, 383 (Ind. 2019) (quoting *Perryman v. Motorist Mus. Ins. Co.*, 846 N.E.2d 683, 690 (Ind. Ct. App. 2006)).  While equitable estoppel is often connected with claims of fraudulent concealment, it is a distinct doctrine that "also applies to other conduct that lulls a party into inaction."  *Id.* (citation and quotation marks omitted).

Under Indiana law, to establish equitable estoppel, "a party's conduct 'must be of a sufficient affirmative character to prevent inquiry *or* to elude investigation *or* to mislead and hinder.'"  *Id.* (quoting *Paramo v. Edwards*, 563 N.E.2d 595, 599 (Ind. 1990)) (emphasis added by *Kenworth*).  Equitable estoppel "may arise from silence or acquiescence as well as from positive conduct," but "silence will not form the basis of an

---

abuse occurred.  *Id.* at 704.  Additionally, unlike Does 4–14, the *Snyder-Hill* plaintiffs alleged that they did not recognize their abuser's conduct as abuse at the time it occurred.  *Id.* at 706.  Thus, *Snyder-Hill* is distinguishable from the facts at bar.

estoppel unless the silent party has a duty to speak." *Town of New Chi. v. City of Lake Station ex rel. Lake Station Sanitary Dist.*, 939 N.E.2d 638, 653 (Ind. Ct. App. 2010) (citing *City of New Albany v. Cotner*, 919 N.E.2d 125, 133–34 (Ind. Ct. App. 2009), *reh'g denied, trans. denied*).

Plaintiffs maintain that the statute of limitations on the tort and contract claims alleged by Does 4–6 and 8–14 should be deemed tolled under the doctrine of equitable estoppel because the NCAA was aware of student-athletes' risk of sexual exploitation at the hands of the coaches yet failed to inform student-athletes of that risk, despite having a duty to do so, and deliberately chose "not to prohibit sexualized misconduct by NCAA coaches" even after other sports organizations began adopting policies to prevent similar misconduct.  Am. Compl. ¶ 93.  Even assuming these allegations to be true, equitable estoppel tolls the limitations period only where the defendant's "fraud or other misconduct has prevented a party from commencing his action or induced him to delay the bringing of his action beyond the time allowed by law." *Davis v. Shelter Ins. Co.*, 957 N.E.2d 995, 998 (Ind. Ct. App. 2011) (quotation marks and citation omitted).  Plaintiffs have failed to identify the way in which the NCAA's failure to inform student-athletes of the risk of sexual exploitation by coaches and/or to address previous instances of sexualized misconduct directed at other student-athletes prevented Does 4–6 and 8–14 from bringing their tort and contract claims against the NCAA or otherwise induced them to delay filing suit once they themselves were subjected to sexualized abuse and harassment by the Coaches.  As Judge Beeler recognized in rejecting a similar argument raised by Plaintiffs in the parallel California litigation involving USF, the information

allegedly concealed by the NCAA did not involve "critical facts that prevented the plaintiffs from learning the facts underlying their claims"; rather, "the plaintiffs knew about the conduct and left the team because of it." *Doe 1*, 2023 WL 105096, at *13.

These facts distinguish our case from those presented in *Langston v. Mid-America Intercollegiate Athletics Association*, 448 F. Supp. 3d 938 (N.D. Ill. 2020), where plaintiffs, all former NCAA football players, alleged that the NCAA concealed information from them regarding the risk of latent, concussion-related degenerative brain injuries. In *Langston*, although plaintiffs were aware they had suffered concussions while playing NCAA football, they alleged that the NCAA concealed facts regarding the risk that suffering concussive and sub-concussive hits in football could later result in the development of CTE and other degenerative brain injuries. In contrast, Does 4–6 and 8–14, "unlike the plaintiffs in *Langston*, … were aware of the facts" relevant to bringing their lawsuit. *Doe 1*, 2023 WL 105096, at *15. Thus, Plaintiffs have not plausibly alleged that any information the NCAA concealed from them either prevented them from filing their claims or induced them to forbear from filing a lawsuit until after the statute of limitations had run.

Plaintiffs also allege that USF's NCAA Faculty Athletic Representative affirmatively "led Plaintiffs to believe that there was no basis and thus need for a claim given that the Coaches' conduct was 'normal' and did not constitute sexual abuse." Am. Compl. ¶ 515. Even assuming such allegations of gaslighting are sufficient to avoid the statute of limitations, Plaintiffs target the USF's NCAA Faculty Athletic Representative— who was not alleged to have been hired, employed, or controlled by the NCAA—only on

the basis that he engaged in such behavior.  There is no allegation or argument that anyone from the NCAA engaged in similar affirmative conduct aimed at normalizing the alleged abuse and harassment suffered by Does 4–14 so as to induce them to delay filing a lawsuit until after the limitations period had run.

For these reasons, we hold that the allegations upon which Plaintiffs rely and the reasonable inferences that could be drawn from those allegations do not give rise to equitable grounds sufficient to toll the statute of limitations.

### 4. Time-Barred Claims

Having found that the tort and contract claims alleged by Does 4–6 and 8–14 accrued at the time the sexualized abuse and harassment allegedly occurred and that Plaintiffs have failed to adequately allege any grounds to toll the applicable limitations periods, the following claims are ruled untimely and will be dismissed: (1) all tort claims brought by Does 4–6 and 8–14; (2) the contract claims brought by Does 9 and 11.

### C.    Negligence Claims (Does 1–3)

Plaintiffs have brought the following negligence-based claims against the NCAA based on its failure to protect Does 1–3 from the sexualized misconduct alleged to have been inflicted by the Coaches: (1) gross negligence; (2) negligence; (3) breach of fiduciary duty; (4) negligent failure to warn, train, or educate;[9] and (5) negligent infliction of emotional distress.

---

[9] Plaintiffs contend that the NCAA waived any argument in support of dismissal of their claim that the NCAA negligently failed to warn, train, or educate *student-athletes* on the risk of sexual abuse or harassment by coaches by addressing that claim only as to the NCAA's alleged failure to train NCAA *coaches* not to engage in such conduct.  In its opening brief, however, the NCAA

To recover damages based on negligence under Indiana law, a plaintiff must establish: "(1) a duty owed by the defendant to the plaintiff; (2) breach of that duty; and (3) injury to the plaintiff resulting from the defendant's breach." *Wiley v. ESG Sec. Inc.*, 187 N.E.3d 267, 272 (Ind. Ct. App. 2022), *trans. denied* (citation omitted). "A duty of reasonable care is 'not, of course, owed to the world at large,' but arises out of a relationship between the parties." *Williams v. Cingular Wireless*, 809 N.E.2d 473, 476 (Ind. Ct. App. 2004) (quoting *Webb v. Jarvis*, 575 N.E.2d 992, 997 (Ind. 1991)). Likewise, there is no "duty … to control the conduct of a third person as to prevent him from causing physical harm to another" without a special relationship between the defendant and the third person or the defendant and the plaintiff. *Buchanan ex rel. Buchanan v. Vowell*, 926 N.E.2d 515, 522 (Ind. Ct. App. 2010) (quoting Restatement (Second) of Torts § 315 (1965)). "In the absence of any duty, no negligence or liability can be based upon the alleged breach." *Tolbert v. Redbones, Inc.*, --- N.E.3d ---, 2024 WL 3050183, at *3 (Ind. June 19, 2024) (citing *Wiley*, 187 N.E.3d at 272). Duty, therefore, "is an indispensable element of a negligence claim." *Pennington v. Mem. Hosp. of South Bend, Inc.*, 223 N.E.3d 1086, 1096 (Ind. 2024). Whether a duty exists is a question of law that courts decide. *Id.*

Here, the NCAA seeks dismissal of each of the negligence-based claims alleged against it by Does 1–3, arguing that, while timely filed, these claims must be dismissed

---

argued that all Plaintiffs' negligence claims were subject to dismissal for failure to adequately plead the element of duty and both sides had the opportunity to fully brief that issue. Accordingly, we hold that there was no waiver.

due to Plaintiffs' failure to adequately plead that the NCAA had a legally-recognized duty to take measures to protect student-athletes from sexually-motivated abuse and harassment at the hands of their coaches.  Plaintiffs rejoin that they have adequately pled four grounds for finding that the NCAA had a duty to student-athletes: (1) voluntary assumption; (2) fiduciary relationship; (3) special relationship; and (4) the common law. We address each of these grounds in turn below.

### 1.  Voluntary Assumption

Under Indiana law, "[a] duty of care may … arise where one party assumes such a duty, either gratuitously or voluntarily.  The assumption of such a duty creates a special relationship between the parties and a corresponding duty to act in the manner of a reasonably prudent person." *Delta Tau Delta v. Johnson*, 712 N.E.2d 968, 975 (Ind. 1999) (citation omitted).  This assumption under the law "requires affirmative, deliberate conduct such that it is 'apparent that the actor … specifically [undertook] to perform the task that he is charged with having performed negligently, for without the actual assumption of the undertaking there can be no correlative legal duty to perform the undertaking carefully.'" *Yost v. Wabash College*, 3 N.E.3d 509, 517 (Ind. 2014) (quoting *Lather v. Berg*, 519 N.E.2d 755, 766 (Ind. Ct. App. 1988)).  "Although the existence and extent of an assumed duty is generally a question of fact for the jury, it may be resolved as a matter of law if the designated evidence is insufficient to establish an injury." *Spierer v. Rossman*, 798 F.3d 502, 511 (7th Cir. 2015) (affirming dismissal for failure to state a claim for negligence under the theory that the defendants assumed a duty of care) (citation omitted).

Here, Plaintiffs maintain that the NCAA constitution and bylaws specifically promise that "athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well-being of student athletes," which promise appears on the NCAA website and was orally reiterated by the NCAA's former president, Mark Emmert, in remarks made when he represented in testimony before the United States Senate that the NCAA has "a clear, moral obligation to make sure that we do everything we can to support and protect student-athletes." Am. Compl. ¶¶ 1, 67, 75. Plaintiffs stress that the NCAA directly oversees and controls the conduct of coaches at NCAA member institutions by, for example, proscribing sports wagering, tobacco use, and marketing to sports agents; that the NCAA has the power to discipline coaches for violations of NCAA rules; and that the NCAA has, in fact, on a number of occasions, issued sanctions against coaches following investigations into NCAA rules violations. Plaintiffs contend that these facts plausibly establish that the NCAA was in a position to keep student-athletes safe and had expressly promised to do so, and are sufficient to show that the NCAA voluntarily assumed a special duty of care to protect the health and safety of NCAA student-athletes.

The NCAA responds that such general statements of support for enhancing and protecting student-athletes' wellbeing as are contained in its policies and allegedly reiterated by a former official before Congress are far too broad and aspirational to adequately support a finding that the NCAA assumed a specific duty to protect Plaintiffs from sexualized misconduct or abuse by their coaches. Moreover, the NCAA maintains that Plaintiffs have not adequately alleged that the NCAA has the type of day-to-day

oversight and control over the conduct of NCAA coaches with respect to student-athlete welfare conditions and issues as would be required to establish that it had assumed such a duty under Indiana law.

We agree with the NCAA that Plaintiffs' allegations do not plausibly allege that the NCAA assumed a duty to protect student-athletes from sexual harassment and abuse by their coaches.  As noted above, under Indiana law, the concept of assumed duty "requires a focus upon the specific services undertaken."  *Yost*, 3 N.E.3d at 521.  Here, Plaintiffs rely on claims that the NCAA has publicly espoused and included in its constitution and bylaws aspirational goals and statements of generic intent to promote student-athlete health and safety in its athletic programs, has recognized that improper sexual relationships between coaches and student-athletes are a "serious problem," and, to that end, has published educational resources for its member institutions regarding sexual abuse prevention and has issued statements and resolutions reminding its member institutions of their responsibility to ensure student-athlete health and safety, specifically in the context of combating sexual abuse.  *See*, *e.g.*, Am. Compl. ¶¶ 95, 97, 99, 102.  The Amended Complaint specifically acknowledges, however, that the NCAA itself has not accepted day-to-day responsibility for protecting student-athletes on college and university campuses, only that the NCAA "foists responsibility for ensuring college student-athlete environments are safe and health solely on the [member] institutions themselves …."  Am. Compl. ¶ 100.

These kinds of generalized, sweeping assertions allegedly made by the NCAA regarding student-athlete welfare and its efforts to educate its member institutions on

sexual abuse prevention are not sufficient as a matter of law to plausibly claim that the NCAA undertook any specific affirmative tasks amounting to a voluntary undertaking extending to actual oversight and control over the behavior of individual coaches and their daily interactions with student-athletes to protect their health and safety, which is the duty Plaintiffs assert that the NCAA assumed here.  Although Plaintiffs allege that the NCAA promulgates and enforces standards regarding the employment of coaches, including compensation and permissible number of coaches, and certain aspects of coaches' conduct with respect to, *inter alia*, recruiting, sports wagering, and tobacco use, and that the NCAA has the authority to discipline and sanction coaches for violations of NCAA bylaws, Plaintiffs allege no facts plausibly suggesting that the NCAA assumed responsibility and control over the day-to-day management and supervision of college coaches' daily interactions and relationships with student-athletes, which is the cause of the harm alleged here.  In fact, a close reading of the Amended Complaint discloses that Plaintiffs have affirmatively alleged the exact opposite.

Under similar circumstances, Indiana courts have consistently found no assumption of duty on behalf of national associations to ensure the safety of individual members of their local institutions where the national associations have undertaken analogous or even broader services than Plaintiffs have alleged were undertaken here by the NCAA.  *See*, *e.g.*, *Lanni v. Nat'l Coll. Ath. Ass'n*, 42 N.E.3d 542, 553 (Ind. Ct. App. 2015) (holding that evidence that the NCAA assumed a broad duty to ensure student-athlete welfare did not "demonstrate that it undertook or assumed a duty to actually oversee or directly supervise the actions of the member institutions and the NCAA's

student athletes"); *Smith v. Delta Tau Delta, Inc.*, 9 N.E.3d 154 (Ind. 2014) (holding that a national fraternity's provision of information to the local fraternity to discourage hazing and alcohol abuse and disciplining chapters and member for violations did not establish the assumption of a duty to ensure the safety of the local fraternity's members from injury or death related to hazing or alcohol abuse); *Yost*, 3 N.E.3d at 521 (holding that evidence that a national fraternity "engaged in educational outreach programs to enhance proper behavior and to discourage hazing" and had the power to suspend the charters of local chapters and to discipline individual members was insufficient as a matter of law to prove the specific undertaking "extend[ed] to actual oversight and control over the behavior of individual student members of the local fraternity" such that the national fraternity had undertaken a specific duty to protect students from hazing).  Although we acknowledge, as Plaintiffs argue, that these cases were all decided on summary judgment and thus applied a different legal standard than is applied at the motion to dismiss stage, they are nonetheless relevant here as we assess whether, assuming all facts in the Amended Complaint are true, Plaintiffs have plausibly alleged that the NCAA assumed a duty to protect student-athletes from sexual abuse and harassment by their coaches.  For the reasons detailed above, we find that they have not.

Plaintiffs' only cited cases to the contrary are all readily distinguishable.  In *Greiber v. National Collegiate Athletic Association*, No. 600400/17, 2021 WL 8442463 (N.Y. Sup. Ct. Nov. 29, 2021), for example, the trial court, applying New York law, denied summary judgment on a negligence claim brought against the NCAA by a women's lacrosse player, finding that because the NCAA "exercised significant control

over the rules of play and equipment for women's lacrosse, and imposed conditions of membership on its member institutions which included requirements regarding head injury protocols," the NCAA "was charged with carrying out these functions with reasonable care," and that genuine issues of material fact regarding the NCAA's discharging of that duty remained in light of an NCAA rule that prohibited lacrosse players from wearing helmets. *Id.* at *5. Unlike *Greiber*, where the NCAA was shown to have direct control over the head injury protocol alleged to have resulted in the plaintiffs' harm, Plaintiffs here have not alleged a similarly specific undertaking by the NCAA in the area of sexual abuse and harassment of student-athletes by coaches. A review of applicable precedent strengthens our finding that Plaintiffs' have failed to plausibly allege that the NCAA assumed a duty to protect them from such misconduct.

### 2.  Fiduciary Relationship

We turn next to address Plaintiffs' claim that the NCAA owed them a fiduciary duty to protect their health and safety. Under Indiana law, "[a] confidential or fiduciary relationship exists when confidence is reposed by one party in another with resulting superiority and influence exercised by the other." *Butler v. Symmergy Clinic, PC*, 158 N.E.3d 407, 414 (Ind. Ct. App. 2020) (quoting *Kalwitz v. Estate of Kalwitz*, 822 N.E.2d 274, 281 (Ind. Ct. App. 2005), *trans. denied*). The types of relationships typically recognized as fiduciary relationships "require an unusually high degree of care," *Aldrich*, 565 F. Supp. 3d at 1108, such as "attorney and client, guardian and ward, principal and agent, pastor and parishioner, husband and wife, and … parent and child." *Leever v. Leever*, 919 N.E.2d 118, 123 (Ind. Ct. App. 2009). Whether a fiduciary duty exists is

ordinarily a question of fact in Indiana. *Kapoor v. Dybwad*, 49 N.E.3d 108, 129 (Ind. Ct. App. 2015) (quoting *Paulson v. Centier Bank*, 704 N.E.2d 482, 490 (Ind. Ct. App. 1998)).

Plaintiffs allege that fiduciary duty owed them arose from the "special relationship of trust and confidence" between the NCAA and student-athletes. Am. Compl. ¶ 586. According to Plaintiffs, the NCAA's fiduciary duty was created when the NCAA "actively promoted itself as providing a safe environment for its student-athletes and intended that student-athletes rely on this promise, including in its governing documents, on its website, and with its president's own words." Pls.' Resp. at 33 (citing Am. Compl. ¶¶ 67, 75, 77). Plaintiffs contend that, because the NCAA is in the best position to protect against the risk of harm, student-athletes depend on it to do so, and the NCAA is therefore "duty bound to act for the benefit of its student-athletes to protect them from sexually abusive and exploitative coaches." *Id.*

These facts as alleged are insufficient to plausibly frame a special relationship of confidence between the NCAA and each of the student-athletes participating in intercollegiate athletics as required to impose a fiduciary duty. While we accept as true that "there is certainly trust between [student-athletes] and the NCAA, … trust is not enough." *Aldrich*, 565 F. Supp. 3d at 1109 (citation and quotation marks omitted). Plaintiffs have failed to allege any facts that would plausibly suggest the existence of the type of "close, confidential relationship" between the NCAA and each of its student-athletes as is required to adequately plead fiduciary duty under Indiana law. *Id.*

Moreover, Plaintiffs have cited no cases in which a similar relationship gave rise to a fiduciary duty, nor have we identified any. To the contrary, the courts that have

addressed this issue have uniformly held that the relationship between the NCAA and student-athletes is not fiduciary in nature.  *See id.* (holding that the plaintiffs' allegation that the NCAA "actively promoted itself as providing a safe and nurturing environment for its student-athletes" was insufficient to plead a fiduciary relationship between the NCAA and student-athletes); *Flood v. Nat'l Collegiate Ath. Ass'n*, No. 1:15-CV-890, 2015 WL 5785801, at *11 (M.D. Pa. Aug. 26, 2015), *report and recommendation adopted*, 2015 WL 5783373 (M.D. Pa. Sep. 30, 2015) ("[C]ourts have flatly rejected the notion that the relationship between student-athletes, colleges, and the NCAA somehow rises to the level of a fiduciary relationship."); *Schmitz v. Nat'l Collegiate Ath. Ass'n*, 67 N.E.3d 852, 870 (Ohio Ct. App. 2016) ("To suggest that the NCAA maintains a 'special relationship' akin to a fiduciary relationship with all of its 400,000 students who participate in intercollegiate athletics is simply not supported under the law.").  Our view accords with this overwhelmingly consistent precedent.

### 3.  Special Relationship/Common Law Duty

In the absence of allegations sufficient to plausibly allege that the NCAA has assumed a duty to protect student-athletes from sexual misconduct and abuse by coaches or that it has a fiduciary duty to do so, we consider next whether Plaintiffs have alleged sufficient facts to support the existence of a common law duty, based in part on some form of special relationship between the parties.  For the reasons detailed below, we conclude they have not.

As set forth above, "[a] duty of reasonable care is 'not, of course, owed to the world at large,' but arises out of a relationship between the parties."  *Williams*, 809

N.E.2d at 476 (quoting *Webb*, 575 N.E.2d at 997).  Likewise, there is no "duty … to control the conduct of a third person as to prevent him from causing physical harm to another," without a special relationship between the defendant and the third person or the defendant and the plaintiff.  *See Neal v. IAB Fin. Bank*, 68 N.E.3d 1114, 1118 (Ind. Ct. App. 2017) (quoting Restatement (Second) of Torts § 315).  Where, as here, no other test has been declared or articulated on which to determine whether a common law duty in negligence exists, Indiana courts employ the three-part balancing test set forth in *Webb v. Jarvis*, 575 N.E.2d 992 (Ind. 1991), requiring consideration of: (1) the relationship between the parties; (2) the reasonable foreseeability of the harm; and (3) public policy concerns.  *Id.* at 995, *disapproved of in other circumstances by Goodwin v. Yeakle's Sports Bar & Grille, Inc.*, 62 N.E.3d 384, 391 (Ind. 2016)).[10]  Whether a duty exists is generally a question of law for the Court, although "factual questions may be interwoven with the determination of the existence of a relation, rendering the existence of a duty a mixed question of law and fact, ultimately to be resolved by the fact-finder."  *Harper v. Guarantee Auto Stores*, 533 N.E.2d 1258, 1261–62 (Ind. Ct. App. 1989), *trans. denied*.

### i.    Relationship

---

[10] Plaintiffs argue that the *Webb* balancing test has "been called into question as being overly restrictive" and is now "only used 'where the element of duty has not already been declared or otherwise articulated.'"  Pls.' Resp. at 32 (quoting *Goodwin*, 62 N.E.3d at 387).  Unlike in *Goodwin*, however, where the law was clear as to what duty was owed by a business owner to an invitee and thus did not require application of the *Webb* factors, here, the law as to the existence of a common law duty is unsettled.  Accordingly, application of the *Webb* balancing test in the case at bar is appropriate to determine whether a duty exists.  *See, e.g.*, *Springbrook Village Batesville LLC v. Se. Ind. Title Co.*, 195 N.E.3d 398, 403 (Ind. Ct. App. 2022) (applying *Webb* factors post-*Goodwin* where "the element of duty [was] not already … declared or otherwise articulated").

The relationship between the NCAA and the "[n]early half a million" student-athletes that comprise the 19,886 teams competing in NCAA sports annually at more than 1,000 schools throughout the country is simply too attenuated to create a legally cognizable duty to protect each of those students against third-party sexual misconduct. Am. Compl. ¶¶ 29, 67.  Although the Amended Complaint alleges that the NCAA has expressed the broad goal of conducting its intercollegiate athletics program in a manner that promotes student-athlete welfare, Plaintiffs do not allege any facts that plausibly suggest that the NCAA exerts the kind of day-to-day oversight and control over (and thus responsibility for) student-athletes as required to give rise to such a common law duty of care under Indiana law.  *See*, *e.g.*, *Yost*, 3 N.E.3d at 521.

In *Yost v. Wabash College*, the Indiana Supreme Court addressed whether the national fraternity defendant owed a common law duty to protect its local chapter's individual members from hazing at the hands of other members.  Despite evidence that the national fraternity defendant had the power to discipline or expel individual members, the Indiana Supreme Court found that the fraternity "lacked any direct oversight and control of the individual fraternity members" when the national fraternity "did not have any employees present in the fraternity house, and the day-to-day management was the responsibility of the local fraternity."  *Id.*  The Indiana Supreme Court ruled that, despite the national fraternity's "aspirational objectives" and efforts to "promote their fulfillment," the relationship between the national fraternity and its members was too "remote and tenuous" to impose a common law duty of care on the national fraternity in favor of its individual members.  *Id.*  Because Plaintiffs' allegations regarding the

NCAA's relationship with student-athletes are indistinguishable from the evidence reviewed and found insufficient to establish a common law duty in *Yost*, even accepting Plaintiffs' allegations here as true, they are insufficient to plausibly allege the type of relationship that gives rise to a legally cognizable and enforceable common law duty of care under Indiana law. *See Lanni*, 42 N.E.3d at 549 (finding *Yost* determinative in holding that the NCAA owed the plaintiff student-athlete no common law duty of care to protect her from injury sustained as a spectator at a NCAA-sanctioned competition).

Nor have Plaintiffs adequately alleged that the NCAA's relationship with college coaches created a legally cognizable duty to control the coaches' conduct and prevent them from sexually harassing and abusing student-athletes. Plaintiffs assert that the NCAA is in the best position to protect against the risk of harm to student-athletes from their coaches because the NCAA regulates the conduct of college coaches "in a myriad of ways," Pls.' Resp. at 29, including through the NCAA Faculty Athletic Representative, who, Plaintiffs allege, plays a "leading role" in the matters of student-athlete welfare at each member institution. Plaintiffs nevertheless concede that the Faculty Athletic Representative is an employee of the member institution, not the NCAA; thus, the NCAA lacks a basis of control over the Faculty Athletic Representative's conduct. Moreover, while Plaintiffs allege that the NCAA has the authority to promulgate rules and enforce standards that impact the conduct of coaches as well as the power to discipline and sanction coaches for violations of those rules and standards, Plaintiffs have not alleged (nor could they) that the NCAA has direct oversight or control over coaches' conduct or the ability to monitor coaches on a day-to-day basis as would place the NCAA "in a

unique position to protect against the risk of harm" alleged by Plaintiffs. *Brown v. USA Taekwondo*, 40 Cal. App. 5th 1077, 1102 (Cal. Ct. App. 2019) (quoting *Barenborg v. Sigma Alpha Epsilon Fraternity*, 33 Cal. App. 5th 70, 80 (Cal. Ct. App. 2019)). Absent facts plausibly suggesting that the NCAA has such control over coaches, Plaintiffs' allegations regarding the NCAA's post-conduct disciplinary powers are insufficient to constitute a special relationship between the NCAA and college coaches sufficient to impose a common law duty of care.

### ii.     Reasonable Foreseeability

For the purpose of determining whether an act is foreseeable in the context of duty, Indiana courts assess "whether there is some probability or likelihood of harm that is serious enough to induce a reasonable person to take precautions to avoid it." *Goodwin*, 62 N.E.3d at 392 (quotation marks and citation omitted). This analysis looks to "the broad type of plaintiff and harm involved, without regard to the facts of the actual occurrence." *Id.* at 393 (quoting *Goldsberry v. Grubbs*, 672 N.E.2d 475, 479 (Ind. Ct. App. 1996)). "Because almost any outcome is possible and can be foreseen, the mere fact that a particular outcome is 'sufficiently likely' is not enough to give rise to a duty." *Id.* at 392. Thus, in determining foreseeability in the context of duty, Indiana courts also consider whether the defendant "knew or had reason to know of any present and specific circumstances that would cause a reasonable person to recognize the probability or likelihood of imminent harm." *Cavanaugh's Sports Bar & Eatery, Ltd. v. Porterfield*, 140 N.E.3d 837, 840 (Ind. 2020).

In the case at bar, the "broad type of plaintiff" at issue is a student-athlete, and the "broad type of harm" is sexual abuse or harassment by a coach.  As a general matter, it is, of course, foreseeable that a coach could take advantage of the power imbalance in their relationship with a student-athlete to engage in sexual harassment or abuse, but the fact that such an outcome can be said to be "sufficiently likely" is not enough to give rise to a duty under Indiana law.  Plaintiffs have fallen short in alleging facts plausibly suggesting that the NCAA knew or should have known of any "present and specific circumstances" rendering the probability of harm more imminent.  It is not alleged, for example, that the NCAA was privy to any knowledge of prior incidents of sexual misconduct or harassment at USF.  Although according to Plaintiffs, reports of sexual misconduct were made to USF's NCAA Faculty Athletic Representative, Plaintiffs concede that that official is the employee of USF, not the NCAA.  Further, there is no allegation that the USF's NCAA Faculty Athletic Representative ever informed the NCAA of such reports of abuse.  Plaintiffs' remaining allegation regarding the defendant's knowledge is that the NCAA was aware of a high student-athlete transfer rate from USF.  Assuming the NCAA had such knowledge, we view it as not plausible that the NCAA would or should have known, based on USF's high transfer rate, that the Coaches were engaging in sexual harassment and abuse.  Accordingly, the case before us is distinguishable from the circumstances in *Doe v. Delta Tau Delta Beta Alpha Chapter*, No. 1:16-cv-01480-JMS-DML, 2018 WL 3375016 (S.D. Ind. July 11, 2018), in which the Court ruled that a local fraternity had a duty to protect the plaintiff from sexual assault while she was a guest at the fraternity house when it was also alleged that the defendant *did* have knowledge of a

prior sexual assault allegation against the member accused of causing the same harm to the plaintiff.  *Id.* at *4–*5.

For these reasons, we hold that the facts alleged in the Amended Complaint are insufficient as a matter of law to plausibly suggest that the probability or likelihood of sexually harassing conduct by the USF Coaches was reasonably foreseeable to the NCAA under the standard set forth under Indiana law.

### iii.    Public Policy

Plaintiffs next argue that, as the only entity with control over and responsibility for intercollegiate sports, the NCAA is in the best position to protect student-athletes from sexual harassment and abuse by coaches, such that the interests of sound public policy favor imposing such a duty on the NCAA.  However, as detailed above, Plaintiffs have not alleged that the NCAA exerts everyday oversight and control over the coaches or student-athletes or that any NCAA employee is present during the day-to-day interactions between coaches and student-athletes.  Under similar circumstances, the Supreme Court of Indiana found in *Yost* that public policy concerns did "*not* favor recognition of a specific duty of care" toward individual student members of the national organization, reasoning that the national organization "should be encouraged, not disincentivized, to undertake programs to promote safe and positive behavior …."  3 N.E.3d at 521 (emphasis added).

For the foregoing reasons, we find that Plaintiffs' allegations in their Amended Complaint are insufficient under *Webb* to plausibly allege that the NCAA has a common

law duty to protect student-athletes from sexual harassment and abuse by their coaches under Indiana law.

### D.  Vicarious Liability (Does 1–3)

Plaintiffs also seek to hold the NCAA vicariously liable for USF's and the Coaches' intentional infliction of emotional distress through the doctrine of respondeat superior.  The NCAA has moved to dismiss this claim on grounds that Plaintiffs have failed to adequately allege that it has an agency relationship with USF and the Coaches as required to impose vicarious liability.

Under Indiana law, "for the liability of an agent to be imputed to a principal, an agency relationship must exist, and an essential element of that relationship is that the agent must 'act on the principal's behalf.'"  *Smith v. Delta Tau Delta, Inc.*, 9 N.E.3d 154, 164 (Ind. 2014) (quoting Restatement (Third) of Agency § 1.01 (2006)).  The agent must also "consent to act on the principal's behalf, as well as be subject to the principal's control."  *Id.* (citations omitted).  Whether an agency relationship exists is generally a question of fact but may be decided on a motion to dismiss if the complaint fails to adequately "allege facts demonstrating a principal/agent relationship."  *United States v. Rathbone Ret. Cmty., Inc.*, No. 3:08-cv-174-RLY-WGH, 2009 WL 2147878, at *2 (S.D. Ind. July 15, 2009).

Plaintiffs' allegations here are not sufficient to plausibly allege the existence of an agency relationship between the NCAA and either its member institutions or college coaches.  Although the Amended Complaint alleges that the NCAA promulgates and enforces standards regarding the employment of coaches and certain aspects of their

conduct with respect to, *inter alia*, recruiting, sports wagering, and tobacco use; that the NCAA has exercised authority to discipline and sanction coaches for violations of NCAA bylaws; and that the NCAA promulgates joint aspirational goals with its member institutions to promote student-athletes' health and safety, the Amended Complaint is devoid of facts that plausibly suggest that the "everyday management and supervision of activities and conduct" by member institutions and coaches related to student-athlete welfare is "undertaken at the direction and control" of the NCAA as is necessary for an agency relationship to exist. *Smith*, 9 N.E.3d at 164; *accord Yost*, 3 N.E.3d at 522.

According to Plaintiffs, they have sufficiently alleged the element of control having alleged that the NCAA promulgates "extensive policies governing the day-to-day conduct of college coaches" and that "[c]oaches may even be subject to disciplinary or corrective action for violating NCAA Bylaws." Pls.' Resp. at 35. The NCAA rejoins noting that the Indiana Supreme Court has held that post-conduct or "remedial" disciplinary powers such as those the NCAA is alleged to hold are an insufficient basis on which to establish an agency relationship. *See Smith*, 9 N.E.3d at 164 (holding that a national fraternity's "right to discipline, suspend or revoke its affiliation with the local fraternity or its members" did not render a local fraternity or its members agents of the national fraternity); *Yost*, 3 N.E.3d at 522 (national fraternity's "right to suspend or revoke its affiliation with the local fraternity or its members" did not create an agency relationship).

Additionally, Plaintiffs have alleged no facts suggesting that the NCAA has any control over the "day-to-day conduct of college coaches" with regard to their individual

interactions with student-athletes. *See Cox v. Gov't Employees Ins. Co.*, 126 F.2d 254, 257 (6th Cir. 1942) ("A voluntary association is not liable for the tort of a member when perpetrated beyond the scope of its control over his acts."). Thus, taking Plaintiffs' allegations as true, as we are required to do at this stage of the litigation, they are not sufficient to plausibly allege an agency relationship as they do not plausibly suggest that the "actual management and control" over the coaches with regard to student-athlete health and safety "is a responsibility consensually exercised by" each member institution "as the agent and at the direction of and on behalf of" the NCAA. *Yost*, 3 N.E.3d at 522.

### E.    Contract Claims (Does 1–8, 10, 12–14)

The NCAA also argues that Plaintiffs' breach of express and implied contract claims must be dismissed because they have failed to adequately allege the existence of a valid contract under either theory. The NCAA moves to dismiss Plaintiffs' third-party beneficiary contract claim as well on grounds that they have not properly alleged their third-party beneficiary status. Plaintiffs contend that they have plausibly alleged the existence of three express or implied contracts, to wit, the National Letter of Intent ("NLI"), the Student-Athlete Statement (the "SA Statement"), and the Division I Manual's Constitution and Bylaws (the "Manual"),[11] which is incorporated by reference in the NLI

---

[11] The NLI and the SA Statement are both attached to Plaintiffs' Amended Complaint and, although not attached, the Manual is both referenced in the Amended Complaint and essential to Plaintiff's claims; thus, these documents may be considered in evaluating the NCAA's motion to dismiss under Rule 12(b)(6) without converting the motion to one for summary judgment. *See Geinosky v. City of Chi.*, 675 F.3d 743 (7th Cir. 2012) ("A motion under Rule 12(b)(6) can be based only on the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice.").

and the SA Statement.  Alternatively, Plaintiffs argue that they have plausibly alleged that they are third-party beneficiaries of the Manual, which is a valid contract between the NCAA and each of its member institutions that includes a promise to protect the safety and well-being of student-athletes.  We address these arguments in turn below.

### 1. Express Contract

Plaintiffs allege that by failing to protect them from the Coaches' abuse and harassment, the NCAA breached Plaintiffs' signed NLIs and SA Statements as well as the Manual, as incorporated into those two documents.  The NCAA responds that neither the NLIs nor the SA Statements contains an expression of mutual assent between the student-athlete and the NCAA to enter into a contractual relationship and thus do not qualify as contracts between the NCAA and the student-athletes.  For the following reasons, the Court agrees.

Under Indiana law, "[t]he basic requirements for a contract are offer, acceptance, consideration, and a meeting of the minds between the contracting parties on all essential elements or terms of the transaction." *Perrill v. Perrill*, 126 N.E.3d 834, 840 (Ind. Ct. App. 2019) (quoting *Jernas v. Gumz*, 53 N.E.3d 434, 445 (Ind. Ct. App. 2016), *trans. denied*).  "An offer is defined as 'the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.'" *Zimmerman v. McColley*, 826 N.E.2d 71, 77 (Ind. Ct. App. 2005) (quoting Restatement (Second) of Contracts § 24 (1981)).  "Whether a contract exists is a question of law." *Buskirk v. Buskirk*, 86 N.E.3d 217, 223 (Ind. Ct. App. 2017)

(citing *Conwell v. Gray Loon Outdoor Mktg. Grp., Inc.*, 906 N.E.2d 805, 813 (Ind. 2009)).

The NLIs are documents signed by the matriculating NCAA student-athlete and the NCAA member-institution, which bind the matriculating student-athlete and the school.  Specifically, the student agrees to attend the member institution full-time for one academic year, participate in an NCAA sport, and abide by the NCAA's rules on eligibility and recruiting.  The institution, in turn, provides a "written offer of athletics financial aid" for the academic year.  Exh. A to Am. Compl.  Although the NLI states that it is "administered by the NCAA" and references certain NCAA rules contained in the Manual related to eligibility requirements, the NLI is silent regarding any NCAA bylaws addressing student health or safety and does not include any promises or obligations on behalf of the NCAA with regard to student-athlete health and safety.  *See id.*

The SA Statement, which is signed only by the matriculating student-athlete (or if the student is a minor, also by their parent or legal guardian), states that its purpose is "[t]o assist in certifying eligibility."  Exh. B to Am. Compl.  The form requires NCAA student-athletes to provide their schools certain information relevant to their eligibility and to acknowledge that they have read the NCAA rules regarding eligibility, recruitment, financial aid, amateur status, sports-wagering activities, drug testing, and penalties for providing false information.  As with the NLI, while the SA Statement references the eligibility provisions of the Manual and informs student-athletes that they are "responsible for knowing and understanding the application of all NCAA Division I regulations related to your eligibility," the SA Statement contains no reference to any

45

NCAA rules addressing student health or safety nor does it specify any affirmative commitments on behalf of the NCAA, including to protect or promote the health and safety of student-athletes. *See id.*

In sum, neither the NLI, the SA Statement, nor the incorporated provisions of the Manual regarding eligibility demonstrates any manifestation of a willingness on the part of the NCAA, never mind a commitment, to enter into a bargain regarding student-athlete health and safety that could be interpreted to give rise to an offer to enter a contract pursuant to which each student-athlete agrees to provide their athletic services in NCAA intercollegiate competition in exchange for the NCAA promising to protect their wellbeing. Furthermore, these documents are devoid of any reasonably certain and definite contract terms addressing student-athlete health and safety sufficient to form such a contract. Having failed to plausibly plead the existence of an express contract, Plaintiffs' breach of express contract claim must be dismissed.

## 2. Implied Contract

We turn next to address Plaintiffs' breach of implied contract claim. Plaintiffs allege that, even if no express contracts are found to exist between Plaintiffs and the NCAA, the same "facts and circumstances" referenced above establish an implied contract "wherein student-athletes, in return for participation under the NCAA's governance, agreed to be bound by the NCAA's rules and expected the NCAA to provide appropriate rules and regulations to protect their health and safety to the extent possible." Am. Compl. ¶ 544. The NCAA seeks dismissal of Plaintiffs' breach of implied contract claim on the same grounds their breach of express contract claim fails.

Implied contracts are "not created or evidenced by the explicit agreement of the parties," but are instead "inferred by the law, as a matter of reason and justice from [the parties'] acts or conduct, [with] the circumstances surrounding the transaction making it a reasonable, or even a necessary, assumption that a contract existed between them by tacit understanding." *Wayt v. Town of Crothersville*, 866 F. Supp. 2d 1008, 1018–19 (S.D. Ind. 2012) (quotation marks and citation omitted). To withstand a motion to dismiss under Indiana law, "a claim of breach of implied contract requires facts concerning the promises allegedly made by the parties to the contract, how those promises were communicated and how the exchange of obligations created an implied contract." *Robinson v. Leonard-Dent*, No. 3:12-cv-417-PPS, 2013 WL 5701067, at *13 n.5 (N.D. Ind. Oct. 18, 2013); *see also Bissessur v. Ind. Univ. Bd. of Trustees*, 581 F.3d 599, 603 (7th Cir. 2009) (holding that, to state a claim for breach of implied contract under Indiana law, a plaintiff must allege more than that "he had a contract with the defendant, gave the defendant consideration, and the defendant breached the contract").

Here, Plaintiffs have alleged no acts or conduct on the part of the NCAA that could be construed as a communication of a promise to them to undertake a contractual obligation. As discussed above, neither the NLI nor the SA Statement contains any promises to student-athletes that would plausibly suggest the existence of an implied contract between the NCAA and student-athletes of the nature alleged by Plaintiffs. The only other "fact" or "circumstance" alleged by Plaintiffs that might arguably support the existence of an implied contract with the NCAA to protect student-athlete health and safety is the Manual, specifically, the recitation of the text of Articles 1 and 2 of the

47

NCAA's constitution.  However, "[t]he mere existence of the NCAA's constitution and bylaws is insufficient to constitute the NCAA's communication of a promise to Plaintiffs."  *Rose v. Nat'l Coll. Ath. Ass'n*, 346 F. Supp. 3d 1212, 1228 (N.D. Ill. 2018). Without facts "indicating that the NCAA … directed the statements in those documents to communicate a promise" to them, Plaintiffs have failed to plausibly allege the existence of an implied contract.  *Id.*  Accordingly, Plaintiffs' breach of implied contract claim must be dismissed.

### 3.  Third Party Beneficiary

Alternatively, Plaintiffs claim that they are third party beneficiaries of a contract between the NCAA and its institutional members that they allege the NCAA breached. Specifically, Plaintiffs allege that "[a]s an express condition of its membership into the NCAA, each institution must abide by its respective NCAA Division Manual, which expressly encompasses the NCAA Constitution, Operating Bylaws, and Administrative Bylaws," rendering the Manual "a contract between the NCAA and its member institutions, such as USF."  Am. Compl. ¶ 549.  The Amended Complaint cites portions of the Manual that describe standards for athletic programs, protecting student-athlete health and safety, and fostering a positive environment between students and coaches.  As to these portions, Plaintiffs highlight the following:

In the Manual, the NCAA promises to do the following for student-athletes:

a.  "initiate, stimulate and improve intercollegiate athletics programs;"

b.  "uphold the principle of institutional control of, and responsibility for, all intercollegiate sports in conformity with the constitution and bylaws of this association;"

c. "legislate … upon any subject of general concern to the members related to the administration of intercollegiate athletics;"

d. conduct intercollegiate athletics programs "in a manner designed to protect and enhance" student-athletes' physical and educational wellbeing;

e. require each member institution [to] "protect the health of, and provide a safe environment for, each of its participating student-athletes;"

f. require each member institution [to] "establish and maintain an environment that fosters a positive relationship between the student-athlete and coach;"

g. require each member institution [to] "establish and maintain an environment in which a student-athlete's activities are conducted as an integral part of the student-athlete's educational experience;"

h. "assist the institution in its efforts to achieve full compliance with all rules and regulations and … afford the institution, its staff and student-athletes fair procedures in the consideration of an identified or alleged failure in compliance."

Am. Compl. ¶ 551.  Plaintiffs contend that they are third party beneficiaries of these promises in the Manual "because the parties to the contract intended to benefit the student-athletes."  *Id.* ¶ 550.

Under Indiana law, a third party suing for breach of contract must show "(1) [a] clear intent by the actual parties to the contract to benefit the third party; (2) [a] duty imposed on one of the contracting parties in favor of the third party; and (3) [that] performance of the contract terms is necessary to render the third party a direct benefit intended by the parties to the contract."  *Luhnow v. Horn*, 760 N.E.2d 621, 628 (Ind. Ct. App. 2001) (citation omitted) (emphasis removed).  Intent to benefit the third party "is the controlling factor and may be shown by specifically naming the third party or by other evidence."  *Id.*  "The requisite intent 'is not a desire or purpose to confer a particular

49

benefit upon the third party nor a desire to advance his interest or promote his welfare, but an intent that the promising party or parties shall assume a direct obligation to him." *CFA, Inc. v. Conduent State & Local Sols., Inc.*, No. 1:22-cv-01575-TWP-TAB, 2024 WL 1859804, at *4 (S.D. Ind. Apr. 29, 2024) (quoting *Centennial Mortg., Inc. v. Blumenfeld*, 745 N.E.2d 268, 276 (Ind. Ct. App. 2001)).  Thus, "[i]t is not enough that performance of the contract would be of benefit to the third party"; rather, "[t]o be enforceable, it must clearly appear that it was the purpose or a purpose of the contract to impose an obligation on one of the contracting parties in favor of the third party." *Kirtley v. McClelland*, 562 N.E.2d 27, 37 (Ind. Ct. App. 1990).

Even assuming that the Manual constitutes a contract between the NCAA and its member institutions, Plaintiffs' allegations fail to plausibly suggest that the Manual creates an enforceable obligation to student-athletes as third-party beneficiaries under Indiana law.  The Manual contains a variety of rules and bylaws governing the relationship between the NCAA and its member institutions, including those quoted in the Amended Complaint, many of which it is plausible to infer are intended in some way to benefit NCAA student-athletes.  But, as explained above, the fact that a contract may incidentally benefit a third party or even that the contracting parties intended that a third party benefit from their contract is not sufficient to confer third party beneficiary status under Indiana law.  Rather, the contract itself must evince the contracting parties' intent to impose, and for at least one party to assume, a direct obligation in favor of the third party.

The allegations in the Amended Complaint do not plausibly reveal such an intent on the part of the NCAA and its member institutions.  At most, the principles set forth in

the Manual, as quoted in Plaintiffs' Amended Complaint, reflect an aspirational goal to conduct athletic programs in a manner that promotes NCAA student-athletes' health, safety, and overall welfare, but do not plausibly demonstrate an intent to create a direct contractual obligation to do so on the part of the NCAA or its member schools to individual student-athletes.  As Judge Beeler observed in dismissing Plaintiffs' corresponding third-party beneficiary claim against USF in the parallel California litigation, while "[t]he NCAA principles may describe some of the rules of the road" relative to the duty of care applicable in the negligence context, "that does not make a hortatory pronouncement (however important) a contractual obligation that benefits the plaintiffs as third-party beneficiaries."  *Doe I*, 685 F. Supp. 3d at 906; *see also Hairston v. Pac. 10 Conf.*, 101 F.3d 1315, 1320 (9th Cir. 1996) (affirming the district court's holding that NCAA football players were not third-party beneficiaries of a contract among the Pac-10 member institutions that promised, *inter alia*, quality competitive opportunities and increased educational opportunities for student-athletes because such "vague, hortatory pronouncements in the contract" were not "by themselves … sufficient to support the players' claim that the Pac-10 intended to assume a direct contractual obligation to every football player on a Pac-10 team") (cleaned up).[12]

---

[12] We recognize, as Plaintiffs highlight, that other courts have permitted student-athletes' third party beneficiary claims against the NCAA to survive past the motion to dismiss stage.  *See, e.g.*, *Weston v. Big Sky Conference, Inc.*, 466 F. Supp. 3d 896 (N.D. Ill. 2020); *Richardson v. Se. Conf.*, 612 F. Supp. 3d 753 (N.D. Ill. 2020).  However, because the court in those cases either did not analyze the language of the Manual itself (*Weston*) or analyzed contractual obligations expressing "specific commitments" targeted at the health and safety of NCAA football players (*Richardson*), we find that the decisions have limited applicability here.

For these reasons, Plaintiffs' third-party beneficiary claim must be dismissed.

## III.    Conclusion

For the foregoing reasons, the NCAA's Motion to Dismiss [Dkt. 54] is <u>GRANTED</u> without prejudice.  If Plaintiffs seek to amend their complaint in an effort to overcome the deficiencies identified in this order, they must file an amended pleading within forty (40) days from the date of this Order.  If Plaintiffs fail to file a second amended complaint within the forty days allowed, final judgment will be entered, and the case dismissed with prejudice.[13]

IT IS SO ORDERED.

Date:  _____7/2/2024_____          _____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

---

[13] The docket reveals other currently pending motions that we anticipate the parties will review in light of this Order.

Distribution:

Arend J. Abel
COHEN & MALAD LLP
aabel@cohenandmalad.com

Nicholas Blake Alford
FAEGRE DRINKER BIDDLE & REATH LLP (Indianapolis)
Nicholas.Alford@faegredrinker.com

Hailyn Jennifer Chen
Munger, Tolles & Olson LLP
hailyn.chen@mto.com

Melissa Ryan Clark
Fegan Scott LLC
melissa@feganscott.com

Lynn A. Ellenberger
Fegan Scott LLC
lynn@feganscott.com

Elizabeth A. Fegan
FEGAN SCOTT, LLC
beth@feganscott.com

Kathleen Foley
Munger, Tolles & Olson LLP
kathleen.foley@mto.com

Michelle A. Lamy
LIEFF CABRASER HEIMANN & BERNSTEIN LLP
mlamy@lchb.com

Carolyn Hoecker Luedtke
MUNGER, TOLLES & OLSON LLP
carolyn.luedtke@mto.com

Jessica A. Moldovan
Lieff Cabraser Heimann & Bernstein, LLP
jmoldovan@lchb.com

Andrea Roberts Pierson
FAEGRE DRINKER BIDDLE & REATH LLP (Indianapolis)
andrea.pierson@faegredrinker.com

Jonathan David Selbin
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
jselbin@lchb.com

Paige Smith
Fegan Scott LLC
paige@feganscott.com

Ariel Tal Teshuva
Munger, Tolles & Olson LLP
ariel.teshuva@mto.com

Lynn A. Toops
COHEN & MALAD LLP
ltoops@cohenandmalad.com